# Exhibit A:
# Motion for Direct Criminal Contempt
# Filed by Mark D. Shelnutt
# June 2013

IN THE CIRCUIT COURT, FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

IN RE: The Former Marriage of:                    CASE NO.: 2002-4655-DR-FJ

WILLIAM T. OVERCASH,

       Former Husband,

and

LORI A. FOULTZ,

       Former Wife.

_____/

## MOTION FOR DIRECT CRIMINAL CONTEMPT

**COMES NOW**, the Former Wife, LORI A. FOULTZ, by and through her undersigned attorney of record, and files with the Court her Motion for Direct Criminal Contempt in the above style cause, and as ground therefore would state:

      1.     A hearing was held before this Court on February 27, 2013 in which both parties were present and represented by their respective counsels.  Scheduled for hearing that day was a litany of case management issues and motions for contempt for non-payment of support obligations by the Former Husband.  Attached as Exhibit "A" is the Notice for Hearing.

      2.     The Former Husband was testifying before and in the direct presence of the Court as to his ability to pay the Court-order attorney's fees to counsel for the Former Wife.  On direct examination, the following statements were made between Attorney Gordon and the Former Husband:

          Q:     Okay.  What is your position today, as we sit here today, in terms of what you have available in your bank account to pay these fees?

1

A:   I have the amount to pay Lori that $2,500 for the month of
     February which I thought I had paid.

Q:   Twenty-four.

A:   Twenty-four.  And other than that, I am financially broke
     because I issued checks for property taxes.

Q:   How much were those?

A:   $8,000.00.

Q:   Is that for the home that we're talking about, the equitable
     distribution on Ms. Foultz?

A:   The home and the farm.  I think it's around $8,000.00.  I
     know–I can't tell you the exact numbers, but the farm and the
     home had to be paid.

Q:   Okay.  Two separate bills?

A:   Right.

Q:   You've already done that?

A:   Yes.

The complete transcript from the February 27, 2013 hearing is attached as Exhibit

"B."  For the Court's convenience, the above conversation begins on page 82, line 11.

3.      As of the date of filing this motion, the Former Husband has not paid the property

taxes for either property that he attested to paying.  Records from the Marion County Property

Appraisers are attached as Exhibit "C."

4.      This Court should find that the Former Husband's willful misrepresentations to the

Court were an act of perjury and punishable by criminal contempt, pursuant to Florida Rules of

Criminal Procedure 3.840.  The Former Wife would ask that this Court enter its Order to Show

Cause, pursuant to this Rule, to order the Former Husband to appear at a time and place as specified

by this Court, to enter a plea to a charge of direct criminal contempt of either guilty or not guilty,

to hold a hearing on same, and to find that the Former Husband is in willful criminal contempt for

his calculated attempts to hinder and obstruct the administration of justice.

5.      The Wife has retained the Office of Mark D. Shelnutt, P.A. to represent her in this

matter and has agreed to pay a reasonable fee for the services.  Due to the Former Husband's

2

actions, the Wife has been required to retain the undersigned counsel to file this Motion and has incurred attorney's fees and costs.

**WHEREFORE,** the Former Wife would respectfully requests that this Honorable Court enter its Order finding the Former Husband in direct criminal contempt for his statements made before this Court, that a hearing be held on this Court's Order to Show Cause, and that the Former Husband come before the Court and, upon his failing to produce evidence that he is not in direct criminal contempt pursuant to the above statute, that he be incarcerated for a reasonable time for those his actions, awarding reasonable attorney's fees and costs to the Former Wife, and such other and further relief as may be deemed reasonable and necessary under the circumstances.

**DATED** this _____ day of June, 2013.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by Email to Beth M. Gordon, Esquire, thegordonlawfirm@aol.com, Robert E. Taylor, Jr., Esquire, Robert@rtaylorlaw.com, sonja@rtaylorlaw.com, and Janet Behnke, Esquire, Guardian Ad Litem, janet@behnkelaw.net and pam@behnkelaw.net, this _____ day of June, 2013.

*MARK D. SHELNUTT, P.A.*

By_____
Mark D. Shelnutt, Esquire
Florida Bar No.: 304042
Rebecca A. Guthrie, Esquire
Florida Bar No.: 0030028
1404 East Silver Springs Blvd.
Ocala, Florida 34470
Telephone: (352) 629-6203
Facsimile: (352) 401-9485
mshelnutt@shelnuttpa.com
skoener@shenuttpa.com
Attorneys for the Former Wife

3

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

IN RE: The Former Marriage of:

CASE NO.: 2002-4655-DR-FJ

WILLIAM T. OVERCASH,

        Former Husband,

and

LORI A. FOULTZ,

        Former Wife.

_____/

## NOTICE OF HEARING

**YOU ARE HEREBY NOTIFIED** that on February 27, 2013, at 2:00 p.m., or as soon thereafter as counsel can be heard, the undersigned will call upon to be heard the following:

1.     Former Wife's Request for Case Management Conference.

2.     Former Wife's Motion to Hearing on Former Wife's Motion to Impute Income to Former Husband and Motion to Defer Ruling on Former Husband's Motion to Impute Income to the Former Wife.

3.     Former Wife's Motion for Temporary Appellate Attorney Fees and Costs.

4.     Former Wife's Amended Motion for Indirect Civil Contempt.

5.     Former Wife's Motion for Contempt for Failure to Pay Court Ordered Attorney's Fees and Costs.

6.     Former Wife's Motion for Prospective Temporary Attorney's Fees and Costs.

These matters shall be heard before the Honorable Barbara Gurrola, Senior Circuit Court Judge, Marion County Judicial Center, 110 NW 1st Avenue, Ocala, Florida 34475. (Three hours reserved) (Check with security for courtroom)

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

**FAILURE TO APPEAR AT THE HEARING MAY RESULT IN THE COURT ISSUING A WRIT OF BODILY ATTACHMENT FOR YOUR ARREST. IF YOU ARE ARRESTED, YOU MAY BE HELD IN JAIL UP TO 48 HOURS BEFORE A HEARING IS HELD.**

EXHIBIT
A

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator at the Marion County Judicial Center, 110 NW 1st Avenue, Ocala, Florida 34475 or (352) 401-6710 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days. If you are hearing impaired or voice impaired, call 711.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by Email delivery to Beth M. Gordon, Esquire, thegordonlawfirm@aol.com, Robert E. Taylor, Jr., Esquire, Robert@rtaylorlaw.com and sonja@rtaylorlaw.com, and Janet Behnke, Esquire, janet@behnkelaw.net, this ___ day of February, 2013.

MARK D. SHELNUTT, P.A.

By: _____
Mark D. Shelnutt, Esquire
Florida Bar No.: 304042
Rebecca A. Guthrie, Esquire
Florida Bar No.: 0030028
1404 East Silver Springs Blvd.
Ocala, Florida 34470
Telephone: (352) 629-6203
Facsimile: (352) 401-9485
mshelnutt@shelnuttpa.com
skoerner@shelnuttpa.com
Attorneys for the Former Wife

IN THE CIRCUIT COURT OF THE
FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CASE NO.: 2002-4655-DR-FJ

IN RE:  The Former Marriage of:
WILLIAM T. OVERCASH,

ORIGINAL

          Former Husband,

and

LORI A. FOULTZ,

          Former Wife.

_____/

PROCEEDINGS BEFORE THE HONORABLE BARBARA GURROLA

DATE:           February 27, 2013

TIME:           2:19 p.m. - 4:40 p.m.

LOCATION:       110 N.W. First Street
                Ocala, Florida

REPORTER:       Dona Fisher,
                Registered Professional Reporter,
                Florida Professional Reporter,
                by stenographic means.



```
 1    APPEARANCES:
 2          On behalf of the Former Husband:
 3          BETH M. GORDON, ESQUIRE
            The Gordon Law Firm
 4          P.O. Box 734
            Williston, Florida 32696
 5          352-528-0111
            thegordonlawfirm@aol.com
 6
 7          ROBERT E. TAYLOR, JR., ESQ.
            THE R. TAYLOR LAW FIRM, P.A.
 8          10014 North Dale Mabry Highway, Suite 101
            Tampa, Florida 33618
 9          Robert@rtaylorlaw.com
10
11          On behalf of the Former Wife:
12          MARK D. SHELNUTT, ESQUIRE
            REBECCA A. GUTHRIE, ESQUIRE
13          MARK D. SHELNUTT, P.A.
            1404 East Silver Springs Boulevard
14          Ocala, Florida 34470
            352-629-6203
15          nolenutt@aol.com
16
17          ALSO PRESENT:  Lori Foultz
                           Dr. Todd Overcash
18
19
20
21
22
23
24
25
```

1b4ff3ce-0c7e-44ae-ac42-9594a24a99df

```
 1                        I N D E X
 2     TESTIMONY OF LORI FOULTZ:              PAGE
 3     Direct Examination By Mr. Shelnutt........10
 4
       TESTIMONY OF DR. OVERCASH:             PAGE
 5
 6     Direct Examination By Ms. Gordon.........18
       Cross-Examination By Mr. Shelnutt........23
 7     Redirect Examination By Ms. Gordon.......29
 8
 9     TESTIMONY OF DR. OVERCASH:             PAGE
10     Direct Examination By Mr. Shelnutt........65
       Cross-Examination By Mr. Taylor..........68
11
12     TESTIMONY OF LORI FOULTZ:             PAGE
13
       Direct Examination By Mr. Shelnutt........69
14     Cross-Examination By Mr. Taylor..........70
       Redirect Examination By Mr. Shelnutt.....72
15     Recross-Examination By Ms. Gordon........74
       Redirect Examination By Mr. Shelnutt.....75
16
17
       TESTIMONY OF DR. OVERCASH:             PAGE
18
19     Direct Examination By Ms. Gordon.........81
       Cross-Examination By Mr. Shelnutt........84
20     Redirect Examination By Ms. Gordon.......94
21
       Certificate of Oath.....................128
22
23
24
25
```

```
 1              P R O C E E D I N G S
 2        THE COURT:  All right.  So we're here in the
 3   former marriage of Todd Overcash and Lori Foultz,
 4   formerly known as Lori Overcash, Case No.
 5   2002-4655-DR-FJ.
 6        I just want to bring to the attention the first
 7   thing I need to do is back when we had a hearing in
 8   October and I signed an order -- the hearing was in
 9   September -- I signed an order and I continued because
10   it was my understanding -- let me just clarify this so
11   that Mr. Shelnutt and Ms. Gordon and Mr. Taylor know --
12   my understanding that we were going to continue because
13   the former husband hadn't had an opportunity to present
14   whatever evidence it wished to, testimony, regarding
15   that.  And then when we got to the next hearing, I
16   wanted to take it up and let you finish so I could rule
17   on that and Mr. Taylor said that it wasn't noticed for
18   hearing.
19        Well, upon reviewing the order that I had signed,
20   it said it was continued until the next hearing.  So as
21   far as I'm concerned, that's what I want to do first,
22   before we do anything.  Okay.
23        And this was the Former Wife's Amended Motion for
24   Indirect Civil Contempt.  So you all have whatever -- I
25   heard the evidence from Mr. Shelnutt, and you all can
```

1       -- do you understand what I'm saying?

2           MR. SHELNUTT:  Well, I'm -- Ms. Koerner's getting

3       the order.

4           Yes, ma'am, I...

5           THE COURT:  Because as I look at your request for

6       case management, you're waiting for me to rule.  Well,

7       my understanding was that Mr. Taylor and Ms. Gordon

8       didn't feel that they had had an opportunity -- I don't

9       know whether it was the close of the day or exactly

10      what happened -- so I didn't sign it; I was giving them

11      an opportunity to continue it to the next hearing.  But

12      then when we had the next hearing, Mr. Taylor said,

13      Well, we didn't have notice of this and, therefore,

14      that wouldn't be fair.  So but I -- I do desire to

15      finish that so that I can rule on that.

16          MR. SHELNUTT:  Is this the motion, Your Honor, for

17      the child being removed and the passport issue?  Is

18      that what you're talking about?

19          THE COURT:  It was paragraph four of the order.

20      You're the one that had prepared the order, right?

21          MR. SHELNUTT:  Yes, ma'am.

22          THE COURT:  But it was all of these.  They wanted

23      -- they had questions about the child support -- in

24      other words, there was an issue that they said that

25      they paid the child support, and that's paragraph five.

1      So my understanding -- and if I am wrong, I
2  apologize -- but my understanding was that they wanted
3  to present evidence at the next hearing or that I
4  wanted to let them have that opportunity.
5      But now it's -- that opportunity has -- yeah, the
6  issue had to do with the -- one of the things had to do
7  with the father taking the child out of the country or
8  on a vacation.  I can't remember if it was out of the
9  country -- I think the Bahamas --
10     MR. SHELNUTT:  Yes, ma'am.
11     THE COURT:  -- without giving the time frame
12  notice that he was supposed to.
13     MR. SHELNUTT:  That's correct.  In fact, we got
14  halfway through it and they said they didn't have
15  enough time.  That is the first issue, Your Honor, on
16  our request for case management was your reservation of
17  ruling on the Motion for Contempt Enforcement.  That
18  was actually heard on November the 13th, 2012.  Yeah,
19  three months ago.
20     THE COURT:  Well, anyway, obviously, I'm going to
21  give, you know, you an opportunity -- for them an
22  opportunity if they want to present any evidence
23  regarding that.
24     And then, of course, I guess I thought that this
25  all was part and parcel, which is why I didn't grant

1    paragraph five either and -- four, five -- I don't

2    know, for some reason, four, five and then seven.  But

3    anyway, but that shouldn't had been continued,

4    evidently.  But I continued it thinking that you all

5    had testimony that you wished to present regarding

6    that, Mr. Taylor.

7         So does your client wish to testify?

8         MR. SHELNUTT:  Judge, I'm trying to get up to

9    speed.  I'm really, in all honesty, I'm kind of lost.

10        THE COURT:  You're saying that I reserved ruling,

11   that I didn't rule on any of that.  I'm looking at the

12   order.  Remember the order that I continued to the next

13   hearing?

14        MR. SHELNUTT:  Is the order dated the 10th of

15   December of 2012?

16        THE COURT:  No.  October 9th.

17        MR. SHELNUTT:  Okay.

18        THE COURT:  Because as I look at your request for

19   case management -- and if you think you're just waiting

20   for me to rule, I'm waiting to hear -- give the former

21   husband an opportunity to present whatever testimony he

22   wanted to present because we ran out of time.  You can

23   have my copy.

24        MR. SHELNUTT:  Judge, here's what I have.  I have

25   an order -- and yes, ma'am, I did prepare this -- and

1   it's dated the 10th of December 2012, signed by Your

2   Honor.  And it's an order on Motion for Contempt and

3   Enforcement.  The hearing that we had was on November

4   13th, 2012; it was against the former husband for his

5   willful failure to provide notice prior to traveling

6   with the wife.

7        THE COURT:  You mean with the child.

8        MR. SHELNUTT:  With the child, yes, ma'am.

9        And it says, The Court will reserve ruling on the

10  issues of contempt and enforcement.  Neither the former

11  husband nor the former wife is allowed to remove the

12  minor child from the State of Florida and all of the

13  terms and conditions.  Is that the one we're talking

14  about now?

15       THE COURT:  Well, there's that one and the other

16  one, both together.  But, yes, that is what we're

17  talking about.  I don't think they had an opportunity

18  -- I mean, I didn't hear anything, as I recall, from

19  them.  Perhaps...

20       MR. SHELNUTT:  Well, here's my concern.  I -- my

21  understanding is that all of the testimony was

22  presented, and I clearly remember them talking about

23  this particular issue because I cross-examined them.

24  And so my understanding was the testimony was closed on

25  that and you were just reserving making a ruling.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1  THE COURT:  All right.  And that is separate from

2  the next paragraph that I continued.

3  MR. SHELNUTT:  Yes, ma'am.

4  THE COURT:  But that -- the next paragraph, we're

5  ready to go forward on that one, right?

6  MR. SHELNUTT:  Okay.  And which one is that one

7  now?

8  THE COURT:  That's the former husband found to be

9  in willful contempt -- regarding his failure to make

10  the payments of 2,400 in July 2012, still owing 1,700

11  for July 2012, and owes 2,400 for August of 2012.  And

12  then the next paragraph, the proposed order that you

13  wanted me to sign that I X'd out, "The former wife

14  shall request an audit of child support payments made

15  by the former husband and the Court reserves s

16  jurisdiction."

17  My understanding was that they weren't finished

18  testifying and we ran out of time.  If I...

19  MR. SHELNUTT:  Well, Ms. Foultz did an audit.

20  Correct?

21  MS. FOULTZ:  Yes.

22  THE COURT:  Let me have the parties raise their

23  right hands, please.

24  MS. FOULTZ:  Yes.

25  DR. OVERCASH:  I do.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1          THE COURT:  Thank you.

2          MR. SHELNUTT:  Okay.

3                    DIRECT EXAMINATION

4     BY MR. SHELNUTT:

5          Q    Ms. Foultz, did you have an audit done of the

6     child support issue?

7          A    Yes, we did that.

8          Q    And as a result of the audit, what -- do we have a

9     copy of the audit with us?

10         MR. TAYLOR:  Judge, we also don't have a copy of

11         the audit.

12         THE COURT:  They can tell us.

13    BY MR. SHELNUTT:

14         Q    What was the result of the audit?

15         A    He is up to date on the child support.

16         THE COURT:  Okay.

17         Mr. Taylor?

18         MR. TAYLOR:  I have nothing to say in light of the

19    fact that he is up to date on the child support.

20         THE COURT:  I remember that hearing.

21         MR. TAYLOR:  I think that was...

22         THE COURT:  That was one of the first hearings

23    that we had.

24         MR. TAYLOR:  That was one of the concerns that we

25    raised at that hearing and he said he was up to date.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    THE COURT:  All right.  As far as the issue of the

2    father taking the child to -- he was supposed to give a

3    week's notice, I believe, before he took the child.

4    MR. SHELNUTT:  He gave -- reasonable notice, it

5    said.

6    THE COURT:  Reasonable notice.  Twenty-four hours

7    was not reasonable notice.

8    MR. SHELNUTT:  No.  It was less than 24 hours.

9    THE COURT:  Is there any further testimony that

10   your client wants to make with regard to the issue of

11   the former wife's motion for contempt regarding

12   removing the child?

13   MR. SHELNUTT:  And, Judge, before we go on --

14   THE COURT:  Yes.

15   MR. SHELNUTT:  -- there was also, just to refresh

16   your recollection because I know it's been a while, he

17   didn't post a property bond in the amount of $10,000,

18   nor did he sign a waiver of extradition.  So there were

19   actually three different things that were part of that

20   pursuant to the order that was entered by the Court by

21   Judge Swigert, specifically back on the 19th of

22   September, nunc pro tunc, August 9th of 2011.  So there

23   were three things he didn't do.

24   THE COURT:  Okay.

25   MS. GORDON:  If I might be heard?

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

```
 1          MR. SHELNUTT:  Judge, if the person that just came
 2     in is going to be a potential witness, we'd ask that
 3     the rule be invoked.
 4          MS. GORDON:  She's not.
 5          THE COURT:  Isn't this a closed...
 6          MR. SHELNUTT:  No, no.  I'm just saying that if
 7     she's going to be a witness, I would ask the rule be
 8     invoked.
 9          MS. GORDON:  Well, I'm not calling her as a
10     witness.
11          THE COURT:  All right.
12          MR. SHELNUTT:  That's fine.
13          MS. GORDON:  I think we're talking about -- and
14     the Court can correct me if I'm wrong -- is it a
15     September 19th, 2011 order of Judge Swigert's that
16     required particular things be done if either party
17     remove the child -- or if the husband removed the child
18     -- took her on vacation out of the country; is that the
19     date of the order, September 19th?
20          THE COURT:  It is.  I think Mr. Shelnutt just said
21     it is.
22          MR. SHELNUTT:  Yes, ma'am, it is.  It is.
23          MS. GORDON:  Okay.  My recollection is that is one
24     of the orders that is now void, and on September 10th
25     of 2012 we discussed that, and at the time...
```

1      THE COURT:  Okay.  I think it's clear that the

2  Court can continue to make rulings even though there's

3  issues are up on appeal.

4      MS. GORDON:  No, no, no.  That issue is no longer

5  on appeal; that was decided.

6      THE COURT:  Okay.  Well, anyway, go ahead.

7      MS. GORDON:  In fact, that appeal...

8      THE COURT:  Does your client have any -- is there

9  any evidence you wish to present?  Does your client

10  have any...

11      MS. GORDON:  I just would like to make a legal

12  argument, and the legal argument, I would be very clear

13  because I'm not sure I'm making myself clear, that

14  order is of no force and effect in this Court right now

15  because it doesn't exist.  It's void as opposed to

16  voidable for things -- anything after that Motion to

17  Disqualify is then -- any order by Judge Swigert was

18  the void, just like...

19      THE COURT:  So he signed this order after he was

20  disqualified; is that what you're saying?

21      MS. GORDON:  No, no, no.

22      He signed -- he never disqualified himself.  He

23  denied the provocation.

24      THE COURT:  He was still the Judge of record.

25      MS. GORDON:  Yes.  And that's when he signed the

1    order.

2            THE COURT:  Okay.

3            MS. GORDON:  After he -- I'm not sure.  But in any

4    case, the -- maybe seven months later, the Appellate

5    Court came in and granted a petition to -- what is it

6    called -- the petition to get him off the case.

7            MR. SHELNUTT:  It's a writ of prohibition.

8            MS. GORDON:  They granted the writ of prohibition.

9            I'm not conversant in that right now because I

10   didn't think I'd be arguing that.

11           I thought it was pretty much taken for granted

12   that all those orders subsequent to the filing of the

13   motion, and the 30 days went by, it's automatic that

14   the Judge is either taking himself off the case or by

15   operation of law he becomes -- the case must be

16   reassigned.  And that's what the Appellate Court ruled.

17   And by operation of rule, all the orders subsequent to

18   that 30 days...

19           THE COURT:  Did anybody provide a copy of whatever

20   you're saying the Court ruled?  Am I supposed to abide

21   by something that the Appellate Court -- I don't have

22   any copy.

23           MS. GORDON:  Your Honor, with all due respect,

24   Mr. Shelnutt is asking you to enforce a rule...

25           THE COURT:  No, no, no.  Mr. Shelnutt didn't ask

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    me anything.  What I'm saying --

2         MS. GORDON:  Really?

3         THE COURT:  -- I want to finish what I started --

4         MS. GORDON:  Right.

5         THE COURT:  -- at that other hearing.

6         MS. GORDON:  I understand.  But he's moving for

7    the Court to enforce an order which is no longer a

8    valid order.

9         MR. TAYLOR:  Right.

10        THE COURT:  And you say you have some piece of

11   paper from the Appellate Court telling me that that's

12   not a valid order?

13        MS. GORDON:  That is correct.

14        THE COURT:  Really?  Okay.

15   Can I see it please?

16        MS. GORDON:  Do you have that -- I can pull it up

17   on my...

18        MR. SHELNUTT:  Judge...

19        THE COURT:  Well, I mean -- are you saying that

20   anything that Judge Swigert signed between the time you

21   asked to have him recused and...

22        MS. GORDON:  That is correct.

23        MR. SHELNUTT:  And, Judge, I think as an officer

24   of the court she has an obligation to accurately relay

25   what that order says.

1       That writ of prohibition disqualified him as a

2   judge.  We've done the research, there's no statute,

3   there's no case law, there's nothing that says that any

4   order -- nor did the Appellate Court say that those

5   orders were void, voidable...

6       THE COURT:  Okay.  She's saying that the Appellate

7   Court did say that.

8       MS. GORDON:  Yeah.  Because it's an obvious rule.

9       THE COURT:  What?

10      MS. GORDON:  That is the case law.

11      THE COURT:  What do you mean that's an obvious

12  rule?

13      MS. GORDON:  They don't have to say that.  If a

14  judge is recused --

15      THE COURT:  Oh, that's -- okay.

16      MS. GORDON:  -- the law is.  I mean, you could --

17  the Court can take exception with that.  That is...

18      THE COURT:  No.  I don't believe that that is the

19  law.

20      MS. GORDON:  Really?  Okay.

21      MR. SHELNUTT:  Judge, that specifically is not law

22  because if it was, there would be a case out there that

23  says that's what happens, and that opinion didn't say

24  that.  It simply said that Judge Swigert was

25  disqualified, that was it.

1       THE COURT:  Right.

2       MS. GORDON:  Is it -- I'm trying to get the

3  position of counsel.

4       THE COURT:  Well, this is a family law case that

5  has begun in 2002, and it's got 23 volumes.  So,

6  obviously, there are many orders, and if I'm not

7  mistaken, Judge Swigert was the judge -- well, no.

8  There was another...

9       MR. SHELNUTT:  No.  He was the judge on the

10  original divorce case, 11-day trial and all the

11  subsequent, so, yes ma'am.

12       THE COURT:  So all of those orders, as far as this

13  Court is concerned, I don't know of any of his orders

14  that I am obliged to disregard and considered that they

15  are void or voidable or whatever it is you're saying.

16       MS. GORDON:  Really?

17       Okay, that's fine.

18       THE COURT:  All right.

19       So I'm going to ask it one more time, does your

20  client -- do you have any evidence you want to present

21  with regard to the Motion for Indirect Civil Contempt

22  regarding his...

23       MS. GORDON:  Well, yeah, my client would like to

24  testify very briefly, Your Honor.

25       THE COURT:  Okay.  Go ahead.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1        Sir, she's going to ask you some questions, sir.

2                    DIRECT EXAMINATION

3    BY MS. GORDON:

4        Q    Dr. Overcash, do you remember the whole passport

5    issue we're talking about here?

6        A    I do.

7        Q    Do you remember going and physically having to go

8    have both parents sign to get a passport for the child?

9        A    We had -- Lori had to sign the document, then I

10   signed it and sent it in to get a passport.

11       Q    Okay.  When did you tell -- strike that.

12           Did you discuss with Ms. Foultz why you wanted the

13   passport and where you might be going?

14       A    We had discussed it for two years.  We had

15   scheduled for four trials to get a passport and each time

16   she agreed to sign the passport it was canceled.

17           MR. SHELNUTT:  Objection; relevancy.

18           THE COURT:  Sustained.

19           Let's go to the issue of what did he do.

20   BY MS. GORDON:

21       Q    Did you discuss with Ms. Foultz that you were

22   going to go snorkeling with Natasha in the Bahamas?

23       A    I did.

24       Q    Okay.  And when did you discuss that with her

25   relative to when you left?

1      A   When she finally...

2      Q   In terms of days.  If you can...

3      A   It was weeks prior to us going because she had

4   been ordered to sign the appropriate documents for the

5   passport within 30 days of the order.

6          MR. SHELNUTT:  Judge, objection.

7          THE COURT:  Sustained.

8          MR. SHELNUTT:  This has nothing to do with...

9          THE COURT:  Answer the question that she is

10  asking.

11         DR. OVERCASH:  I'm trying to answer the question.

12         THE COURT:  I don't need to go all the way back to

13  what the former wife didn't do; I just want to know

14  what you did do.

15     A   When I asked for the passport, it was stated then

16  where I was going to take her.

17         MR. SHELNUTT:  Objection.

18  BY MS. GORDON:

19     Q   When you left to go to the Bahamas, did you

20  discuss with Ms. Foultz where and when you would be going?

21     A   I told her as soon as I got the passport in we

22  would go to the Bahamas.

23     Q   Okay.  And when did you get the passport in?  Was

24  it a Friday, a Wednesday; do you remember?  It was a year

25  ago.

1          A    I don't remember the exact date.

2               And her passport came in and mine did not --

3          Q    Okay.

4          A    -- and that led to telling her there might be a

5    delay.

6               THE COURT:  By "her" do you mean your child?

7               THE WITNESS:  My daughter's passport came in.

8    There was a problem with my passport, got lost in the

9    mail, getting it back to me for my renewal.

10              THE COURT:  Okay.  The question is:  When you did

11   go, how many day's notice did you give or how much

12   notice did you give the mother before you left for the

13   Bahamas?

14              THE WITNESS:  I told her -- when we turned in the

15   passport two weeks prior to receipt of the passport...

16              THE COURT:  Okay.  How much notice?

17              THE WITNESS:  Two weeks, ma'am, that's what I just

18   said.

19              THE COURT:  She had two weeks notice that you were

20   leaving on Monday or Wednesday or Sunday or when.

21         A    I told her two -- when I -- I'm trying to be as

22   clear as I can.

23   BY MS. GORDON:

24         Q    This is about a year and a half ago?

25         A    Yes.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      Q      September?

2      A      Yes.

3             When she finally signed the thing for me to get

4      the passport, I sent it in to get rapid passport production.

5      And I told her when the passport came in we would be going

6      to the Bahamas.  My passport got delayed because of an error

7      in DC.  Natasha's came in and I told her, Might not be able

8      to go now because I don't know if my passport will get here.

9      And then my passport got here the day I was supposed to

10     leave, and I let her know that it actually did get here and

11     we are proceeding with what I told you about two weeks ago,

12     and we went to the Bahamas.

13             THE COURT:  Anymore questions?

14     BY MS. GORDON:

15     Q      **When you got to the Bahamas, did you also call**

16     **and/or text Ms. Foultz about exactly where you were staying?**

17     A      I did several things.  First of all, contacted

18     Verizon, I had my...

19             MR. SHELNUTT:  Judge, objection.  He's not

20     responding to the question.

21             THE COURT:  Answer the question that she asked

22     you, please, sir.  Listen very closely.  Try not to

23     answer what you want her -- I mean, she's the lawyer,

24     she's going to ask you the question.  Just listen to

25     the question and please try to answer the question that

1      she asks you.

2              THE WITNESS:  I am answering it in detail, ma'am.

3              THE COURT:  No.  I want you to answer the question

4      that she asked.

5              THE WITNESS:  I emailed her, I text her, and in

6      the text I told her where we were staying.  I told her

7      my phone which was activated to be useful in the

8      Bahamas, so she could get ahold of me.

9              However, there was an error in the Bahama's side

10     and then I had to get her the exact phone number to the

11     room that we stayed in.

12     BY MS. GORDON:

13         Q     What efforts did you make to get a travel bond?

14         A     No one issues a travel bond.

15             MR. SHELNUTT:  Objection; not responsive to the

16     question.

17             THE COURT:  Sustained.

18             MS. GORDON:  Let me withdraw the question and ask

19     a different question.

20     BY MS. GORDON:

21         Q     Did you go around town trying to get a travel

22     bond?

23         A     I contacted bond agencies in Ocala, in Orlando,

24     New York, LA, and no one will issue a travel bond.

25

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    Q     And what did you do at that point?

2    A     What I did was I issued a cashier's check for the

3    amount of the travel bond and I put it in your possession.

4    Q     Okay.

5    MS. GORDON:  Your Honor, I can testify to that

6    that I had that the entire time he was out of town and.

7    And I gave it back to him when he -- it was a cashier's

8    check in the amount of $10,000, which I was ready, if

9    should he not come back, to turn over to counsel.

10   MR. SHELNUTT:  Well, Judge, she can't represent

11   Dr. Overcash and be a witness in this case because this

12   is a contested matter.  Ethically, she can't do that.

13   So she's going to have to disqualify herself.

14   MS. GORDON:  I think I can affirm what he just

15   said is true.

16   THE COURT:  You can't.

17   MS. GORDON:  I have nothing further.

18   MR. SHELNUTT:  I have some questions, Your Honor,

19   with the Court's permission.

20   THE COURT:  Yes, sir.

21                    CROSS-EXAMINATION

22   BY MR. SHELNUTT:

23   Q     First of all, Dr. Overcash, you can clearly read

24   and write the English language, right?

25   A     I can.

1      Q    And you can read the order which specifically says

2    you're required to post a property bond in the amount of

3    $10,000, correct?

4      A    I did.

5      Q    And you didn't do that, did you?

6      A    I was...

7      Q    Sir, it's a "yes" or a "no".

8           Did you post a property bond?

9      A    $10,000 cashier's check is a property bond.

10     Q    Sir...

11          MR. TAYLOR:  Excuse me.

12          Judge, I believe he already answered the question.

13          MR. SHELNUTT:  If the answer is no, I agree.  But

14   he didn't answer the question.

15          MR. TAYLOR:  He did answer the question, Judge, by

16   stating he could not get anyone to issue him a bond.

17          THE COURT:  He didn't issue -- okay, so he did

18   not...

19          MR. SHELNUTT:  Okay.

20          THE COURT:  So the answer is no.

21   BY MR. SHELNUTT:

22     Q    So rather than get the order changed or ask the

23   Judge for a change on that, you just went ahead and did what

24   you wanted to do, correct?  You got...

25     A    No, sir.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

```
 1           Q     You got $10,000 and gave it to your lawyer.
 2    That's what you just said, right?
 3                 MS. GORDON:  Your Honor, asked and answered;
 4           that's what he just said.
 5                 MR. SHELNUTT:  That's fine.  Okay.
 6    BY MR. SHELNUTT:
 7           Q     Did you sign a Waiver of Extradition?
 8           A     Could not.
 9           Q     Sir, did you...
10           A     I did not.
11           Q     You see in this paperwork that the Judge orders
12    specifically for you to sign a Waiver of Extradition,
13    correct?
14           A     Yes.
15           Q     And you knew you were supposed to do that.
16           A     I understood it was ordered but it's not a valid
17    order.
18           Q     Okay.  So you made the decision that it wasn't a
19    valid order?
20           A     No, sir, I did not.
21           Q     Dr. Overcash, you said that you have emails saying
22    two weeks before your travel plans you sent that email to
23    Lori, correct?
24           A     Yes.
25           Q     Where's the email?
```

1      A      I didn't know we were having this hearing today.

2      Q      Sir, did you see, right up at the top of Former

3   Wife's Request for Case Management, the first thing listed

4   is Former Husband's Unauthorized Travel Out of the Country

5   With the Minor Child?

6      A      No, sir.

7      Q      Well, okay.  That's what we're here for today.

8             Oh, by the way, I've got an email from you

9   WTOBariatric@AOL.com, Saturday, June the 2nd, at 12:50 a.m.

10  "Plan is for Natasha and I to fly June 2nd at 4:00 p.m."

11            Would you like to see your email?

12            MS. GORDON:  May I see a copy?

13            MR. SHELNUTT:  Sure.

14            May I show it to the witness, Your Honor?

15            THE COURT:  Yes, sir.

16  BY MR. SHELNUTT:

17     Q      You sent that email, didn't you, the day of, at

18  12:50 a.m., in the middle of the night.

19     A      No, sir.

20     Q      You didn't send that email?

21     A      Not at 12:50 a.m.  No, sir.

22     Q      What does it say on it?

23     A      Those are alterable.  I'm not up at 12:50 a.m.

24     Q      So now somebody's altered that email.

25     A      Emails are not admissible in court when altered.

1       And I'll show you where she's altered them before.

2                   MR. SHELNUTT:  Judge -- I would offer...

3                   THE COURT:  Sir, I'm going to tell you now that

4       you may answer questions.  When the question is through

5       and you are through with your answer, you don't respond

6       again.

7                   Those are outbursts that we are not going to put

8       up with.  This Court's not going to put up with that

9       anymore.  Okay?

10                  MR. SHELNUTT:  Judge, I would offer this as the

11      Wife's first exhibit in this Motion for Contempt.

12                  I'm sorry.  Is it admitted?

13                  THE COURT:  Yes.

14                  MR. SHELNUTT:  Okay.

15      BY MR. SHELNUTT:

16          Q    Dr. Overcash, you said that you told her a couple

17      weeks before where you were going.

18                  Do you remember sending her an email on May the

19      8th of 2012 saying that Natasha and I will be traveling this

20      summer.  The plan is to take Natasha to South Africa.

21          A    That was...

22                  MS. GORDON:  May I see that?

23      BY MR. SHELNUTT:

24          Q    Sir, did you do it or not?

25                  MS. GORDON:  Can I see that?

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1              THE WITNESS:  Can I see the email?

2              MR. SHELNUTT:  Sure.  Show it to your counsel

3         first.

4    BY MR. SHELNUTT:

5         Q    You're WTOBariatric@aol.com, are you not?

6         A    I am.

7         Q    Please look at the bottom, May the 8th, where it

8    says you're going to be traveling to South Africa.

9              Is there anything in there about the Bahamas?

10        A    No, sir.

11        Q    Thank you.

12             And you don't have any emails or any kind of

13   correspondence whatsoever that you brought today to the

14   hearing to verify that you let Ms. Foultz have any kind of

15   advanced notice prior to June the 2nd, do you?

16        A    Yes.  I didn't bring it with me but it's in the

17   court records where we testified originally, under my

18   previous attorney, that we wanted the passport so that we

19   could either go to South Africa, Europe or the Bahamas.

20             MR. SHELNUTT:  Judge, once again, would you just

21        ask him...

22             THE COURT:  Please, just answer the question.

23             THE WITNESS:  He asked me if...

24             THE COURT:  A lot of people were late and a lot of

25        people had other things to do at this hearing, so we

1          got an hour late start.

2                MR. SHELNUTT:  That's all I have.

3                THE COURT:  So we don't have time for anymore --

4          anything else?

5                THE WITNESS:  I...

6                THE COURT:  No.  You have two attorneys to ask you

7          questions.

8                MS. GORDON:  Yes.  I would like to ask, very

9          briefly.

10                       REDIRECT EXAMINATION

11         BY MS. GORDON:

12             Q    Doctor, during the year and a half that you were

13         trying to get your passport, you discussed many different

14         places to go with Natasha, correct?

15             A    Yeah.

16             Q    One of them being, perhaps, South Africa?

17             A    Yes.

18             Q    When you finally got to go, it was what month, to

19         the Bahamas?

20                MR. SHELNUTT:  Judge, that's already been asked

21         and answered.  He already covered that.

22                THE COURT:  All right.  Now, look, she's going to

23         ask you questions.  That...

24                MS. GORDON:  I need to ask him about the Waiver of

25         Extradition, Your Honor.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

```
 1              THE COURT:  All right.  Ask him about the Waiver
 2         of Extradition.
 3    BY MS. GORDON:
 4         Q    What about the Waiver of Extradition?  Did you ask
 5    the Bahamian government, some entity there, about doing a
 6    Waiver of Extradition for the Bahamas?
 7         A    I actually did more than that.
 8              MR. SHELNUTT:  Okay, Judge.  Objection, first of
 9         all...
10              THE COURT:  Please, just answer.
11              MS. GORDON:  I'm not done with my question.
12              THE COURT:  Please just answer the question she
13         asks you.
14              THE WITNESS:  The Bahamas, when I...
15              THE COURT:  I said answer the question she asks
16         you.
17    BY MS. GORDON:
18         Q    Let me ask the question again.
19              What did you do, if anything, to comply with the
20    part of the order that required you to do something called a
21    Waiver of Extradition?
22         A    I contacted the Bahamas first.
23         Q    What entity there?
24         A    I contacted their embassy in the Miami area and
25    they told me...
```

1        MR. SHELNUTT:  Objection, Your Honor.  That's

2   hearsay.

3        THE COURT:  Sustained.

4   BY MS. GORDON:

5        Q    Were you able to sign what's called a Waiver of

6   Extradition?

7        A    The only country in the world that has a Waiver of

8   Extradition is the United States.

9        MR. SHELNUTT:  Objection; yes or no.  Your Honor,

10   objection.  He's not answering.

11        THE COURT:  No.  You're not able.

12        Okay.  Listen to the question.  If you can answer

13   it yes or no, please answer it yes or no.

14   BY MS. GORDON:

15        Q    Did they offer you something to sign called a

16   Waiver of Extradition?

17        A    They told me I could not sign a...

18        MR. SHELNUTT:  Objection, Your Honor.  That's

19   hearsay.

20        MR. TAYLOR:  Just...

21        A    No.

22   BY MS. GORDON:

23        Q    Waiver's of Extradition are for people

24   incarcerated, correct?

25        A    Yes.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1          MR. SHELNUTT:  Objection; leading.

2          THE COURT:  Yes.  Sustained.

3          Okay.

4     BY MS. GORDON:

5          Q     Was it possible for you to do a Waiver of

6     Extradition?

7          A     No.

8          MS. GORDON:  Okay.  Nothing further.

9          THE COURT:  All right.

10         Anything else, Mr. Shelnutt?

11         MR. SHELNUTT:  No, ma'am.

12         THE COURT:  Okay.  The Court finds that the former

13    husband, the father, is in contempt of this Court.

14    Failure to follow the order of the Court with regard to

15    traveling to the Bahamas, with regard to getting a

16    property bond, with regard to -- and, again, I don't

17    know if it was possible to get a Waiver of Extradition,

18    but I certainly imagine that there's something else

19    that could have been done.  But looking at -- let me

20    see that.  Reading this email, 1 -- you state that, We

21    will be staying with a friend at the Atlantis and I

22    will notify you of the room number.  Didn't bother to

23    give her a telephone number.  We will be scuba diving

24    while there.

25         And you gave her no notice.  I mean, I don't know.

1   Was the child in your care?  Don't even answer -- don't

2   answer that.

3       Anyway, the Court finds that you are in contempt

4   of Court.  I hesitate giving you a fine because you

5   seem not to be paying or -- you have so many things

6   that you need to do in order to fulfill your

7   obligations as far as the final judgment is concerned.

8       MR. SHELNUTT:  Judge, we would ask for reasonable

9   attorney's fees and costs incurred.

10       THE COURT:  Well, absolutely.

11       But as far as a specific fine -- but I will

12   require that you pay reasonable fees and costs.  I find

13   your -- I don't know what would be -- we've had this.

14       MR. SHELNUTT:  Judge, I can do it one of two ways.

15   I can tell you that I think three hours for this whole

16   thing, counting for the last time and doing all of the

17   hearings and motions and everything, would be

18   reasonable.  However, if they don't agree, I'll be glad

19   to go back and do it down to the tenth of the hour.

20   We've of four or five hearings scheduled for this

21   afternoon and they involve his nonpayment of money.

22       And, Judge, we would also ask an additional

23   penalty is that he be ordered to give Natasha's

24   passport back to the mother.

25       THE COURT:  That's a reasonable request.

1          MR. SHELNUTT:  Thank you.

2          THE COURT:  I am going to order that you provide

3     the child's passport to the mother.

4          MR. SHELNUTT:  And can we do that within a certain

5     period of time because otherwise...

6          THE COURT:  Yes.  Twenty-four hours.

7          So by tomorrow you need to...

8          DR. OVERCASH:  That passport is not present in my

9     home.  Someone's been in my home.

10          THE COURT:  Dr. Overcash, you cannot continue to

11     make these outbursts.  All right.

12          DR. OVERCASH:  I don't have the passport.

13          MR. TAYLOR:  Judge, can I just have a minute with

14     Dr. Overcash?

15          THE COURT:  Yes, sir.

16          MR. TAYLOR:  Thank you.

17          [Pause.]

18          THE COURT:  For the record, I want to say when the

19     last outburst that Dr. Overcash made when the Court

20     instructed him to return the passport of the child, he

21     continues to leave his seat, get up and stare at the

22     former wife with regard to, Somebody's been in my house

23     and it's not there.

24          Now, that is not going to happen again.  You need

25     to remain seated.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      Do you understand that, sir?

2      DR. OVERCASH:  Yes, ma'am.

3      THE COURT:  Thank you.

4      MR. TAYLOR:  Judge, we've come to an understanding

5   and I believe everything will be handled appropriately

6   from here on out.

7      THE COURT:  Thank you, sir.

8      MR. SHELNUTT:  May I have a ruling on the

9   attorney's fees, Your Honor, before we go on to

10  something else?

11     THE COURT:  Yes.

12     MR. SHELNUTT:  Well, and we also, what are we

13  going to do about the passport?

14     MR. TAYLOR:  May I say, Judge, Dr. Overcash will

15  turn the passport over tomorrow to Ms. Gordon who will

16  then forward it on to Mr. Shelnutt.

17     MR. SHELNUTT:  So have we miraculously found the

18  passport that was not there now?

19     THE COURT:  Evidently.

20     MR. TAYLOR:  If he has...

21     MR. SHELNUTT:  Immaculate production.

22     THE COURT:  Mr. Shelnutt, that's not necessary.

23     MR. SHELNUTT:  I'm sorry.

24     MR. TAYLOR:  I am saying, Judge, that the passport

25  will be provided to Ms. Gordon tomorrow who will then

1      forward it on to Mr. Shelnutt.

2          THE COURT:  All right.  I don't know what

3      "forwarded on" means, but I will...

4          MR. TAYLOR: · She will get it to him.

5          THE COURT:  Tomorrow's Thursday.  So Mr. Shelnutt

6      should have it by Friday, right?

7          MR. TAYLOR:  Yes, ma'am. ·

8          THE COURT:  Or perhaps the latest, Monday.  ·

9          MR. TAYLOR:  Yes.

10         MS. GORDON:  I will call him and make

11     arrangements.

12         MR. SHELNUTT:  And as far as the fees?

13         THE COURT:  And as far as the attorney's fees, do

14     you want to have an actual -- do you want him to

15     produce an affidavit --

16         MS. GORDON:  Yeah.

17         THE COURT:  -- or are you willing to, at this

18     point in time -- I believe you said three hours?

19         MR. SHELNUTT:  Yes, ma'am.

20         THE COURT:  $300 an hour.

21         MR. SHELNUTT:  I'm sure that's probably less than

22     I've got in it.  But in light of everything else we've

23     got going on, Judge, it probably pales in comparison.

24         THE COURT:  Is that something you would agree to

25     or do you wish to have him do the actual...

1    MR. TAYLOR:  No.  Because if he has to go back and

2    then do an actual calculation, that will take more

3    time.

4    THE COURT:  Yes, it would.

5    MR. TAYLOR:  So I think we'll go on and stipulate.

6    MR. SHELNUTT:  Can I get that within ten days?

7    THE COURT:  Stipulate to the $900 in attorney's

8    fees within ten days.

9    MS. GORDON:  Your Honor, with all due respect to

10   the Court's ruling, I understand the way the Court's

11   ruled, I don't want our stipulating to the amount of

12   fees to in any way reflect upon our belief that this

13   order is not enforceable at this point by the Court.

14   I'm sorry to upset the Court.  I just wanted...

15   THE COURT:  That's fine but I thought you just

16   stipulated to this.

17   MS. GORDON:  No.

18   MR. TAYLOR:  We just stipulated to the amount.

19   THE COURT:  Just a minute.  You stipulated to the

20   amount of $900.

21   MR. TAYLOR:  Yes.

22   THE COURT:  But, again, if that's going...

23   MR. TAYLOR:  Can we...

24   THE COURT:  Obviously, you have the right to

25   appeal everything you want to appeal.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      MR. TAYLOR:  I understand that, Your Honor.

2      THE COURT:  You have that right, okay.

3      But at this point...

4      MR. TAYLOR:  Can we have 20 days to try to get the

5   $900 to Mr. Shelnutt?

6      THE COURT:  No, I don't think so.

7      I'll tell you what, I'll take that request under

8   advisement and we'll hear the rest of the motions

9   because there are a lot of issues here.  Okay.

10      [Pause.]

11      THE COURT:  So which one are we doing next?

12      MR. SHELNUTT:  Well, I have Ms. Behnke who's

13   waited patiently for us to schedule a trial date and

14   for her to advise the Court of her progress in the

15   case.  If we could just take a few minutes and do that.

16      THE COURT:  Okay.  Let's do that.

17      Yes, ma'am.

18      MS. BEHNKE:  Well, Your Honor, as you know, I've

19   really only been back in this case just under three

20   weeks so there still remains a lot to be done which I

21   think what would be pertinent in the terms of setting

22   the trial date.

23      I have done any initial lengthy interviews with

24   each of the parents and with Natasha, and have reviewed

25   the Court file -- not all the depositions and

1    et cetera, but the actual pleadings that are relevant

2    that have been filed since the original supplemental

3    petition.

4         I have not gone into any of the DCF matters,

5    dependency matters.  I have not talked to the other

6    people.  Both parties have given me names of people

7    they would like me to contact that I have not yet

8    contacted.  So I probably have -- probably around 12

9    hours that I've put into the case so far and will have

10   quite a few more, probably three times that much by the

11   time I'm done.  But I would say I would probably need

12   at least a couple months to get the report finished and

13   in, to finish the interviews, and actually get the

14   report in.  And if the parties want that done for

15   mediation, you know, we need -- I need to know that

16   too.

17        MR. SHELNUTT:  Just a suggestion.

18   I'm sorry, were you done?

19        MS. BEHNKE:  No, that's it.

20        MR. SHELNUTT:  Just kind of going perspective

21   math, Judge:  This is the end of February, if we use

22   March and April to allow Ms. Behnkey to get finished

23   then, do a report, then we'd schedule a mediation as

24   close to the first of May as we could.

25        Does June sound reasonable for trial?

1      MR. TAYLOR:  We do mediation, you're proposing

2   when?

3      [Thereupon, portion of transcript referring to

4   scheduling was redacted out.]

5      THE COURT:  And, Ms. Behnke, will have her report

6   in by May 8th?

7      MS. BEHNKE:  Yes.

8      MR. SHELNUTT:  Ms. Behnke, do you have anything

9   else that you need to -- you're welcome to stay around,

10   but I --no.  I mean the rest of these are enforcement.

11      MS. BEHNKE:  No.  I come to these, Your Honor,

12   because the order says for me to attend all hearings.

13   If no one thinks there's anything that's going to

14   happen subsequent to this that's relevant to the

15   child...

16      MR. SHELNUTT:  Well, there is one thing.  There's

17   a health insurance question that's No. 8 on here, and I

18   have handed the Court an exhibit -- if you'll recall...

19      It's marked, it's not introduced.

20      Dr. Overcash unilaterally canceled Natasha's

21   health insurance several months ago.  He was ordered to

22   carry it.  And testified at his deposition that Natasha

23   was uninsurable.

24      Well, that's not so because we now have health

25   insurance for Natasha through Blue Cross Blue Shield at

1    a very reasonable cost.  And so I want to bring that to

2    the Court's attention.

3         We are not waiving our right to file any kind of

4    appropriate motions for contempt for his unilateral

5    failure to carry that but we're letting the Court know

6    that that's happened.  And, obviously, we need an

7    agreement then on a temporary basis that we're going to

8    reserve jurisdiction over having apportioned that cost.

9         Ms. Foultz now has, as the Court knows, has a

10   hundred percent of the time sharing with Natasha,

11   which, of course, increases her monthly expenses.  And

12   depending what happens in the dependency case, there

13   may need to be an additional or a new child support

14   figure figured cut.

15        So all I'm asking at this time is the Court

16   acknowledge that the child does have health insurance,

17   and we can put in the order that we could reserve

18   jurisdiction, however that's going to be apportioned,

19   and if we can't agree, then upon notice of hearing

20   we'll resolve that issue.

21        MS. GORDON:  Your Honor, if I could?

22        THE COURT:  Want to speak to that.  Go ahead.

23        MS. GORDON:  Yeah.

24        This is through -- it appears to be both Natasha

25   and Ms. Foultz, so the -- there is an amount listed

1   here -- I can't read it without glasses -- but there's

2   a total amount and then there's an amount for the

3   dependent, which I think...

4          THE COURT:  I'm sorry?  There's an amount what?

5          MS. GORDON:  For the dependent, which l assume is

6   Nat- -- it says here "Lori's" and then it says "Lori's

7   Dependent" in handwriting there on the premium

8   breakdown.  And it seems very reasonable.  It's a good

9   thing.  I'm going to discuss it with my client and

10  he'll agree to pay that.  I assume Ms. Foultz got it

11  through work.

12         MR. SHELNUTT:  Did you get it through your work?

13         MS. FOULTZ:  No.  I got it privately through Blue

14  Cross and Blue Shield.

15         MS. GORDON:  Okay.

16         MR. SHELNUTT:  And it was equally available to Dr.

17  Overcash had he wanted to do that.

18         MS. GORDON:  I don't think that is true because he

19  is actually not insurable himself through Blue Cross

20  Blue Shield.  He's had a brain tumor, he's had all

21  sorts of things, so I don't think he could get this.

22  The fact that she got it is a good thing.  Probably --

23  you know, I would encourage him to pay for Natasha

24  through that, that would be fine.

25         MR. SHELNUTT:  Then if we could agree that he'll

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1     start paying for it, that would be great --

2           MS. GORDON:  Okay.

3           MR. SHELNUTT:  -- because he's ordered to do that

4     through the final judgment.

5           THE COURT:  Now the question is...

6           MR. SHELNUTT:  Will he?

7           THE COURT:  Does he pay?  It would need to be paid

8     to the mother.

9           MR. SHELNUTT:  Yes, ma'am.

10          THE COURT:  The money to the mother rather than

11    Dr. Overcash paying it directly.

12          MR. SHELNUTT:  It's $213 a month.

13          MS. GORDON:  No.

14          MR. SHELNUTT:  Sorry.  Is it $209?

15    Okay.  I miss read it.

16          THE COURT:  $209 a month.

17          MS. GORDON:  No.  That's Lori and Natasha.

18          MR. TAYLOR:  That's both parties, Judge.

19          MS. GORDON:  I don't know.  Does Your Honor have a

20    copy of this?

21          THE COURT:  No.

22          MS. GORDON:  May I approach?

23          MR. SHELNUTT:  Judge, if you want, Ms. Foultz is

24    under oath, she can answer the question for me.

25          MS. GORDON:  I'm just seeing this for the first

1          time.

2                  THE COURT:  Okay.

3                  MS. GORDON:  But it seems to me to be

4          self-explanatory; it says Lori is the applicant and

5          then Lori's dependent.  It says premium breakdown.

6          Okay.

7                  THE COURT:  Okay.  So this includes your insurance

8          on you, ma'am?

9                  MS. FOULTZ:  It does.  I actually just got under

10         my husband through his insurance, but then this came up

11         so I had to cancel that and I was able to get this

12         separately myself, Blue Cross, so it does include me,

13         and then Natasha's part is the $42.  There's three

14         different plans there on that copy that I gave you.

15                 THE COURT:  Okay.

16                 MS. FOULTZ:  And I went with the one on the back.

17         The Blue Option is 533, so Natasha's portion is $42.

18                 THE COURT:  But would she have insurance at $42 a

19         month but for your being on that policy.

20                 MS. FOULTZ:  I -- through Blue Cross there had to

21         be a parent doing it.

22                 THE COURT:  Okay.

23                 MS. FOULTZ:  I also applied to Florida Kid Care,

24         which is the state health insurance, and she was

25         approved for that but her premium alone for just her

1b4ff3ce-0c7e-44de-ac42-8594a24a99df

1    was $141 a month.

2          MR. SHELNUTT:  So you went with the $42.

3          MS. FOULTZ:  Right.

4          MR. SHELNUTT:  Okay.

5          THE COURT:  So what are we saying here?  The

6    doctor...

7          MR. SHELNUTT:  The doctor needs to pay the $42 a

8    month on a temporary basis until further order.

9          MS. GORDON:  He agrees to do that.

10          THE COURT:  He agrees to do that?

11          MS. GORDON:  Yes.

12          THE COURT:  All right.  So the doctor is going to

13    pay $42 a month.  He needs to pay that probably

14    separately, you know.

15          MS. GORDON:  Separate check.

16          THE COURT:  Yeah, separate check.

17          MS. GORDON:  Shall be made out to Blue Cross Blue

18    Shield or...

19          THE COURT:  No.  The mother.

20          MR. SHELNUTT:  He pays it directly to the mother?

21          THE COURT:  The check needs to be made to

22    Ms. Foultz.

23          MR. SHELNUTT:  Judge -- I'm sorry, is that -- are

24    we done with that issue, Mr. Taylor?

25          MR. TAYLOR:  Give me a second.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1       MR. SHELNUTT:  All right.

2       THE COURT:  Forty-two dollars, that's what the

3   Court's going to order.

4       And the doctor is shaking his head yes, he agrees

5   to write a check monthly -- when is it due or...

6       MS. FOULTZ:  I just got it this week.  It's going

7   to be effective March 1st but they already took that

8   initial money out.  So I assume the beginning of every

9   month, she said that was coming out.

10      THE COURT:  Okay.  So you need to write a check

11  to...

12      MR. SHELNUTT:  So he would owe for February and

13  March, correct?

14      MS. FOULTZ:  No.  March is when it's going to

15  start.

16      MR. SHELNUTT:  Okay.  Sorry.

17      THE COURT:  So March 1st is Friday, so you need to

18  -- you know, you can send the check -- how is he doing

19  this with the check?  Just sends it to her?

20      MS. GORDON:  I imagine.

21      MR. SHELNUTT:  And not through the child.

22      THE COURT:  Dr. Overcash is pointing to his

23  lawyer.

24      MS. GORDON:  Want to send it to me?

25      DR. OVERCASH:  I could have it delivered to his

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1   office.

2        THE COURT:  You're pointing.  What is it you want

3   to say?

4        MS. GORDON:  Well, he's been bringing the other

5   things to Mr. Shelnutt's office and I think that's been

6   successful, so why doesn't he just do that on the

7   first...

8        THE COURT:  Is that right, Mr. Shelnutt?

9        MR. SHELNUTT:  Well, there's been a couple things

10  he's brought.  Not nearly all but yes, ma'am.

11       THE COURT:  Pay in the form of check though, not

12  pennies.

13       Okay.  Forty-two dollars payable the first of the

14  month.  I think March 1st is Friday, if I'm not

15  mistaken.  So make it out to Ms. Foultz and take it to

16  Mr. Shelnutt's office.

17       MR. SHELNUTT:  Anything else on that one

18  Mr. Taylor?

19       MR. TAYLOR:  No.

20       MR. SHELNUTT:  Okay.

21       Judge, I'd like to take up Issues No. 3 and No. 7

22  together, which is the progress of the actions status

23  of outstanding discovery, and the non-service of

24  Dr. Brady of Kate Wilson.

25       May Ms. Behnke be excused?

1       THE COURT:  Yes.

2       Any questions for Ms. Behnke?

3       MS. GORDON:  No.

4       MR. TAYLOR:  No, Judge.

5       THE COURT:  Yes, you may.

6       Thank you, Ms. Behnke, for being here.  I

7  appreciate -- even though you sat here and waited while

8  the other attorneys had different things to do, I

9  appreciate that very much.

10      MS. BEHNKE:  Thank you, Your Honor.

11      THE COURT:  Thank you.

12      [Ms. Behnke exits the courtroom.]

13      MR. SHELNUTT:  Judge, I have a real interesting

14  issue on discovery connected with this case.  We took

15  Dr. Overcash's deposition several months ago.  Now, you

16  can see he's dressed in scrubs but he says he's not

17  practicing medicine; however, he's seeing indigent

18  patients three days a week, Monday, Wednesday, Friday.

19  He sees ten to 12 people a day but "doesn't get paid".

20      During the deposition I ask about his office,

21  where does he work?  Well, it's a Dr. Brady.  Who keeps

22  your books?  Who keeps your cash disbursement's

23  journal?  Dr. Brady's wife.

24      Dr. Brady's wife, nor Dr. Brady, when we tried to

25  serve them, is anywhere on planet earth, as far as we

1    could tell.  In fact, we got a very cryptic -- now,

2    unless something has changed -- this phantom Dr. Brady

3    is nowhere to be found.  Supposedly there is a

4    sheriff's office investigation which, by the way, they

5    would not confirm.

6        According to his deposition, the cash receipts

7    journal of all of the monies that he receives for this

8    practice that he's not practicing in, even though he's

9    seeing indigent patients, is kept by Dr. Brady.  The

10   phantom Dr. Brady has loaned him over $50,000, he says;

11   although, we have no documents to comport with that.

12       So my concern is we have a discovery cut-off date.

13   He says that he knows where Dr. Brady is.  In fact, he

14   talked to him just last week, the week before the

15   deposition.

16       And Natasha advised Ms. Foultz that Dr. Brady was

17   at the hearing a few weeks ago -- was he at the

18   arraignment?

19       MR. TAYLOR:  Judge, I'm going to object to that.

20   That's hearsay.

21       MR. SHELNUTT:  It's case management.  I mean, I'm

22   just asking.  I understand it's hearsay, I agree with

23   that.  But I'm trying to get some kind of order from

24   the Court that says, You've got to disclose these

25   people if you're working for them, if you know they

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    exist, so that I can complete discovery.

2        The rest of it, Judge, on the discovery issue, I

3    think -- there are lots of documents I'm waiting on.  I

4    still don't have any documents pursuant to my request

5    for production for all of the attorney's fees that Dr.

6    Overcash has said he's paid to Cheney Mason's office,

7    Craig Turner's office, Mr. Taylor's office, Beth

8    Gordon's office, Mr. Levenstein's office, who's

9    supposably representing him in some other kind of

10   action down in South Florida -- he's got at least five

11   lawyers on the payroll.  So I've asked for all those

12   records, and those are supposed to be forthcoming, but

13   I don't have them yet.  So that's the status on that

14   but I really need those records.

15       And so I'm asking the Court to either inquire or

16   require him to produce Dr. Brady's address and

17   Ms. Wilson's -- the alleged wife, because I've tried

18   and I can't find them and they're essential to this

19   case.

20       THE COURT:  Dr. Brady's wife?

21       MR. SHELNUTT:  Dr. Brady and Dr. Brady's wife are

22   actually the people who are supposably loaning him

23   money, keeping his cash receipts and cash disbursements

24   journals.  He's practicing in their office.  They own

25   the equipment that he's using.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

```
 1              It's very curious now that we can't find them.  So

 2     I'm just trying to find out if we help and expedite

 3     this proceeding.

 4              THE COURT:  Well, we need to move this along, so.

 5              Dr. Overcash, how do we -- how would anyone

 6     contact this Dr. Brady?  What's his first name?

 7              MS. GORDON:  I don't know what efforts were made

 8     to contact.  Did you serve him?

 9              MR. SHELNUTT:  Judge, I tried to call the office

10     number, it's disconnected.

11              THE COURT:  What is this man's name?

12              MR. SHELNUTT:  867-1330 is disconnected as of this

13     morning.

14              We tried to serve him.  Rob -- what's his last

15     name -- our process server, went out there, tried to

16     serve him.

17              No, it's Bob Cole, Robert Cole, tried to serve

18     him.

19              THE COURT:  Okay.

20              MR. SHELNUTT:  I'll tell you exactly what he said.

21              MS. GORDON:  He tried to serve the business or

22     Dr. Brady personally?

23              MR. SHELNUTT:  Tried to serve our request for

24     production of a nonparty.

25              MS. GORDON:  I was just wondering if you tried to
```

1    serve the business or the individual.

2         MR. TAYLOR:  If it would please the Court?

3         THE COURT:  Yes, Mr. Taylor.

4         MR. TAYLOR:  I will take it upon myself to try to

5    locate Dr. Brady and...

6         THE COURT:  Well, let me find out.

7         Does he exist?  Is there a Dr. Brady?  What's his

8    first name, Dr. Overcash?

9         DR. OVERCASH:  I always call him by "Dr. Brady".

10   He exists.  He's written a book that's been published.

11        THE COURT:  What's his first name?

12        DR. OVERCASH:  I don't know his first name.  I

13   always call him Dr. Brady.  And his wife is

14   Tanya Brady.

15        MR. SHELNUTT:  Okay.  This is what I got from the

16   management of PC Med who is who he says he's working

17   with or for.

18        "Please be advised that due to being criminally

19   harassed, stalked and receiving death threats through

20   the U.S. mail system, Dr. Brady officially retired as

21   of July 2012.  He receives no compensation through this

22   practice.  This is documented by the Marion County

23   Sheriff's Office who's conducting a criminal

24   investigation in the above criminal activity.

25   Dr. Brady was advised for his and his family's safety,

1   to take certain steps to protect themselves, and they

2   have done so.  His exact location is a secret and as

3   such his whereabouts are unknown to us."

4        We can tell you he believes he is no longer living

5   in the State of Florida.  His cell phone number for

6   more than 15 years that he's had has been disconnected.

7        MS. GORDON:  I don't know anything about that.

8        MR. SHELNUTT:  Well...

9        MS. GORDON:  Why don't you try serving PC Med

10  instead of Brady.

11       THE COURT:  Okay.  I still haven't heard.

12       So you don't -- you work for someone you don't

13  know his first name and he's a doctor and you call him

14  Dr. Brady?

15       DR. OVERCASH:  First of all...

16       THE COURT:  Does he call you Dr. Overcash?

17       DR. OVERCASH:  Yes.

18       THE COURT:  Okay.

19       Did he ask you what your first name was?

20       DR. OVERCASH:  No, ma'am.

21       THE COURT:  You -- okay.  He didn't ask you...

22       DR. OVERCASH:  He's under a death threat, ma'am.

23       THE COURT:  Yet he's -- yet he's seeing patients?

24       DR. OVERCASH:  He's not a -- he's a PhD doctor;

25  he's not an MD doctor.

1            THE COURT:  Really?

2            DR. OVERCASH:  Yes, ma'am.

3            MS. GORDON:  I think he's just the owner of the

4       business.  I don't think he's...

5            DR. OVERCASH:  He's a PhD.

6            THE COURT:  Okay.

7            DR. OVERCASH:  He's a PhD.

8            THE COURT:  Who else works at his office or his

9       medical clinic or whatever?

10           DR. OVERCASH:  His wife.  Mary Lou Potter is a

11      nurse practitioner here who comes in free to help with

12      Medicaid patients who need GYN exams.  And then

13      students from -- what's this college on Easy Street

14      called, that does medical assistant training?  It's

15      right there on Easy Street.  I can't remember the name

16      of the college.

17           THE COURT:  I've heard of Easy Street, never been

18      on.  It.

19           MR. SHELNUTT:  Judge, here's my concern.

20           This is just...

21           THE COURT:  Ludicrous, frankly.  I can't think of

22      anything other than...

23           MS. GORDON:  Well, Your Honor...

24           THE COURT:  This makes no sense.  He goes in and

25      sees patients?  I mean, is this a legal place?  I

1     mean...

2            MR. SHELNUTT:  No...

3            THE COURT:  I'm asking.

4            MR. SHELNUTT:  He sees the patients.

5            THE COURT:  I know.  I'm trying to find out how

6     that could be.

7            What is it you're looking at your phone for, sir?

8     I mean...

9            DR. OVERCASH:  I had a message come in.

10           THE COURT:  Really?  And so you stopped when I was

11    trying to question you to look at your message?

12           MS. GORDON:  Your Honor...

13           THE COURT:  I'm sorry.  I just -- I find so much

14    of this to be unbelievable that -- you're seeing

15    Medicaid patients at that office of a PhD who...

16           DR. OVERCASH:  He owns the practice.

17           THE COURT:  It's not a practice, I don't think.

18           MR. SHELNUTT:  Judge, here's the problem, we're

19    trying to impute an income to him, and that was

20    originally set for today, okay.  I don't have the first

21    document.

22           THE COURT:  Okay.  Well, you also asked for a

23    continuance.

24           MR. SHELNUTT:  Yes, I did.

25           THE COURT:  So do you have any objection to that

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    continuance?

2         MS. GORDON:  No, Your Honor.

3         But perhaps I could be a little more helpful.

4         THE COURT:  Wait a minute.

5         I was looking at Mr. Taylor and he said no and now

6    -- but you have an objection?

7         MS. GORDON:  No, I don't.  I was going to ask --

8    I'm sorry, Robert.

9         MR. TAYLOR:  I was going to say, just for the

10   record, Your Honor, I believe that the Court -- I think

11   I stated this earlier -- that the Court should have

12   ruled on my motion to impute income to the former wife

13   without any additional evidence from the former wife or

14   Mr. Shelnutt.  However, since Court has, you know,

15   reserved on this issue and is allowing him to, I guess,

16   pursue...

17        THE COURT:  Well, you didn't -- you wouldn't let

18   him proceed on that day.

19        MR. TAYLOR:  Well, he hadn't filed a motion on

20   that day.

21        MR. SHELNUTT:  Yes, we did.

22        THE COURT:  But I'm saying, you didn't let him

23   proceed which is why -- you know, and...

24        MR. TAYLOR:  And what I'm saying, Judge, is I have

25   no objection to it being continued.  Okay?  That's all.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      MR. SHELNUTT:  Okay.

2      THE COURT:  All right.

3      MR. SHELNUTT:  And I appreciate that but now

4   here's the next step then.

5      There's a lot of money that he owes and they're

6   saying that he shouldn't have to pay it in attorney's

7   fees and contempt fees because we should impute an

8   income to Ms. Foultz.  Now, here's a man over here

9   that's seeing, according to his own testimony, 30 to 36

10  patients per week.  If we just say each patient -- if

11  he was really doing what he could be doing and

12  according to what we think, if he's seeing them at $50

13  a patient --

14     MR. TAYLOR:  Judge, I'm going to object because

15  he's arguing the motion now.

16     MR. SHELNUTT:  No.  What I'm doing is I'm saying,

17  Judge, please don't let that motion for continuance,

18  because we don't have anything from Dr. Overcash, serve

19  as an impediment to us trying to get our attorney's

20  fees that have already been ordered from a long time

21  ago.

22     THE COURT:  They have.

23     MR. SHELNUTT:  So that's all I've got to say and

24  I'm ready to go forward.

25     MS. GORDON:  Your Honor...

1    THE COURT:  As far as the motion to continue the

2    hearing on the former wife's motion to impute income on

3    the former husband and the motion to defer ruling on

4    the former husband's motion to impute income on the

5    former wife...

6        MR. SHELNUTT:  That's granted?

7        THE COURT:  I am granting that, yes.

8        MR. SHELNUTT:  Can I ask one other question and we

9    can move on?

10       Informally I'll just ask Mr. Taylor.

11       Are you going to try to get me the information on

12   these people that he's allegedly working for?

13       MR. TAYLOR:  I will take it upon myself.

14       THE COURT.  I appreciate that.  Thank you.

15       MS. GORDON:  My only question is, since I haven't

16   seen it, what is -- the subpoena was directed to

17   Dr. Brady himself or PC Med?

18       MR. SHELNUTT:  Directed to Dr. Brady who -- nobody

19   said he worked for PC Med.  He said he worked for

20   Dr. Brady and that's what I did.

21       If you're now saying PC Med, it's not going to do

22   me any good because we still don't know who to serve PC

23   Med.  That's the place of business.

24       MS. GORDON:  Well, a registered agent for them.

25       MR. TAYLOR:  I will...

1    MR. SHELNUTT:  I think Mr. Taylor and I have an

2    understanding that we're going to try to work together

3    to get that information.

4    THE COURT:  Okay.  It's in the file -- someone

5    named Kate Wilson.

6    MR. SHELNUTT:  Oh, Kate Wilson is the horse

7    trainer, that's somebody else.

8    THE COURT:  Okay.

9    MR. SHELNUTT:  There's one other issue, Your

10   Honor, on the case management before we proceed on the

11   other issues.

12   You never entered a ruling, although we got 99

13   percent there, I think, and somenow we went off on a

14   tangent.  If you'll recall, we had a hearing shortly

15   after Christmas where the Court before that had

16   specifically told Dr. Overcash, Do not use the child as

17   a go-between.  Do not send money.  Do not send

18   messages.  All of the above.

19   Christmas Eve or Christmas Day, Ms. Foultz got a

20   check that was court ordered by the Court, delivered to

21   her from Natasha by Dr. Overcash, and he admitted at

22   that hearing that he had done that.  So you reserved

23   ruling on what you were going to do with that.  And so,

24   that's another issue that's outstanding, and so -- and

25   their issue was, Well, Judge, that's not noticed so we

1    really -- it's not fair for us to take that up.

2        So that's where we're at on that issue.

3        THE COURT:  We'll take it up today.

4        MR. SHELNUTT:  So I...

5        MR. TAYLOR:  Your honor, I think at that hearing,

6    simply told Dr. Overcash just not to...

7        THE COURT:  No.  At that point in time I said, No

8    one take -- if I'm not mistaken, no one takes the child

9    anywhere -- either parent takes the child anywhere from

10   -- out of state or out of the country for over the

11   holidays.

12       MR. SHELNUTT:  No.  This was using the child...

13       MS. GORDON:  In addition...

14       MR. SHELNUTT:  This is the child as a go-between.

15       THE COURT:  Right.  He was not to have any -- he

16   was not to do the kind of thing that he did.

17       MS. GORDON:  Right.

18       THE COURT:  And specifically, do not discuss this

19   case, you know, with the child.  So, obviously, that --

20   he admitted he gave the check to the child.

21       MS. GORDON:  Well, Your Honor...

22       THE COURT:  And then he used -- excuse me, go

23   ahead.

24       MS. GORDON:  I recall that --

25       THE COURT:  Yes.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    MS. GORDON:  -- and at the time Dr. Overcash

2    agreed never to do that again and, in fact, it's been

3    several months, he has not done that.

4        I know recent events would prevent him from doing

5    it anyway.  But this was a long time ago, and the Court

6    instructed him not to do it again and he, in fact, has

7    not.

8        MR. SHELNUTT:  Well, Judge, with all due respect,

9    the reason he hasn't done it is because he hasn't paid

10   her.  There hasn't been another payment, period.

11       MS. GORDON:  That's not true.  He's made payments

12   at the office of Mr. Shelnutt.  He's paid many -- he's

13   -- in fact, Mr. Shelnutt just said a few minutes ago

14   that, in fact, he's made several payments, not all but

15   several.

16       MR. SHELNUTT:  He made one payment for $2,500 out

17   of the 5,000 that was originally ordered way back in

18   October.  There's another 2,500 that's owed on that,

19   and another about 20,000-plus ever since then.  So,

20   yeah, he made that one payment.

21       MS. GORDON:  The point is, he didn't do it through

22   Natasha; he was instructed not to and he has not.

23       THE COURT:  Well, at this point in time he doesn't

24   have any contact with the child.

25       MS. GORDON:  That came much later than the

1     payment.

2          THE COURT:  All right.  I find it very

3     disheartening that Dr. Overcash doesn't really listen

4     to the Court, really -- and I appreciate the fact that

5     he evidently doesn't have any respect for this

6     particular Judge, perhaps, but certainly for the Court.

7     And when the Court issues -- when the Court says

8     something, it's time -- it is time to pay attention and

9     to follow the Court's order.

10         I am not going to do anything at this point in

11    time with regard to the fact that you -- really, is

12    blatant, handing the child the check.  I don't know

13    whether you just wanted to make sure that the child

14    knew that you were paying the mother or whatever the

15    reason, but it's going to cease.  Any of that is going

16    to cease.

17         So I am not doing anymore with it than that, okay.

18         MR. SHELNUTT:  Yeah.

19         THE COURT:  I find -- and I find, you know,

20    Mr. Taylor has stated that Dr. Overcash is not going to

21    behave as he has been behaving.  I certainly hope not.

22         Because if indeed, you know, it happens during any

23    other hearings or during a trial, I mean, I would be

24    inclined to, you know -- I don't know, but perhaps have

25    him leave the room, leave the courtroom, because he

1    can't just jump up and make outbursts as he does.  I

2    will not have it anymore.  Okay.

3         MR. SHELNUTT:  Okay.

4         THE COURT:  So you listen to Mr. Taylor, and

5    you've listened to me, sir, so make sure that you --

6    now you have two fine attorneys, let them proceed and

7    do what they need to do.

8         MR. SHELNUTT:  So to have closure on that, if we

9    can enter an order it's simply going to say that the

10   Court at this time either withholds a finding of

11   contempt or finds contempt but is not going to do

12   anything on the assurance it won't happen again or how

13   would you like it worded?

14        THE COURT:  Obviously, he was in contempt.

15        MR. SHELNUTT:  Well, that's what I'm thinking,

16   but...

17        THE COURT:  He was in contempt, but I -- he, as

18   Ms. Gordon said, he promised that he would not do it

19   again and he hasn't done anything like that again, or

20   so I'm told.

21        MR. SHELNUTT:  All right.  So I'll put in the

22   order that he's found in contempt, he's not...

23        THE COURT:  I'm not going to do anything more

24   about it.

25        MR. SHELNUTT:  Judge, the next thing I would --

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      I'm sorry?

2          MS. GORDON:  I'm sorry.

3          I thought the ruling was the Court stated that the

4      Court wasn't doing anything more than that, not that

5      she was finding him in contempt for doing that.

6          MR. SHELNUTT:  There has to be a finding of

7      something.

8          MS. GORDON:  Okay.

9          THE COURT:  Sorry if I didn't explain it more

10     clearly.

11         MR. SHELNUTT:  Judge, the next motion I have is

12     our Amended Motion for Indirect Civil Attempt.  I think

13     this is the third time it's been brought up before the

14     Court since Your Honor's been on it.

15         In 2007 the Court entered a final judgment on the

16     dissolution of marriage, and made Dr. Overcash pay

17     one-half the value of the party's marital home, $2,400

18     a month, enforceable by contempt.

19         He has not paid those payments for either January

20     or February, so we're asking that, once again, that he

21     be found in contempt.

22         So I'll call Dr. Overcash as the first witness if

23     he -- if he says that he's paid it, then I'm going to

24     ask him where the payment is because it hasn't

25     happened.

1          THE COURT:  Okay.

2                     DIRECT EXAMINATION

3   BY MR. SHELNUTT:

4        Q    Sir, could you state your name.

5        A    William Todd Overcash.

6        Q    Dr. Overcash, have you paid the equitable

7   distribution payments for January and February?

8        A    February was paid.

9        Q    Sir, do you have -- okay.  Where's the proof of

10  the payment, Dr. Overcash?

11       A    I walked out to my car and get the receipt while I

12  paid your office and you wrote a receipt for the $2,500 that

13  I paid on the house.

14       Q    Sir, you paid $2,500 on the attorney fees that...

15       A    No, sir.  To the house.

16       Q    Why would you pay $2,500 not $2,400 if the payment

17  was supposed to be $2,400?

18       A    Because I thought she had said previously I was

19  behind a hundred.  But I know I paid you to your office.

20       Q    Sir, did you pay $2,400 for the month of January

21  or the month of February for Ms. Foultz's equitable

22  distribution payments?

23       A    My understanding, the February was due.

24       Q    Yes, sir.  It was due ten days ago.

25       A    I had no way to deliver it.  I didn't know whether

IN RE: Lori Foultz v. Todd Overcash                    February 27, 2013

Page 66

1       to bring it to your office.

2               Q       Sir, did you pay it?

3               A       No.

4               Q       Do you know how to use the U.S. mail?

5               A       I'm not supposed to communicate with her at all.

6               MR. SHELNUTT:  Judge, would you please ask him to

7       answer my questions.  I get so tired of this.

8               THE COURT:  I don't know.  If we're going to have

9       three days of this, sir, it is going to get tired.  I

10      -- just listen closely to the question that is asked of

11      you.

12              A       Yes, I know how to use the U.S. mail.

13      BY MR. SHELNUTT:

14              Q       Okay.  And you've got two fine attorneys

15      representing you.  Did you think about maybe giving the

16      payment to them so they could give it to me?

17              A       To be honest with you no, sir, because I've been

18      very distressed by what has occurred.

19              Q       Now, let me show you the check that you wrote to

20      our office on February the 5th.

21              Who's it made out to?

22              A       It's made out...

23              Q       Who's it made out to?

24              A       To you.

25              Q       Thank you.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

IN RE: Lori Foultz v. Todd Overcash          February 27, 2013

Page 67

```
 1            That's for $2,500?
 2     A    Right.  I made a notation for what it was for.
 3     Q    Lori Foultz.
 4            I'm representing Ms. Foultz.
 5     A    It's for the house.
 6     Q    Does it say that?
 7     A    When it was delivered to you, your staff was told
 8   that.
 9     Q    Sir...
10           MR. SHELNUTT:  May I approach, Your Honor?
11           THE COURT:  Yes.
12           MR. SHELNUTT:  I'd offer this, I guess it would be
13   No. 2 for purposes of this hearing.
14           THE COURT:  No. 2.
15           THE CLERK:  Yes, ma'am.
16   BY MR. SHELNUTT:
17     Q    So you acknowledge you paid $2,500 on this date to
18   my office in the name of Mark Shelnutt, not Lori Foultz,
19   correct?
20     A    I did.
21     Q    Why would you make the check payable to me if it's
22   for Lori Foultz's equitable distribution payment?
23     A    Because I've been told not to communicate with her
24   in any way, so I'm communicating with you.  And I wrote on
25   there for Lori Foultz.
```

1      MR. SHELNUTT:  Judge, I don't have any other

2  questions of Dr. Overcash, Your Honor.

3      A    I'll never write a check to you again then.

4      MR. SHELNUTT:  May I call -- do you have any

5  questions, Mr. Taylor.

6      MR. TAYLOR:  Just give me a second here.

7                  CROSS-EXAMINATION

8  BY MR. TAYLOR:

9      Q    Dr. Overcash, did you advise anyone at

10  Mr. Shelnutt's office that the $2,500 was for the equitable

11  distribution payment?

12     A    I wouldn't go into Shelnutt's office.  I had

13  someone else deliver it and they advised them.

14     MR. SHELNUTT:  Judge...

15     MR. TAYLOR:  Excuse me, Judge.

16     MR. SHELNUTT:  That's hearsay; move to strike.

17     MR. TAYLOR:  No.  I asked him a direct question,

18  Your Honor.

19     MR. SHELNUTT:  He wasn't responsive.

20     THE COURT:  I know you did but he didn't answer

21  it.  Did he advise -- no, he didn't advise anyone.

22     MR. TAYLOR:  All right.  That was the answer.

23     THE COURT:  May I see that check?

24     MR. SHELNUTT:  If there are no more questions,

25  I'll call Ms. Foultz.

1          THE COURT:  Do you have any questions for

2     Dr. Overcash?

3          MR. TAYLOR:  No.

4          MS. GORDON:  No.

5                    DIRECT EXAMINATION

6     BY MR. SHELNUTT:

7          Q     Ms. Foultz, could you state your name, please.

8          A     Lori Foultz.

9          Q     Ms. Foultz, have you received either $2,400 month

10    payment for the month of January or February for 2013 for

11    the equitable distribution payment that has been ordered by

12    Judge Swigert of $2,400 a month?

13         A     No, I haven't.

14         Q     So at this time he owes you $4,800 for the

15    equitable distribution payment?

16         A     Yes.

17         Q     And that's also due with interest at 6 percent; is

18    that correct, that's how the $2,400 payment came to be?

19         A     Right.

20         Q     And have you agreed to pay me a reasonable fee for

21    my services?

22         A     Yes.

23         Q     Has it cost you additional attorney's fees and

24    costs for having to file this motion, set it for hearing,

25    and argue it before Judge Gurrola?

```
1            A     Yes.

2            Q     And are you asking that your reasonable attorney's

3    fees and costs be reimbursed to you by Dr. Overcash within a

4    reasonable period of time?

5            A     Yes

6                  MR. SHELNUTT:  That's all I have.

7                          CROSS-EXAMINATION

8    BY MR. TAYLOR:

9            Q     Ms. Foultz, have you received any other type

10   payments from Mr. Shelnutt's office that came from

11   Dr. Overcash?

12           A     That one payment back in December, I believe it

13   was.  Right?

14                 MR. SHELNUTT:  If you know -- I can't answer for

15           you.

16           A     There was a -- he was ordered to pay something

17   then and it went to Mark but that was -- well, I have my

18   notes.  That would had been for December's.

19   BY MR. TAYLOR:

20           Q     All right.  So do you know to whom he wrote the

21   check?  Was it made out to Mr. Shelnutt or was it made out

22   to you?

23           A     That last one?

24           Q     Yes, ma'am, the last check.

25           A     I believe it was -- I don't know.  I didn't see
```

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    it.

2         Q    All right.  So you received a payment in December,

3    correct, for the equitable distribution.  Who did you

4    receive the check from?  Was it from Mr. Shelnutt or from

5    Dr. Overcash?

6         A    It actually -- they had to deposit -- Mark's

7    office had to deposit it and make sure it was cashed, and

8    then they wrote me a check, Mark's office did.

9         Q    All right.  So did they -- do you know if they did

10   the same thing for the January 20th check that says for

11   Lori Foultz?

12        A    They didn't -- no, they did not do that.  They

13   actually told me that they got a check for attorney's fees,

14   that that's what they were told, the money was for

15   attorney's fees so 1 did not get...

16             MR. TAYLOR:  That's hearsay, Your Honor.  I move

17        to strike that answer.

18             THE COURT:  All right.  Granted.

19   BY MR. TAYLOR:

20        Q    So in the past, then, you have received -- well,

21   in December, then, you did receive a check from Mr. Shelnutt

22   and as far as you know, Dr. Overcash delivered a payment to

23   him which they cashed and then gave you a check for.

24        A    I actually found my notes, and it was November

25   30th, 2012, there was a check to Mark that was Court

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    ordered, $4,800, and that was supposed to be for September

2    and October.

3        Q    All right.  So my question to you is:  You got the

4    check from Mr. Shelnutt, and as far as you know, that was a

5    check that had been written to his office and then they, in

6    turn, sent you one of their checks, right?

7        A    Yes.

8        Q    Okay.  So it is quite possible, is it not, that

9    the check that was delivered on or about January 20th, since

10   it says, For Lori Foultz, should have been sent to you,

11   correct?

12            MR. SHELNUTT:  Objection; calls for speculation.

13       Anything is possible.

14            THE COURT:  Sustained.

15   BY MR. TAYLOR:

16       Q    Well, this would be consistent, would it not, with

17   what he did last time, in November, I guess.

18       A    I guess it's consistent.

19            MR. TAYLOR:  Okay.  I have no further questions,

20       Judge.

21            MR. SHELNUTT:  Redirect, Your Honor?

22            THE COURT:  Yes.

23                    REDIRECT EXAMINATION

24   BY MR. SHELNUTT:

25       Q    Do you recall Judge Gurrola entering an order on

1b4ff3co-0c7e-44de-ac42-9594a24a99df

1    January the 14th on this same issue because your former

2    husband had failed to pay equitable distribution?  Do you

3    recall that?

4          A    Yes.

5          Q    Do you recall that after we filed our motion, that

6    on December 25th, which is the date that he handed the check

7    to Natasha in the violation of the Court's order, he paid

8    $5,000...

9               MR. TAYLOR:  Judge, object.  He's testifying, not

10         asking a question.

11              MR. SHELNUTT:  It was a question.  Do you recall

12         that?  And I...

13              THE COURT:  Overruled.

14   BY MR. SHELNUTT:

15         Q    Do you recall that he paid a 5,000-dollar payment

16   through Natasha on December 25th?

17         A    On December -- I have notes here.  On December

18   25th, 2012, he gave a check to Natasha for $5,000.

19         Q    And that was not to me, it was to Natasha,

20   correct?

21         A    He gave the check to Natasha who then gave it to

22   me.

23         Q    And then that was $200 more than he was supposed

24   to pay, correct?

25         A    Right.

1          Q     Do you recall the Court ordering him to pay an

2     additional $200 which was the check that he wrote to my

3     office for attorney's fees for $200, which was the balance

4     remaining on attorney's fees?

5          A     Yes.

6          Q     Thank you.

7               MR. SHELNUTT:  No other questions, Your Honor.

8               MS. GORDON:  Your Honor, I have one follow-up.

9               THE COURT:  Okay.

10                    CROSS-EXAMINATION

11     BY MS. GORDON:

12          Q     Ms. Foultz, the $5,000 that you received that you

13     just testified about, when did you receive that?

14          A     December 25th, 2012, and that was for November and

15     December.

16          Q     That was for equitable distribution, correct?

17          A     Yes.

18          Q     Did you receive another check just prior to that

19     for 5,000 in November?

20          A     November 30th, that was the check that was written

21     to Mark, that was court ordered for $4,800, and that was for

22     September and October that he didn't pay.

23               MS. GORDON:  Okay.  Nothing further.

24               MR. SHELNUTT:  Judge, this lady may not be a

25               witness but she's coming up here and handing

1       Dr. Overcash stuff during the hearing.

2              UNIDENTIFIED FEMALE:  I'm not handing him

3       anything.

4              THE COURT:  I'm sorry.  I was looking and reading

5       an order.

6              Would you please sit down, ma'am, whoever you are.

7       Anything else?

8              MS. GORDON:  No further questions.

9              MR. SHELNUTT:  I have one other follow-up.

10             THE COURT:  All right.

11                     REDIRECT EXAMINATION

12      BY MR. SHELNUTT:

13        Q    Ms. Foultz, do you recall months ago Judge Gurrola

14      admonishing Dr. Overcash that he was to make those checks

15      out in the proper amount?

16        A    Yes.  And they were supposed to be either

17      delivered to you or to my mail.

18        Q    Okay.

19             MR. TAYLOR:  I have one last question, Judge.

20                     RECROSS-EXAMINATION

21      BY MR. TAYLOR:

22        Q    Ms. Foultz, you would not have a problem with

23      receiving an overpayment, would you?

24        A    Well, it does make it difficult.

25        Q    Yes or no?

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    A    When he doesn't pay and then I have to keep track

2    of this...

3    Q    You wouldn't have a problem in receiving an

4    overpayment, would you?

5    A    Yes.

6    Q    You would turn it down?

7    A    No, I'm not turning it down but when I have to

8    keep meticulous records of what he owes and what he doesn't

9    owe and...

10        THE COURT:  That's why it -- that's why the Court

11   wants him to pay the amount that he's supposed to pay

12   so that it clearly shows and there's not this dispute.

13   And you had some other argument you wanted to

14   make, you said?  Was there another question, Ms.

15   Gordon, you had?

16        MS. GORDON:  No, no further questions.

17        THE COURT:  Okay.

18        MS. GORDON:  Mr. Taylor has argument though.

19        THE COURT:  All right.

20        MR. SHELNUTT:  Judge, I -- I also have my -- and

21   my paralegal who was present at the time the girl came

22   in and made the payment, however, it's -- I mean, it's

23   hearsay.

24        Never mind.  Never mind.

25        THE COURT:  All right.

1      MR. SHELNUTT:  I mean, Judge, clearly, it's our --

2  there's no question he owes the money.  There's a --

3  there's thousands of dollars in attorney's fees that he

4  owes our office.  We applied tne $2,500 that he paid

5  towards attorney's fees.  I don't know why he did it

6  this way.  But the fact remains, he hasn't paid the

7  right amounts, and whether he owes it as attorney's

8  fees or owes it to Ms. Foultz as equitable

9  distribution, he clearly didn't make the February

10  payment, so regardless, he's in contempt and owes the

11  money, so -- and I'm asking for additional attorneys'

12  fees in that also.  We shouldn't have to do this time

13  after time after time.

14      I'm asking for an additional $600 in attorney's

15  fees on this issue, once more, so that maybe one day

16  he'll pay on time.

17      THE COURT:  All right.  Mr. Taylor?

18      MR. TAYLOR:  I think there's conflicting evidence

19  here with regards to checks and payments made and to

20  whom.

21      Certainly there is no law against paying more than

22  he was supposed to.  There would certainly be a problem

23  if he paid less.  But if, in fact, he paid more, he

24  shouldn't be penalized for that.  The payment should

25  have been for $2,400 but he made it for 25, okay, so he

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    paid a hundred dollars over.

2         Ms. Foultz testified that in the past, Dr.

3    Overcash has paid or made checks payable to

4    Mr. Shelnutt who, in turn, deposited the money and then

5    sent her one of his checks.  There is -- I mean, if

6    we're up in the air, basically, as to what this payment

7    should have been applied to, it does say for

8    Lori Foultz.

9         Clearly, I think if it were for attorney's fees,

10   he would have put "attorney's fees" but instead, he put

11   for Lori Foultz.  So I just don't believe that you can

12   hold him in contempt for making an overpayment.  In the

13   future, if the payment has to be to the penny, then

14   sobeit.  But we have a 2400-dollar payment that's due

15   here this month, which I...

16        THE COURT:  It was already due.  It's past due.

17        MR. TAYLOR:  That's fine, Judge.

18   But, Your Honor, the month isn't up.  He can still

19   pay that, though it's past due, and he'll be caught up.

20        THE COURT:  It needs to be paid -- everything

21   needs to be paid on time in the exact amount that it's

22   owed.  I'm sorry, but I don't believe that this was

23   anything other than intentional.  No, I think this

24   was...

25        MR. TAYLOR:  Intentional what?

```
 1          THE COURT:  Intentionally paid it for attorney's
 2     fees but has this ability to argue this.
 3          But I do find that he is in contempt.  He hasn't
 4     paid February.  And, frankly, ever since I've had the
 5     case, we've had -- every hearing we've had a hearing
 6     where he hasn't paid the equitable distribution.  Some
 7     hearings he argued that she held the check
 8     intentionally.  So it's 2,400 every month, is what you
 9     have to pay; you don't pay more.
10          MR. SHELNUTT:  Judge, it's due for January and
11     February, and the -- the next motion that we were going
12     to do, which is the motion for contempt for failure to
13     pay the court ordered attorney's fees, I, in fact,
14     acknowledge in that that former husband paid counsel
15     2,500 for 5,000 that was due and owing on
16     October 1st, 2012.
17          The money that he gave me we specifically applied.
18     So whether it's applied against his obligation to
19     Ms. Foultz or me, he's still in contempt and, you know,
20     he's never paid anything on time.
21          THE COURT:  I agree.  He is in contempt; the Court
22     finds that he is in contempt.
23          I am going to order that he pay, in addition to
24     the February payment, he's going to have to pay
25     attorney's fees, which I find to be reasonable, $600.
```

1b4ff3ca-0c7e-44de-ac42-9594a24a99df

1      MR. SHELNUTT:  And within what period of time,
2  Your Honor?
3      THE COURT:  Here we go.  Are we going to have that
4  argument that, Mr. Taylor -- I said ten days for the
5  $900, you wanted 20 days.
6      MR. TAYLOR:  Well, Judge, the amounts here are
7  stacking.
8      THE COURT:  Well...
9      MR. TAYLOR:  I understand that is not your fault,
10  not Mr. Shelnutt's fault, but I cannot sit here in good
11  faith and just say that Dr. Overcash can...
12      MR. SHELNUTT:  No, I'm just standing; my back was
13  hurting.  I'm not going to say anything.  Be my turn in
14  a minute.
15      MR. TAYLOR:  I mean, one of the things that we do
16  have to consider here with regard to attorney's fees is
17  Dr. Overcash's ability to pay, and I don't think we
18  have necessarily had an evidentiary hearing on that
19  matter.  Obviously, that has not been noticed for
20  hearing but we certainly would be...
21      THE COURT:  What hasn't been noticed for hearing?
22      MR. TAYLOR:  An evidentiary hearing on
23  Dr. Overcash's ability to pay all of the attorney's
24  fees that have been awarded here.
25      MR. SHELNUTT:  That's not required under the law.

1     If you find that he has either had a present ability

2     and he's had an ability and voluntarily divested

3     himself of that, you can find him in contempt.  There

4     is not a separate evidentiary hearing that is required

5     to do what Mr. Taylor is asking for.

6          MR. TAYLOR:  Judge, may we inquire of Dr. Overcash

7     regarding his ability to pay?

8          THE COURT:  I'm going to let you inquire because

9     I'd like to hear what Dr. Overcash has to say.

10                    DIRECT EXAMINATION

11   BY MS. GORDON:

12        Q    Dr. Overcash, when you talk about your ability to

13   pay all these fees that are being ordered to pay today --

14   first of all, did you intend for that check...

15          TdE COURT:  Okay.  All these fees that are being

16     ordered today.  You mean...

17          MS. GORDON:  Yes.

18          THE COURT:  Okay.  I'm sorry.  You mean the 900

19     and the 600.  Okay, go ahead.

20          MS. GORDON:  Yes.  That's what this -- stacking

21     up.

22          THE COURT:  Yes, all right.

23   BY MS. GORDON:

24        Q    First of all, let me just get back to, did you

25   intend for that check to be...

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1          THE COURT:  We've already argued that, ma'am.

2     That's been argued.

3          MS. GORDON:  Okay.  Let me ask this then.

4     BY MS. GORDON:

5          Q    Has there been a DCF action regarding your

6     daughter Natasha recently, a separate case?

7          A    Yes.

8          Q    Have you had to pay for attorneys to represent you

9     in that case?

10         A    I have.

11         Q    Okay.  What is your position right now, as we sit

12    here today, in terms of what you have available in your bank

13    account to pay these fees?

14         A    I have the amount to pay Lori that $2,500 for the

15    month of February which I thought I had paid.

16         Q    Twenty-four.

17         A    Twenty-four.

18              And other than that, I am financially broke

19    because I issued checks for property taxes.

20         Q    How much were those?

21         A    $8,000.

22         Q    Is that for the home that we're talking about, the

23    equitable distribution on Ms. Foultz?

24         A    The home and the farm.  I think it's around

25    $8,000.  I know -- I can't tell you the exact numbers, but

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1     the farm and the home had to be paid.

2          Q     Okay.  Two separate bills?

3          A     Right.

4          Q     You've already done that?

5          A     Yes.

6          Q     That's something that's written and out?

7          A     It has to be paid on it -- they put a tax lien on

8     the property.

9          Q     Okay.  You have the present ability to pay the

10    remaining amounts of money -- and I think it was how much,

11    Mr. Shelnutt, it was -- how much?

12              MR. SHELNUTT:  $1,500, 900 plus 600.

13              MS. GORDON:  It's about 11 -- not including all

14         the other that we're getting ready to go into.  So

15         we're talking about $11,000.

16              MR. SHELNUTT:  No.  1,500.

17              MS. GORDON:  Okay.  That is 1,500 but there's

18         other amounts.

19              MR. SHELNUTT:  Yeah.  There's about $12,000 that's

20         owed.

21    BY MS. GORDON:

22         Q     So you have approximately $12,000 owed.

23               Do you have the present ability, as you sit here

24    today, to write a check for that?

25         A     I do not.

1      Q      Do you have the present ability to write a check

2   for approximately $1,500 in attorney's fees in addition to

3   the 2,400?

4      A      I do not.

5      Q      When did you write the check for $8,000 for

6   property taxes?

7      A      Over the weekend.

8                        CROSS-EXAMINATION

9   BY MR. SHELNUTT:

10     Q      So immediately before this hearing you knew that

11  we had various motions for contempt and you had not complied

12  with the Court's Orders on paying previous attorney's fees

13  ordered back in October, and you voluntarily divested

14  yourself of $8,000 to pay property taxes; is that correct?

15             MR. TAYLOR:  I'm going to object because

16         Mr. Shelnutt is making the inference that Mr. -- well,

17         he's making an inference as to Dr. Overcash's mental

18         thoughts here and what he did.  And Dr. Overcash stated

19         that he had to pay property taxes that were due and

20         owing, so therefore he paid that.

21             THE COURT:  What is your legal objection?

22             MR. TAYLOR:  Well, objection, Judge, is that

23         Mr. Shelnutt is making argument in his question to

24         Dr. Overcash.

25             THE COURT:  Well, it -- Dr. Overcash says that it

1    has to be paid or they put a tax lien on the property.

2        When does it have to be paid, Dr. Overcash?

3        DR. OVERCASH:  March.

4        THE COURT:  Thirty-first, correct?

5        MR. SHELNUTT:  That's right.

6        THE COURT:  So they don't do anything until April

7    1st.  They're not past due or delinquent until April

8    1st.

9        DR. OVERCASH:  I have no more money coming in

10    before April 1st.

11        MR. SHELNUTT:  May I continue, Your Honor?

12        THE COURT:  Yes, sir, you may.

13        MR. SHELNUTT:  Is the objection overruled?

14        THE COURT:  Yes, it's overruled.

15  BY MR. SHELNUTT:

16    Q    Dr. Overcash, you made a conscious decision to pay

17  $8,000 on property taxes instead of complying with court

18  orders attorney's fees, didn't you?

19    A    No, sir.

20    Q    You knew you owed the money.  You got a copy of

21  the Judge's order, didn't you?

22    A    I don't have a copy of the order; my attorney gets

23  those.  I don't look at them.  I have to pay my property

24  taxes or they take my house.

25    Q    Can the property tax people put you in the jail?

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

```
 1        A    I don't know.

 2        Q    Okay.  Dr. Overcash, do you recall at the last

 3   hearing that we had that you represented to this Judge,

 4   under oath, that you owed the State of Florida $50,000 for a

 5   fine?

 6        A    Yes, sir.

 7        Q    Well, interesting thing.  And you specifically

 8   said that in front of this Judge back on January 14th of

 9   2013, at the last hearing, There's a 50,000-dollar fine and

10   you've paid 24,000 and change of that.

11             Do you recall that?

12        A    Yes, sir.

13        Q    Well, we went on-line, we went on the Internet and

14   found Department of Health vs. William Todd Overcash, and we

15   found a final order that says you owe $7,547.70 for costs

16   and that's it.

17        A    No, sir.  That's invalid.

18        Q    You've got a copy of the other...

19        A    I will be glad to put my attorney on the phone

20   under oath right now.  This is simply the penalty to the

21   State of Florida.  They charge me their investigation fees

22   on top of that which is not part of the court order.

23        Q    Do you have anything to substantiate...

24        A    My attorney's available by phone right now; ne

25   could be sworn in.
```

1              MS. GORDON:  I'd like to see that, please.

2              MR. SHELNUTT:  Sure.

3              THE COURT:  Sir, put your phone away.

4              Thank you.

5      BY MR. SHELNUTT:

6          Q    Now, sir, you continued to get $144,500 a year,

7      don't you?

8          A    No, sir.  They just put me on notice that they are

9      reviewing me and I have to go back and be reevaluated before

10     March 15th.

11         Q    Sir, listen to my question.

12              You've continued to receive $144,500 a year,

13     haven't you?  You're still receiving that as we sit here

14     today.

15         A    No, sir.

16         Q    Do you have any proof of that?

17         A    If you want me to go and get my computer...

18              THE COURT:  Sir, yes or no?  Do you have proof of

19     that?

20              DR. OVERCASH:  No.

21              THE COURT:  Did you receive 12,000, whatever it

22     is, dollars this month?

23              Please put your phone away.

24              DR. OVERCASH:  I have patients I have to respond

25     to.

1          THE COURT:  You have patients that you have to

2     respond to?

3          DR. OVERCASH:  Yes.

4          THE COURT:  During Court?

5          DR. OVERCASH:  Okay.

6          THE COURT:  You proceed to say that -- you don't

7     -- you don't read -- I don't look at the Court's order.

8     That could be one of the big mistakes that you make.

9          Go ahead, Mr. Shelnutt.

10    BY MR. SHELNUTT:

11         Q    So how much are you being paid for these patients?

12         A    I don't get paid.

13         Q    In fact, you're choosing to work voluntarily

14    seeing indigent patients rather than getting some other job

15    making other money, aren't you?

16         A    No, sir.

17         MR. TAYLOR:  Objection.

18    BY MR. SHELNUTT:

19         Q    You said you were paying attorneys but your

20    attorney didn't ask you how much.

21         How much for this dependency case have you paid

22    attorneys?

23         A    I paid them all I could pay for...

24         Q    Sir, it's a number.  How much?

25         A    To this date, I've given them several thousand

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      dollars.

2          Q    No, sir.  You just said that you just recently

3      retained attorneys for the dependency case.  How much have

4      you paid for the dependency case?

5          A    I don't know the number.

6              THE COURT:  Sir, you're going to have to learn to

7          find out what the numbers are so you can answer these

8          questions.

9      BY MR. SHELNUTT:

10         Q    Sir, in fact, it's true you just write checks

11     because you're always able to pay whatever you need to pay,

12     isn't it?

13         A    No, sir.

14         Q    Sir, do you know how much you owe Mr. Taylor?

15         A    No, sir.

16         Q    Do you know how much you owe Ms. Gordon?

17         A    No, sir.

18         Q    You've got an attorney that you told us in your

19     deposition that you owed $60,000 to yet he continues to work

20     on your case.

21         A    Yes, sir.

22         Q    Isn't it true that throughout this whole case for

23     the last nine years, you've paid every penny of your wife's

24     attorney's fees, despite the fact that you always say, I

25     can't pay, I can't pay; isn't that true?

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      A    No, sir.

2      Q    It's not?

3      A    I have not said I couldn't pay.

4      Q    Okay.  Sir, have you paid $5,000 that you're

5  supposed to to my office from October?

6      A    I posted a bond pending an appellate ruling, per

7  my attorney's instructions.

8      Q    You've got two houses, correct?

9      A    Yes, sir.

10     Q    Two cars?

11     A    Yes.

12     Q    A boat?

13     A    No.

14     Q    You got a pontoon boat?

15     A    No.

16     Q    You sold it?

17     A    Wade owns the pontoon.

18     Q    Do you want me to refresh you with your deposition

19  that you said you and Mr. Tackett own half a pontoon boat?

20     A    I forfeited it to Tackett.

21     Q    When did you do that?

22     A    Sir, I borrowed money from Mr. Tackett.

23     Q    Okay.  Sir, you also said you borrowed over

24  $50,000 from Dr. Brady but you don't have any proof of that,

25  do you?

1b4ff3ce-0c7e-44do-ac42-9594a24a99df

1      MR. TAYLOR:  Judge, I'm going to object.

2      MR. SHELNUTT:  They asked for this hearing.

3      THE COURT:  This cannot go on.

4          This man either understands his finances or he

5      doesn't.  If he doesn't understand his finances, then

6      obviously -- he does everything in -- within his power

7      not to answer the questions.  I -- I -- it's -- it's

8      astounding, but I can't put up with it anymore.

9          He either answers the questions -- he knows what

10     he paid you.  He knows what he paid his attorneys for

11     the dependency case, but he doesn't want to tell the

12     Court.

13         Well, of course, he proceeds to say that he's --

14     the orders that the Court does, they go to his lawyers,

15     he doesn't look at them.  Well, I -- I suggest, sir,

16     that you strongly start looking at the orders that the

17     Court signs.

18         Now, do you have some answers for Mr. Shelnutt

19     with regard to what you paid your attorneys, let's say,

20     in the last 60 days?

21         DR. OVERCASH:  I don't keep track of numbers like

22     that.  I'm scared to death with what's happened and I'm

23     having a difficult time and being falsely accused.

24         THE COURT:  So are the rest of us, and so is your

25     daughter.  Now, come on, sir.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      DR. OVERCASH:  And I'm the one who's financially

2  broke.

3      MR. TAYLOR:  Todd.

4      DR. OVERCASH:  I don't know.

5      MS. GORDON:  I can tell the Court -- I'm not

6  testifying -- I don't know if the Court wants to accept

7  it or not, I sent a bill out about two weeks ago.

8      THE COURT:  I just asked what he's paid in the

9  last two months.

10      MS. GORDON:  Nothing to me and I don't think

11  anything to Mr. Taylor on that.  We sent him bills.

12      MR. SHELNUTT:  Well, that's in direct

13  contradiction of what he said just a few weeks ago.

14  This dependency case didn't start until less than a

15  month ago, Judge.

16      He said, I paid my attorneys for dependency.  She

17  hasn't gotten anything.  These are the two attorneys

18  for the dependency.

19      DR. OVERCASH:  I wrote a check to Mr. Taylor.

20      MR. TAYLOR:  Yes.

21      THE COURT:  For how much, sir?

22      DR. OVERCASH:  I think 2,000 or 4,000.

23      THE COURT:  No.  I'm asking you.

24      DR. OVERCASH:  I don't remember, ma'am.

25      THE COURT:  You're going to need to start bringing

1      this kind of stuff.  You need to bring this.

2             DR. OVERCASH:  I can't afford accountants anymore.

3             THE COURT:  You don't need accountants, just bring

4      your checkbook.

5             MR. SHELNUTT:  Just a couple more questions and

6      I'm done.

7             THE COURT:  Go ahead, sir.

8   BY MR. SHELNUTT:

9      Q      We had a hearing on a motion to impute income and

10     you hired a Dr. Flora Pinder to come in here, and pay her

11     $5,500 in November and December, didn't you?

12     A      I guess if that's what you say.

13     Q      That's what she said, 4,000 and an additional

14     1,500.  Do you dispute that?

15     A      No, sir.

16     Q      That's all while this litigation's going on and

17     you've been ordered to pay all these attorney's fees, and

18     you choose to pay your attorneys and tax bills and all this

19     other money, and you make 144,5 a year, but the person

20     that's last in the food chain is this lady.

21     A      Is me.  Me.  I can't defend myself with attorneys.

22     I can't afford them.  I'm declaring bankruptcy.

23            MR. SHELNUTT:  I don't have any other questions,

24     Judge.

25            DR. OVERCASH:  I'm broke.

1b4ff3ce-0c7e-44de-ac42-8594a24a99df

1          THE COURT:  All right.  Anything else?

2                    REDIRECT EXAMINATION

3      BY MS. GORDON:

4          Q    Todd, let me ask you very quickly, is paying taxes

5      on the home for which you owe money to your ex-wife on, is

6      that voluntary on your part?

7          A    No.

8          Q    If you don't pay the taxes, could you lose that

9      home and therefore not be able to pay the equitable

10     distribution on it?

11         A    Yes.

12         Q    Do you believe you could represent yourself

13     without attorneys in the dependency action?

14         A    No.

15         Q    Can you represent yourself in this action without

16     attorneys?

17         A    No.

18         Q    You have a limited fixed income of a certain

19     amount every month, correct?

20         A    Yes.

21         Q    Okay.  And your disability pays you what per

22     month?

23         A    Roughly, 12,5 a month, but it kicked in when I had

24     tons of debt.  I can't help that.

25              MS. GORDON:  Okay.  I have nothing further.

```
 1                   THE COURT:  Okay.  Anything else?
 2                   MS. GORDON:  One more question, Your Honor.
 3        BY MS. GORDON:
 4              Q      You've recently been served with a foreclosure
 5        action; is that correct?
 6              A      Two foreclosures.
 7              Q      Okay.  Can you just briefly explain to the Court.
 8        One is on the mini storage?
 9              A      Yes.
10              Q      And one is...
11              A      The other one is line of credit that existed on
12        Surgical Associates for $150,000.  I'm due payable by the
13        end of this month.
14              Q      What is the bank on the foreclosure?
15              A      SunTrust on both of them.
16              Q      And so that's an active case in this courthouse.
17              A      In this courthouse, yes.
18              Q      All right.  That's not because you've been paying
19        them, is it?
20              A      No, I can't.
21              Q      Because you haven't paid them either.
22                   THE COURT:  Okay.  Foreclosure action on your
23        storage?
24                   DR. OVERCASH:  Yes.
25                   THE COURT:  Midway Storage.
```

1            And on your home?

2            DR. OVERCASH:  No, ma'am.

3            Surgical Associates of Marion County has an

4      outstanding line of credit and there's been a

5      foreclosure demand, and attorneys have activated on

6      that from SunTrust.

7            MR. SHELNUTT:  I just have a couple follow-up,

8      Your Honor.

9            THE COURT:  Go ahead.

10     BY MR. SHELNUTT:

11         Q    Sir, you don't get any income from the storage

12     unit, do you?

13         A    No.

14         Q    So it doesn't make any difference your ability to

15     pay, does it --

16         A    Yes, it does.

17         Q    -- because you don't have any income anyway.

18         A    It does.

19         Q    So do you take money from...

20         A    I'm liable personally for the loan.

21         Q    Sir, do you make any money from the storage unit

22     and use that money to pay your bills?

23         A    No.

24         Q    So whatever else has happened on planet earth, we

25     know that since mid-November of this year, you've paid 5,500

1   to Dr. Pinder and 8,000 to property tax and 2,000 to

2   Mr. Taylor, which is 15,200, rather than do what you were

3   supposed to do and running up all these obligations in

4   attorney's fees; isn't that correct?

5        A    I don't have a right to defend myself?

6        Q    Sir, yes or no?

7        A    I don't understand the question.

8        Q    You paid $15,500 in the last three months for

9   obligations that were not a court order.

10       A    When I sign...

11       Q    Sir, it's yes or no.

12            MS. GORDON:  Let me object.

13  BY MR. SHELNUTT:

14       Q    You think you can answer the question?

15       A    I think it's court ordered, yes.  I have a legal

16  responsibility to defend myself.

17            MR. SHELNUTT:  Judge, I don't have any other

18            questions.

19            THE COURT:  All right.  Thank you.

20            Anything else?

21            MR. SHELNUTT:  No, ma'am.

22            THE COURT:  Anything else?

23            MS. GORDON:  No, ma'am.

24            MR. SHELNUTT:  I have argument, very brief.

25            THE COURT:  Yes.  Go ahead.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      MR. SHELNUTT:  Judge, this applies to this motion,

2  it applies to the next two motions, if we have time to

3  do those, requiring him to pay for all of this

4  litigation.

5      MS. GORDON:  Your Honor, could he go out and get

6  some water?

7      THE COURT:  We don't have any water here.

8      THE BAILIFF:  No, ma'am.  There's a fountain

9  outside.

10     MS. GORDON:  I'll be right back.

11     THE COURT:  You need water too?

12     MR. SHELNUTT:  Please let the record reflect that

13  during the middle of this hearing he's going out to

14  consult with one of his lawyers.

15     MS. GORDON:  Your Honor, my client wanted to

16  consult with me.  If it's not okay, I could stay.

17     THE COURT:  No.  We're in the middle of...

18     MR. SHELNUTT:  Judge, I'm perplexed, I really am,

19  and I've been doing this a long time.  But I don't know

20  how we stop what's going on here.

21     We have outstanding discovery that's long overdue

22  that I've given an extension.  I've tried to come to

23  court and I've tried to enforce the orders that the

24  Court has already entered.  Your Honor started this

25  with a hearing back in December, and a lot of these

1    fees have been owed since October, and now we've had

2    three hearings.  And miraculously, every time we come

3    to court, he always got the money to pay Ms. Foultz.

4    He can always pay it that day or he can send it through

5    Natasha.  Clearly, he's got the ability to do this.

6         We've just had an evidentiary hearing on his

7    ability to pay.  Dr. Overcash can pay whatever he wants

8    to pay whenever he wants to pay it.  He's got two

9    lawyers sitting here with him that represent him not

10   only in this case but the dependency case.

11        I would remind the Court that's not our fault.

12   Whatever happened in the dependency, she's got a

13   hundred percent time sharing at this point.

14        We've got attorneys fees.  Every time we have to

15   come to court, attorney's fees mounting up.  We've got

16   attorney's fees now that are over $20,000, which is the

17   subject of my next motion for all the bills, you

18   ordered him to pay up to $24,000.

19        And, Judge, we can't keep doing this.  And he will

20   not answer a question.  The evidence is overwhelming

21   that he has the ability...

22        THE COURT:  See if he's getting his water.

23        THE BAILIFF:  Yes.

24        MR. SHELNUTT:  He's got the ability, he's just not

25   going to do it until Your Honor either tells him pay it

1  or go to jail; that is the only way this is going to be

2  done.

3      So I would ask that you hold him in contempt, you

4  give him a purge amount.  He just this weekend, knowing

5  he's coming to court on Wednesday, wrote an

6  8,000-dollar check on property taxes that aren't even

7  due yet for over a month.  If that's not present

8  ability to pay, I don't know what is.

9      MS. GORDON:  Your Honor, if I might?

10      THE COURT:  Do you want to wait for your client to

11  return?

12      MS. GORDON:  I don't need to.  Unless he's needed.

13      THE COURT:  Go ahead.

14      MS. GORDON:  All right.  The big picture here --

15  and I really want to stress "the big picture".

16      I know we're dealing with these amounts and things

17  need to be paid on time.  The big picture here is that

18  we have someone -- I'm going to take a guess, was

19  making several hundred thousand dollars a year at the

20  time.

21      THE COURT:  Just a minute.

22      THE BAILIFF:  He was laying outside on the bench

23  advising of chest pains.  I have asked him if he wants

24  medical treatment of any kind; he declines.

25      MR. SHELNUTT:  This has happened twice before in

1    hearings before Judge Swigert.

2        MS. GORDON:  If I could go on -- I don't know what

3    the Court wants to do with that.  I could go on.  As I

4    said, I think it was '07 when this -- this was a

5    mediated agreement.

6        THE COURT:  Does he have a heart condition?

7        MR. SHELNUTT:  No.

8        MS. GORDON:  He has a stress condition, I think,

9    right now.  I don't know.  I'm not a doctor.  I have no

10   idea.

11       The bottom line is, like I said, in '07 there was

12   a mediated agreement.  He made certain agreements while

13   he was a big-time bariatric surgeon at Munroe.  He now

14   -- he had a brain tumor since then.  He was unable to

15   practice surgical medicine.

16       [Thereupon, Dr. Overcash enters the room.]

17       THE COURT:  Okay.

18       MS. GORDON:  And things are different now.

19       THE COURT:  Well, he's back.  He's back.

20       Did you get your water, sir?

21       DR. OVERCASH:  I went to the bathroom, ma'am.  I'm

22   having chest pressure.  It's from stress.  I've been

23   advised not to be under stress.

24       THE COURT:  I'm sure this is stressful.  Because

25   this is coming -- you know, this is coming to a

1    conclusion.

2         Go ahead and finish.  I'm sorry.

3         MS. GORDON:  I'll continue.

4         I want to stress to the Court that the agreements

5    that were made in '07 were done by someone in a very

6    different position than Dr. Overcash is now.  I think

7    the testimony reflects from today and from other days,

8    that Dr. Overcash has gone from someone making a lot of

9    money, by anyone's standards -- and he's still making a

10   very decent living, but he still has the same

11   obligations as the man who was making a lot of money.

12   So the tax bills, the two houses, the one that was

13   rented out, I don't even know if it's even rented now,

14   he agreed to give Ms. Foultz half the value of that

15   home which is now worth half of that.

16        MR. SHELNUTT:  Judge, there's no evidence in any

17   -- these hearings, that the house is worth half of what

18   it was.  That's presenting testimony that's not even

19   before the Court.

20        I object.

21        MS. GORDON:  I think the Court can take judicial

22   notice of the economy is bad.

23        THE COURT:  Well, the economy may be bad but

24   there's only so much housing under the water --

25        MR. SHELNUTT:  Well, it's bad for Ms. Foultz too.

1       MS. GORDON:  -- on a freshwater lake.

2       THE COURT:  The fact is, a lot of people have --

3       MS. GORDON:  Right.

4       THE COURT:  -- have financial setbacks.

5       MS. GORDON:  Right.  But the problem here is that

6   we have never really dealt with the fact that the

7   parties have moved on, Ms. Foultz is remarried, my

8   client wanted to enjoy life with his daughter, he has a

9   certain amount of money every month, and it's very

10  important, his testimony here today, of what he can

11  afford, what he can't afford; his ability to pay is not

12  what it was.

13      He has had to deal with Janet -- at one time,

14  during one month, this Court ordered $5,000 to be paid

15  within ten days to Janet Behnke, $5,000 within ten days

16  to be paid to counsel.

17      THE COURT:  Did he ever pay it to Janet Behnke?

18      MS. GORDON:  No, he did not.

19      MR. SHELNUTT:  No, he has not.

20      THE COURT:  No, he never paid it.

21      MS. GORDON:  Right.

22      THE COURT:  So why would you ever bring it up?

23      MS. GORDON:  The reason I bring it up...

24      THE COURT:  She voluntarily paid it, the wife, on

25  a credit card.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

IN RE: Lori Foultz v. Todd Overcash                    February 27, 2013

Page 104

1          MS. GORDON:  I understand.

2          The reason -- he's repaying that every month.  But

3     the problem is, is that he, at the time, made $12,000 a

4     month, and that right there was 10,000 of that that he

5     was supposed to pay all of his bills.  And part of the

6     Chapter 61 inquiry is supposed to be need and ability

7     to pay.

8          So Dr. Overcash is suffering here from the

9     inability of the Court to recognize that he has no

10    ability to pay these amounts every single month.  And

11    not everyone involved in a divorce has, you know,

12    Mr. Shelnutt billing, you know, $5,000 a month.

13         THE COURT:  But much of his billing is based upon

14    the litigious nature of this case and the fact that

15    your client isn't paying what the equitable

16    distribution that he's supposed to pay to a woman who

17    he truly, by his body language, truly dislikes

18    intensely.  I mean, it's clear.  I'm not -- and I think

19    that's clear that both of them have animosity towards

20    one another.

21         MS. GORDON:  Yes.

22         THE COURT:  Nevertheless, he made choices.  Life

23    is full of choices.  We have to make choices.  We have

24    so much money and we have to choose where it goes.

25         MS. GORDON:  I understand that, Your Honor.  But

1    very clearly, the case law on contempt -- and even

2    under Chapter 61, is ability to pay.  And I think that

3    that should be looked at carefully by the Court.

4         THE COURT:  So you think it was -- that it was

5    just a coincidence that he paid his 8,000-dollar tax

6    bill -- what, what did he say, yesterday?  I don't

7    remember what day he said.

8         MR. SHELNUTT:  He said over the weekend.  Three or

9    four days prior to this hearing.

10        THE COURT:  I don't know whether he put it in the

11   mail over the weekend or what but I'm sure they're not

12   open on weekends.

13        MS. GORDON:  I don't know.  I think it goes up if

14   you don't pay it.

15        THE COURT:  But sure, so what.  You don't get put

16   in jail -- you can't be put in jail for not paying your

17   tax bill.  Even if he didn't pay it by April 1st, it's

18   going to take a while before any -- and you can redeem

19   tax, I believe.

20        MR. SHELNUTT:  You can.

21        THE COURT:  If that were to come about.

22        But nevertheless, he paid it before he absolutely

23   had to.  I -- okay.

24        Anything else?

25        MR. SHELNUTT:  Judge, just -- yes, I would like to

1    add one other thing, and I know it's not a debate, and

2    I know Your Honor has listened carefully to everything.

3    But, Judge, this truly has to stop.  And I'll just give

4    you one example of Dr. Overcash's attitude towards this

5    whole thing.

6        When we took his deposition back in January, I was

7    asking him questions about his attorneys.

8        THE COURT:   January of?

9        MR. SHELNUTT:   January of 2013.

10        At page 54 of that transcript I asked him about

11    who he's having to represent him.

12        "Did you retain Ms. Gordon to represent you?

13        I did.

14        Did you sign a retainer agreement?

15        I did not.

16        Do you know what his hourly rate is?

17        I do not.

18        Do you care?

19        No."

20        And that's his whole attitude.  Judge, he doesn't

21    care.  He thinks if he talks long enough and hard enough,

22    you're either going to get confused or ultimately you're not

23    going to hold him in contempt.

24        Judge, my client is drowning out here and there's

25    a child out there that's drowning.  Emotionally she's got to

1    be taken care of.  We cannot continue to litigate like this

2    without being paid, and there's no deterrent to Dr. Overcash

3    to stop doing it unless and until this comes to an end.  So

4    we're at your mercy.

5              THE COURT:  Anything else?

6         I've looked at his financial affidavit.  I mean, I

7    believe there are -- you know, expenses that he pays

8    every month for horses, and I believe his remark was

9    something about that -- to the Court something about

10   did I want him to get arrested for not caring for his

11   horses.

12        I find it just unbelievable.  He is attempting,

13   every which way that he can, to avoid his obligation.

14   I think it's clear that he's doing that.  Whether he

15   wants to stand up and shake his fist or, you know, yell

16   or whatever he wants to do.  And now he's -- says he's

17   hurting.  Well, he's under stress.

18        Everybody's under stress.  Everyone in this

19   courtroom.  We all have stress, stressful lives.

20   Everyone has some type of stress, some type of

21   financial problems.  But somehow or another, you manage

22   to find the funds when need be.  So -- and, of course,

23   there are things that -- I guess you already got -- as

24   you say, you gave part of your boat away which, of

25   course, I assume if you have a boat, you could sell it

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1      or sell part of it to someone.

2          You're shaking your head no.  You can't sell a

3      boat?

4          DR. OVERCASH:  It has a loan on it that he and I

5      did 50/50 on it and I told him to take over the loan.

6          THE COURT:  Okay, I see.  All right.

7          So he's taken over the loan and you don't have

8      that payment anymore; is that right?

9          DR. OVERCASH:  That's a hundred dollars.  I'm

10     trying to reduce but you just can't sell stuff

11     instantly.

12         THE COURT:  No, that's true.  But I'm trying to

13     think of how long I've been on this case.

14         DR. OVERCASH:  The horse is on the market.

15         THE COURT:  At least since September I think I've

16     been on this case and I don't see that you've sold

17     anything.  I don't know how many cars you have -- I'm

18     not asking you to tell me how many cars you have, I

19     think it's three or two or whatever, whether you owe

20     any money on them or not.

21         But nevertheless, if you are capable of working,

22     then you are capable of being paid to work.

23         DR. OVERCASH:  I can't work as a doctor.

24         THE COURT:  So what are you doing there?

25         DR. OVERCASH:  I am not board certified.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    THE COURT:  What are you doing at this place?  I

2  thought you said you saw Medicaid patients.

3    DR. OVERCASH:  Yes, ma'am.

4    Do you know what we get paid per visit?

5    THE COURT:  I don't care what you get paid.

6    DR. OVERCASH:  It doesn't pay the overhead.

7    THE COURT:  How would you know what the overhead

8  is?

9    MR. SHELNUTT:  Judge, he could work as a

10  physician's assistant.

11    DR. OVERCASH:  No, I can't.

12    MR. SHELNUTT:  He could work as an office

13  practice.

14    MR. TAYLOR:  Mr. Shelnutt is testifying.

15    THE COURT:  Well, I'm asking, if you're seeing

16  patients who are Medicaid patients -- are you seeing

17  them as -- you're seeings them as a doctor, right?

18    DR. OVERCASH:  Yes.

19    THE COURT:  Or are you seeing them -- are you

20  doing -- what else are you doing for them.

21    You're seeing them as a doctor, right?

22    DR. OVERCASH:  Yes, ma'am.

23    THE COURT:  Do they call you "doctor"?

24    DR. OVERCASH:  They do.

25    THE COURT:  Okay.  So you're seeing patients; they

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1   call you doctor, you're being a doctor, you could make

2   some money if you chose, okay.

3       DR. OVERCASH:  Ma'am, I'll be glad to testify

4   about my ability and what I can make and what I get

5   paid.  I get paid 20 bucks to see a patient.

6       THE COURT:  We've tried to get you to testify what

7   you pay and what ability you...

8       DR. OVERCASH:  I see a patient and I get paid $20

9   per patient.

10      THE COURT:  That's fine.

11      MR. SHELNUTT:  Well, that's interesting because

12  his deposition he said he gets paid nothing.

13      DR. OVERCASH:  I don't get paid, the office gets

14  paid.

15      THE COURT:  It sounds to me, I'll be honest with

16  you, that you're really trying to go around, find a way

17  to live the life you want, without paying what has been

18  ordered by Judge Swigert.

19      DR. OVERCASH:  I'm not starting any...

20      THE COURT:  I'm not asking you anymore questions,

21  I'm telling you.

22      MR. TAYLOR:  Todd...

23      THE COURT:  You are clearly -- you're in contempt

24  of this Court.  I...

25      MS. GORDON:  Your Honor, if I might?  There's

```
 1          been...
 2               THE COURT:  No.  We're through with the argument.
 3          I'm ruling now.
 4               He is in contempt of this Court.  And I -- again,
 5          as far as the amounts, you're going to have to find a
 6          way -- you have the ability to make these payments.
 7          You had an ability, within the last 60 days, to pay
 8          upwards of $15,000.  You could have been paying your --
 9          what you've been court ordered to pay.
10               MS. GORDON:  Your Honor, if I might speak about a
11          legal issue.  If it's not the right time, I could...
12               THE COURT:  Go ahead.  What is...
13               MS. GORDON:  The legal issue is there is case law
14          on point on payments such as these, and in particular,
15          in contempt, Chapter 61 proceedings, and people are not
16          required to sell items that they have to pay attorney's
17          fees or equitable distribution.  People are not
18          required to invade 401(k)'s or pensions to...
19               THE COURT:  What I'm trying to say to you is I
20          believe this man has made a conscious effort not to
21          pay.  I think he's made a conscious effort to obstruct
22          this Court every step of the way, to show his disdain
23          for the Court.  He already said he doesn't read any
24          court orders.  He thinks he doesn't have to pay because
25          you've appealed and -- you know, I guess that's his
```

1    thought.

2         But all I'm saying is those are things that he

3    could do if he chose to.  I just -- I find it

4    incredible that he is making every effort not to be --

5    not to let the Court know where he's spent his money,

6    how much money he makes.  I find it very deceptive or

7    attempt at deception.

8         MS. GORDON:  Your Honor...

9         THE COURT:  What, sir, what do you want to say?

10        DR. OVERCASH:  I did a legal financial statement.

11   I did full disclosure to you.  So for you to tell me

12   I'm not being disclosure is calling me a liar, when I

13   am not doing what I'm supposed to do.  And I did,

14   required by law, a financial disclosure.

15        MR. TAYLOR:  Stop it.  Just stop it.

16        MR. SHELNUTT:  Judge, the problem is, what he

17   talks about disclosure, A, has never been accurate or

18   anywhere close.  And I'm sitting here -- I guess I'm

19   waiting for the punchline now at this point.

20        What is it that you're going to order him to pay

21   so that we can get an order done?  Let's move on.

22        I mean, he'll debate with you until the cows come

23   home.

24        THE COURT:  We haven't gotten to the prospective

25   attorney's fees.

1      MR. SHELNUTT:  Well, then we can segue into that,

2  if you want to, Judge can.

3      THE COURT:  Let's do it.

4      MR. SHELNUTT:  The order that Your Honor entered

5  back on the 12th of October that you have since then

6  recertified and said, Yes, this is what I really meant,

7  which is kind of an example of how this goes.

8  Sometimes we have to bring it in front of you two or

9  three times because they keep saying, Well, we've got

10  an objection because there's an appeal pending or we're

11  asking for a stay, and none of that's happened and none

12  of that's going on.

13      So as I sit here right now, if you want to swear

14  me in, I'll tell you what I'm owed.  I mean, we've got

15  $2.500...

16      THE COURT:  Well, I saw your affidavit.

17      MR. SHELNUTT:  Yes.

18      THE COURT:  You prepared an affidavit.

19      MR. SHELNUTT:  Very detailed.

20      THE COURT:  In terms -- there's -- paragraph three

21  in your motion for prospective temporary attorney's

22  fees and costs, and order -- paragraph three, order was

23  entered on October 9, 2012, and ratified at the hearing

24  held on November 13, 2013, awarding the former wife

25  $24,378.02, and reimbursement of attorney's fees and

1    prospective temporary attorney's fees and costs for

2    litigation in the above-styled matter.  This order is

3    attached as Exhibit B.

4         "As of February 1st, 2013, the bill for the

5    pending litigation in this matter is 32,000

6    [inaudible].  The former husband has been ordered to

7    pay up to $24,378.02 in fees and costs.  The former

8    wife requests reimbursement of fees and costs for the

9    difference that remains owing, plus prospective fees

10   and costs for further litigation as this case will

11   likely result in trial."

12        MR. SHELNUTT:  And, Judge, I can tell you that

13   there's nothing that's ever going to happen in this

14   case, I'm afraid, I hope I'm wrong, that's going to

15   result in anything other than a trial.  It's never

16   happened.  It's always been -- everything, as the Court

17   can see from the history of this litigation and from

18   Dr. Overcash's own conduct in front of this Court on

19   several occasions.

20        You've already ordered, since October, that these

21   fees need to be paid.  He's got the ability to pay it.

22   Judge, he clearly could be making, as I indicated a

23   couple hours ago, another $80,000 a year if he was

24   receiving $50 a patient.  It's interesting because in

25   the deposition that we took of him, he says in his

1b4ff3ce-0c7e-44de-ac42-9694a24a99df

1   deposition under oath, I'm not making anything, and he

2   just told you $20.

3        MR. TAYLOR:  Judge, I've got to object, Your

4   Honor, simply because Mr. Shelnutt is, again, arguing,

5   imputing income to Dr. Overcash.

6        MR. SHELNUTT:  Well, the...

7        MR. TAYLOR:  And that matter has been continued.

8        MR. SHELNUTT:  Well...

9        MR. TAYLOR:  So it's inappropriate for him to

10  argue this now when that matter has been continued for

11  another time.

12       THE COURT:  Okay.

13       MR. SHELNUTT:  Judge, all I'm asking that you do

14  at this point in time is affirm and order within a

15  certain period of time these monies to be paid, failing

16  that a writ of bodily attachment will be issued.

17       I can tell you, based on the history of this case,

18  on no less than three different occasions, Judge

19  Swigert had the same conversation with Dr. Overcash.

20  And every single time, under threat of writ of bodily

21  attachment, miraculously the money came pouring out.

22  He makes $12,600 a month.  He has more ability to make

23  it as a physician regardless of what number you want to

24  attach.  He has thousands and thousands of dollars that

25  he has available to him that he voluntarily pays for

1    property taxes and other things.  He has a financial

2    affidavit -- if the Court looks at lines 91 through 94

3    four, he pays $3,000 a month voluntarily on credit

4    cards and has tens of thousands of dollars available to

5    him should he chooses to do that.

6         No, instead he chooses to pay way more than the

7    minimum monthly payment on Visas, Discover, lines of

8    credit; it's $3,000 a month just on his financial

9    affidavit.  Additionally, he double dipped on his child

10   support; he's got that on there twice.

11        He spent $750 a month on everything between pet

12   expenses, club dues, sports and hobbies and

13   entertainment, that comes up to $650 a month.  He no

14   longer is paying for the boat payment like he talked

15   about.  He does what he wants to do.

16        And so, Judge, nobody's asked that this order be

17   rescinded; it's clearly the law of the case.  You

18   previously found he had the ability to pay it.

19   Nothing's changed since October.  He's making exactly

20   the same thing then as he was now.

21        THE COURT:  Okay.  All right.

22        Anything else?

23        MS. GORDON:  Yes, Your Honor.

24        There's been absolutely no evidence whatsoever

25   that Dr. Overcash can work as a surgeon or as a doctor.

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    That's not been before the Court.  In fact, there are

2    many, many reasons.

3         THE COURT:  He just told us that he's working as a

4    doctor.

5         MS. GORDON:  He's working as a doctor -- he's

6    keeping busy.  He's seeing indigent patients for

7    another doctor.  He doesn't have his own practice.

8    He's not making money.

9         MR. SHELNUTT:  There's no evidence that he ever

10   said he's working for another doctor.  This Dr. Brady

11   is not even a doctor; he has a PhD.

12        THE COURT:  All right, anyway.  The Court finds

13   that you are in contempt.  I'm going to order that you

14   pay the $24,378.02 within 30 days.  And -- now, was

15   this the difference between 32,884 and...

16        MR. SHELNUTT:  Judge, if he'll pay the 24,000 --

17   no, that's -- unfortunately, that doesn't even get us

18   from Point A to Point B.

19        THE COURT:  This is just a pass.

20        MR. SHELNUTT:  That's fine.  I'm good for right.

21        THE COURT:  $24,378.02 within 30 days.  And the

22   $1,400 that -- the 900 and the 600.

23        MR. SHELNUTT:  1,500.

24        THE COURT:  1,500.

25        MR. SHELNUTT:  That's also within the 30 days.

1    THE COURT:  Plus the $1,500.

2    What is the total of that?

3    MR. SHELNUTT:  It's $25,878.

4    THE COURT:  All right.  That's to be paid within

5    30 days or the Court will issue a writ of bodily

6    attachment and you will be incarcerated.

7    MR. SHELNUTT:  Okay.

8    MS. GORDON:  Your Honor, I mean, even if my client

9    didn't choose to pay his taxes, he's still -- that

10   would take pretty much all of his income that he gets

11   on disability.  There's been no evidence of his ability

12   to work and, in fact, that will...

13   THE COURT:  He is working.  He says he's working.

14   MS. GORDON:  He's keeping busy.

15   THE COURT:  Now you keep saying there's no

16   evidence of it.  He sees Medicaid patients.

17   MS. GORDON:  Right.

18   Is there evidence of what Medicaid patients pay?

19   Is there anything before the Court on that?

20   THE COURT:  He's working.  He's working as a

21   doctor.

22   MS. GORDON:  Well...

23   THE COURT:  He said he's working.  He's not a

24   grocery store clerk.  I mean, he said he's working as a

25   doctor, he said it.

1b4ff3ca-0c7e-44de-ac42-9594a24a99df

1      MS. GORDON:  I understand, Your Honor.  But there
2  has been...
3      THE COURT:  That's my ruling.  Would you
4  prepare...
5      MR. SHELNUTT:  Yes, I will prepare the order,
6  Judge.
7      MR. SHELNUTT:  Judge, we have one other issue, and
8  that is this case -- no, this case is not up on appeal.
9      The issue up on appeal, we've asked for temporary
10  appellate fees, as well.  And, Judge, at the risk of
11  sounding greedy, this is not our -- we're defending
12  these things.  We've not filed a single affirmative
13  request in anything except to change one day a week in
14  the parenting plan, that's how this whole thing started
15  and it snowballed.
16      But we have an appeal pending, Judge, where they
17  are appealing this Judge Swigert issue.  And what
18  they're saying is that all -- and the only issue on
19  appeal is the fact that there were fees paid by
20  Dr. Overcash between the time that they filed the writ
21  of prohibition and the time he was disqualified.
22      There is no appeal pending as to any -- any
23  attorney's fees due before that time or ordered
24  subsequent to that time, so they filed an appeal.
25  We've just filed our answer brief.  He's filed a second

1    appeal which is already over; that got pro curium

2    affirmed; that was the motion to disqualify Your Honor.

3    That's not before us but we've had to expend additional

4    appellate fees on that, as well.

5         But if the Court has taken a look at the appellate

6    attorney fee affidavit that we've had to file in that

7    particular case?

8         THE COURT:  Yes, I did.

9         MR. SHELNUTT:  I mean, Judge -- you know, once

10   again, we have no money to continue with an appeal.  We

11   don't have any.  We've advanced it.

12        THE COURT:  So the appeal is still ongoing.

13        MR. SHELNUTT:  There's an ongoing appeal as to

14   only that issue about fees that Dr. Overcash paid

15   between the time of Judge Swigert's writ of prohibition

16   that they filed and the time that he was actually

17   disqualified, that's it.

18        THE COURT:  How much are those fees?

19        MS. GORDON:  25,000, something like that, maybe

20   more.

21        MR. TAYLOR:  Judge...

22        MR. SHELNUTT:  Wait a minute.  He's paid 25,000?

23   That's not anywhere in the appellate record.

24        MS. GORDON:  No.  That's what was asked for and

25   ordered during that period.

1          MR. SHELNUTT:  But there's not -- okay.  Well,

2    that's...

3          THE COURT:  Whatever, okay.

4          MR. TAYLOR:  Judge...

5          THE COURT:  Mr. Taylor?

6          MR. TAYLOR:  I was simply going to say that in

7    light of the fact that we have a motion to impute

8    income to the former wife for attorney's fees, which is

9    being held in advanced because...

10         THE COURT:  Only because you wouldn't let it.

11         MR. TAYLOR:  Judge, if I could finish, please.

12         And Mr. Shelnutt now wants to impute income to

13    Dr. Overcash, I think that it is proper.  I think it is

14    proper that you hold off on awarding temporary

15    appellate fees until at least we can determine that

16    there is in fact -- or Ms. Foultz, in fact, does not

17    have the ability to contribute to her attorney's fees.

18         THE COURT:  Okay.  The thing that I understand

19    from -- and this is from evidence and testimony that

20    I've heard in various hearings, is that the top salary

21    or wages that the surgical person, nurse, would

22    receive, requires a certain license that Ms. Foultz

23    doesn't have.

24         MS. GORDON:  She used to have.

25         MR. TAYLOR:  However, the testimony was, Judge,

1b4ff3ce-0c7e-44de-ac42-9594a24a99df

1    that with her current licensing, she could be making

2    upwards of $80,000 or more.

3         MS. GORDON:  Yes.

4         MR. TAYLOR:  That was the testimony of...

5         THE COURT:  Okay.  Right.  If she was working full

6    time.

7         MR. TAYLOR:  If she worked full time, that's

8    right.

9         THE COURT:  Okay.  I understand when -- well, I'm

10   not sure, but I believe when the divorce was granted,

11   that this is -- she was already working part time --

12   maybe not.  I'm not sure of that.  So it's just that I

13   don't want -- it wouldn't be fair for her not to be

14   able to litigate this appeal appropriately.

15        MR. TAYLOR:  Well, she has the right -- sorry --

16   she has the right, Judge, in her response, the

17   responsive brief, to ask the Appellate Court to request

18   of them attorney's fees.

19        THE COURT:  Well, as I understand the law, that's

20   something that the trial Court can also do.

21        MS. GORDON:  No, Your Honor.  The way I understand

22   it is that the trial Court can set the amount only.

23   The right to fees is set by the Appellate Court, is how

24   I understand the appellate rules.

25        MR. SHELNUTT:  What is that.

```
 1          THE COURT:  I don't think so.

 2          MR. SHELNUTT:  No.  You can set the amount of

 3    appellate fees.  The rule says that I can apply at

 4    either place.

 5          MS. GORDON:  That's the way I understand it, is

 6    those two things are separate.

 7          MR. SHELNUTT:  No.

 8          THE COURT:  Well, anyway, since you all are the

 9    ones that appealed, I really don't think that she

10    should be left in the lurch and not be able to provide

11    -- be able to have appropriate attorney preparation,

12    et cetera, for this appeal.

13          So I'm going to order that he pays 7,500 in

14    attorney's fees.  I think that's appellate attorney's

15    fees.  I think that's reasonable.

16          MR. SHELNUTT:  Judge, if we can get that within 60

17    days.

18          THE COURT:  Yeah.  Sixty days is what I was going

19    to say.

20          $7,500, Dr. Overcash, needs to be paid within 60

21    days or the Court will issue a writ of bodily

22    attachment.

23          MS. GORDON:  What is that for.

24          THE COURT:  7,500 for temporary appellate

25    attorney's fees for the former wife.
```

1          MR. SHELNUTT:  I think that's everything, Judge.

2          MS. GORDON:  Your Honor, may we have a -- with

3    regard to the 7,500 for the answer brief alone, there's

4    been nothing else.

5          MR. SHELNUTT:  It's not just the answer brief

6    alone, that's everything.

7          MS. GORDON:  That's for the appellate.

8          THE COURT:  Appellate fees, but he didn't say only

9    for the -- at least I didn't hear him say that.

10          MR. SHELNUTT:  We have to look her brief.  We have

11    to do research.  We have to look at the record on

12    appeal.

13          MS. GORDON:  I'm not finished.

14          I wanted to just ask the Court, as strictly as a

15    housekeeping matter, is there a way that we can discuss

16    whether that's reasonable at another time?  I mean, or

17    does he just have to pay the 7,500?

18          THE COURT:  You know -- okay, sure you can do

19    that.  And then he has to do more legal work to prepare

20    for it.  I mean, the more hearings you have and the

21    more you request, the -- you know, the more everything

22    is going to cost.  But, obviously, you can do, you

23    know, whatever you legally, you know, wish to do;

24    that's your right to do that.

25          MR. SHELNUTT:  Judge, that's all we have.

1      THE COURT:  I don't see how that's -- I don't see

2  how that is not reasonable.  Is it your opinion that

3  $7,500 is not reasonable.

4      MS. GORDON:  Yes, Your Honor.

5      THE COURT:  That's your opinion.

6      MS. GORDON:  I don't -- you know, that is the

7  first I'm hearing of it, so I'd like the opportunity to

8  deal with it.

9      THE COURT:  Well, you read his affidavit though,

10  right?

11      MS. GORDON:  Yes.

12      THE COURT:  How long has the appeal -- there's

13  been two appeals, right?

14      MR. SHELNUTT:  Three, Your Honor.

15      MS. GORDON:  First the appeal by these attorneys.

16      MR. SHELNUTT:  Yes.  And two of them are done.

17      THE COURT:  Oh, I thought there were two.

18      MS. GORDON:  No.  One is done.

19      MR. SHELNUTT:  One is done, she's correct.  But

20  the other two, Judge, were consolidated by a motion and

21  order by the District of Court of Appeals.

22      So they started out as three, one of them has been

23  PCA'd and they were denied, and the other two were

24  combined into one.

25      MS. GORDON:  The first one was granted.  The writ

1    was granted.  That was the first one.

2         THE COURT:  Talking and Judge Swigert?

3         MR. SHELNUTT:  That's not including anything for

4    Judge Swigert.

5         THE COURT:  Wait a minute.  Three appeals, but

6    that's not Judge Swigert's writ of prohibition.

7         MR. SHELNUTT:  No.  That would have been four.

8         MS. GORDON:  No.  That was done.

9         MR. SHELNUTT:  And we're not asking for anything

10   connected with that.

11        THE COURT:  Right.

12        MR. SHELNUTT:  All right, Judge.

13        We'll prepare the orders.  Thank you.

14        THE COURT:  Now, there were some things that you

15   had marked but actually...

16        MR. SHELNUTT:  I introduced them into evidence.

17        THE COURT:  That's right.

18        MR. SHELNUTT:  Yes, ma'am.  There were two

19   documents.

20        THE COURT:  The Blue Cross Blue Shield.

21        MR. SHELNUTT:  That's right.

22        And the other thing, the email.

23        MR. SHELNUTT:  Yes, ma'am.  Those were the two.

24        THE COURT:  I told her to mark them as two -- they

25   were two sheets of paper.  There's three pieces of

IN RE: Lori Foultz v. Todd Overcash                February 27, 2013

Page 127

1      evidence.

2            MR. SHELNUTT:  Yes, ma'am.  Thank you.

3            THE COURT:  Thank you.

4            [Thereupon, proceedings were concluded.]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2      STATE OF FLORIDA )
 3      COUNTY OF MARION )
 4           I, DONA CACCAVALE-FISHER, a Notary Public
 5      for the State of Florida and Registered Professional
 6      Reporter, do hereby certify that I was authorized to
 7      and did stenographically report the foregoing
 8      Proceeding before the Honorable Barbara Gurrola, and
 9      that pages 1 through 128, is a true record of my
10      stenographic notes.
11           I further certify that I am not a relative,
12      employee, or attorney or counsel of any of the parties,
13      nor am I a relative or employee of any of the parties'
14      attorney or counsel connected with the action, nor am I
15      financially interested in the action.
16           Dated this 3rd day of February, 2013.
17
18
19
20
21
22
23      _____
24           Dona Fisher, RPR
25
```



1b4ff3ce-0c7e-44de-ac42-9594a24a99df

Foultz v. Overcash
Judge Gurrola

# ORIGINAL

Page 1

IN THE CIRCUIT COURT OF THE
FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA
CASE NO.: 2002-4655-DR-FJ

IN RE:  The Former Marriage of:

WILLIAM T. OVERCASH,

Former Husband,

and

LORI A. FOULTZ,

Former Wife.

_____/


PROCEEDINGS BEFORE THE HONORABLE BARBARA GURROLA


DATE:              September 10, 2012

TIME:              1:06 p.m. - 5:12 p.m.

LOCATION:          110 N.W. 1st Street
                   Ocala, Florida

REPORTER:          Dona Fisher,
                   Registered Professional Reporter,
                   Florida Professional Reporter,
                   by stenographic means.

"P"

42356664-0044-4f1a-b21a-521a5cb06f2

Foultz v. Overcash
Judge Gurrola

Page 168

A    No.

MR. SHELNUTT:  All right.  That's all I have.

CROSS-EXAMINATION

BY MS. GORDON:

Q    Ma'am, where are you employed now?

A    Surgery Center of Ocala.

Q    Okay.  And how much do you make per hour?

A    $26.50.

Q    So if you do -- how many hours do you work a week?

A    That's per diem rate.

Q    What does that mean?

A    I work per diem.

Q    Per job?

A    When they need me.  So I work 20 to 30 hours a week.  If I would work full time there, I would make less money because then they would put me at a full time rate, which is $26 an hour.

Q    Unless I'm not doing the math correctly, if you worked a 40-hour week, you would be making 42.40, correct?

A    Yes.

Q    But you choose to work less because of what?

A    Because that's the way I choose to do it.

Q    Okay.  You haven't been looking for a 40-hour-a-week job, correct?

A    No.

42956664-0044-4f1a-b21a-521a5cb06f2d

Foultz v. Overcash
Judge Gurrola

Q    And Dr. Overcash would have the child, what,

45 percent of time at this point, approximately?

A    Yes.

Foultz v. Overcash
Judge Gurrola

Page 222

1

C E R T I F I C A T E

2

3          STATE OF FLORIDA }

4          COUNTY OF MARION }

5                   I, DONA FISHER, Registered Professional Reporter

6          and Notary Public, hereby certify that I was authorized

7          to and did stenographically report the foregoing

8          proceedings in the above-styled cause before the

9          Honorable Barbara Gurrola, and that the transcript is a

0          true record of the foregoing proceedings.

1                   I further certify that I am not a relative,

2          employee, attorney, or counsel of any of the parties,

3          nor am I a relative or employee of any of the parties'

4          attorney or counsel connected with the action, nor am I

5          financially interested in the action.

6                   Dated this 2nd day of October, 2012.

7

3

9

)



L

2

3          _____

1          Dona Fisher, RPR

5

42958684-0044-4f1a-b21a-521a5cb0d12d

# Tax Roll Property Summary

**THIS INFORMATION IS NOT A TITLE SEARCH**
**THE INFORMATION IS NOT WARRANTED**

New Search      Back to Search Results      Help

| Account Number | | R49129-003-00 | | | | Type | REAL ESTATE |
|---|---|---|---|---|---|---|---|
| Address | | 14311 SE 128TH ST 1 OCKLAWAHA | | | | Status | |
| Sec/Twn/Rng | | 4  17  24 | | | | Subdivision | 8090 |

| Year | Roll | Account Number | Status | Date Paid | Amount Paid | Balance Due | Pay Online | |
|---|---|---|---|---|---|---|---|---|
| 1999 | R | 1999 R49129-003-00 | PAID | 12/1999 | 3,304.51 | | | Tax Bill |
| 2000 | R | 2000 R49129-003-00 | PAID | 03/2001 | 3,364.54 | | | Tax Bill |
| 2001 | P | 2001 R49129-003-00 | PAID | 02/2002 | 3,440.48 | | | Tax Bill |
| 2002 | R | 2002 R49129-003-00 | PAID | 12/2002 | 3,406.05 | | | Tax Bill |
| 2003 | R | 2003 R49129-003-00 | PAID | 04/2004 | 3,605.56 | | | Tax Bill |
| 2004 | R | 2004 R49129-003-00 | PAID | 03/2005 | 3,398.01 | | | Tax Bill |
| 2005 | R | 2005 R49129-003-00 | PAID | 04/2006 | 3,484.61 | | | Tax Bill |
| 2006 | R | 2006 R49129-003-00 | PAID | 03/2007 | 3,365.55 | | | Tax Bill |
| 2007 | R | 2007 R49129-003-00 | PAID | 03/2008 | 3,136.33 | | | Tax Bill |
| 2008 | R | 2008 R49129-003-00 | PAID | 03/2009 | 3,357.81 | | | Tax Bill |
| 2009 | R | 2009 R49129-003-00 | PAID | 03/2010 | 3,418.43 | | . | Tax Bill |
| 2010 | R | 2010 R49129-003-00 | PAID | 03/2011 | 3,617.10 | | | Tax Bill |
| 2011 | R | 2011 R49129-003-00 | PAID | 03/2012 | 3,697.59 | | | Tax Bill |
| 2012 | R | 2012 R49129-003-00 | CER SOLD | 06/2013 | | | | Tax Bill |
| 2012 | CER | 2013-00021823-00 | UNPAID | | | 4,411.56 | Add to Cart | Certificate |

| CURRENT ACCOUNT DETAILS | | | | |
|---|---|---|---|---|
| Account Number | 2012 | R49129-003-00 | | Tax Bill |

| Property Description | Owner Information |
|---|---|
| SEC 04 TWP 17 RGE 24 PLAT BOOK Y PAGE 093 THE SANCTUARY LOT 3 | OVERCASH WILLIAM TODD FOULTZ LORI ANN 14311 SE 128TH ST OCKLAWAHA FL 32179-5696 |

| Current Values and Exemptions | | Taxes and Fees Levied | |
|---|---|---|---|
| MARKET VALU | 447,953 | TAXES | 3,542.24 |
| ASSESSMENT | 266,545 | SP. ASMT | 266.84 |
| TAXABLE | 216,545 | INT.    4.5000% | 171.41 |
| EXCD01 | 25,000 | SALE 5% | 199.02 |
| EXCD38 | 25,000 | ADV. FEE | 16.02 |

EXHIBIT
C

| | CERTIFICATE HAS BEEN ISSUED FOR | | 4,195.53 | – | GROSS TAX | 3,809.08 | | |
|---|---|---|---|---|---|---|---|---|
| Rcpt Date | Receipt # | Pmt Type | Status | | Disc | Interest | Total | |
| 06/07/2013 991 2012 0016507.0001 Full | | | Pmt Posted | | | | | |

**Links of Interest**
**LINK TO PROPERTY APPRAISER WEB**

# Tax Roll Property Summary

### THIS INFORMATION IS NOT A TITLE SEARCH
### THE INFORMATION IS NOT WARRANTED

New Search     Back to Search Results     Help

| Account Number | R45794-000-00 | | Type | REAL ESTATE |
|---|---|---|---|---|
| Address | 11411 SE 132ND PL 1 OCKLAWAHA | | Status | |
| Sec/Twn/Rng | 12 17 23 | | Subdivision | 9500 |

| Year | Roll | Account Number | Status | Date Paid | Amount Paid | Balance Due | Pay Online |
|---|---|---|---|---|---|---|---|
| 1999 | R | 1999 R45794-000-00 | PAID | 12/1999 | 1,824.72 | | Tax Bill |
| 2000 | R | 2000 R45794-000-00 | PAID | 03/2001 | 1,981.73 | | Tax Bill |
| 2001 | R | 2001 R45794-000-00 | PAID | 03/2002 | 1,991.33 | | Tax Bill |
| 2002 | R | 2002 R45794-000-00 | PAID | 12/2002 | 1,975.35 | | Tax Bill |
| 2003 | R | 2003 R45794-000-00 | PAID | 04/2004 | 3,126.37 | | Tax Bill |
| 2004 | R | 2004 R45794-000-00 | PAID | 03/2005 | 2,984.44 | | Tax Bill |
| 2005 | R | 2005 R45794-000-00 | PAID | 04/2006 | 3,420.13 | | Tax Bill |
| 2006 | R | 2006 R45794-000-00 | PAID | 03/2007 | 3,949.63 | | Tax Bill |
| 2007 | R | 2007 R45794-000-00 | PAID | 03/2008 | 5,148.07 | | Tax Bill |
| 2008 | R | 2008 R45794-000-00 | PAID | 03/2009 | 5,130.59 | | Tax Bill |
| 2009 | R | 2009 R45794-000-00 | PAID | 03/2010 | 4,734.05 | | Tax Bill |
| 2010 | R | 2010 R45794-000-00 | PAID | 03/2011 | 4,117.38 | | Tax Bill |
| 2011 | R | 2011 R45794-000-00 | PAID | 03/2012 | 3,692.18 | | Tax Bill |
| 2012 | R | 2012 R45794-000-00 | CER SOLD | 08/2013 | | | Tax Bill |
| 2012 | CER | 2013-00020979-00 | UNPAID | | | 3,583.68 | Certificate / Add to Cart |

| CURRENT ACCOUNT DETAILS | | | |
|---|---|---|---|
| Account Number | 2012 | R45794-000-00 | Tax Bill |

| Property Description | Owner Information |
|---|---|
| SEC 12 TWP 17 RGE 23 W 1/2 OF SE 1/4 OF GOV LOT 2 & N 285.03 FT OF E 1/2 OF SE 1/4 OF GOV LOT 2 EX E 25 FT | OVERCASH TODD<br>MOBLEY JENNIFER<br>11411 SE 132ND PL<br>OCKLAWAHA FL 32179-5098 |

| Current Values and Exemptions | | Taxes and Fees Levied | |
|---|---|---|---|
| ASSESSMENT | 165,564 | TAXES | 2,561.65 |
| TAXABLE | 165,564 | SP. ASMT | 528.86 |
| | | INT.   4.5000% | 139.07 |
| | | SALE 5% | 161.48 |
| | | ADV. FEE | 16.02 |

| CERTIFICATE HAS BEEN ISSUED FOR | 3,407.08 | – | GROSS TAX | 3,090.51 | | |
|---|---|---|---|---|---|---|
| **Post Date** | **Receipt #** | **Pmt Type** | **Status** | **Disc** | **Interest** | **Total** |
| 06/07/2013 991 2012 0018377.0001 Full | | | Pmt Posted | | | |

**Links of Interest**

LINK TO PROPERTY APPRAISER WEB