# Exhibit H:
(1) Federal Case of discrimination by Judicial and legal community in California under ADAA Federal Statues.

(2) Example Judicial Violation of Law

David Merritt, *pro se*
Salma Merritt, *pro se*
660 Pinnacles Terrace
Sunnyvale, CA 94085
dymerritt@hotmail.com
Tel: 408.469.5584

Beatrice Pacheco-Starks, *pro se*
2518 Sun Mor Avenue
Mt. View, CA. 94040
**NOTE: Defendants disconnected
This Plaintiffs telephone**

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| SALMA MERRITT, DAVID MERRITT and BEATRICE PACHECO-STARKS, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN E. MCKENNEY, THOMAS W. CAIN, MARK H. PIERCE, SOCRATES P. MANOUKIAN, SANTA CLARA SUPERIOR COURT, LYNN SEARLE, MICHAEL DESMERAIS, DOES 1-20, <br><br> Defendants. | Case No. _ CV13-01391-PSG <br><br> **FIRST AMENDED COMPLAINT By Individuals With Disabilities—For Declaratory, Injunctive and Damages Relief**—Person With Physical & Mental Limitations Precluded From Participating In State Court Litigation And Punished Them For Being Disabled and Aide for Aiding and Encouraging Them Against American with Disabilities Act; Unruh Civil Rights Act; California Disabled Persons Act <br><br> **Demand For Jury** |

## <u>COMPLAINT</u>

This action arises under the Americans With Disabilities Act, to correct the unlawful policies and practices imposed by Defendants Kevin Mckenney, Mark Pierce, Peter Manoukian, Cain, Searle, Desmerais and Santa Clara Superior Court; and Does 1-20 ("Defendants") and alleges as follows:

# I.   INTRODUCTION

1. Plaintiff Salma Merritt is a married Medical Doctor with serious physical disabilities, brings this action by her husband and principle Caretaker, David Merritt, to enjoin defendants' refusal to provide accommodations' for her disabilities, so that she and her husband can properly prepare for trials, Opposition to motions, not be subject to mental abuses and other litigation matters that was and is pending before California Superior Court in Santa Clara County, and to which she is being precluded from fully participating in, in part, due to her disabilities.

2. Under the Americans with Disabilities Act, and corresponding State of California laws, the Federal and State Governments mandates for Defendants to provide accommodations to court proceedings where such accommodations are reasonable.

3. Since the Plaintiffs have prevailed in State of California Court of Appeals in disqualifying one of Defendants' state court judges from their case, the Defendants have repeatedly implemented a practice and routine which denies Plaintiffs any accommodations for her disabilities.

4. The Defendants also have a practice or policy of requiring the Plaintiffs to reapply for accommodations over-and-over, each time that they need to have accommodations for upcoming proceedings, even though Mrs. Merritts disabilities are permanent and not temporary in nature.

5. Even though evidence form treating physicians have been presented and represented to Defendants regarding Plaintiffs limitations needs which makes her eligible for court accommodations due to her disabilities alone, Mrs. Merritt's requests for accommodations led defendants to terminate one case (refusing to continue trial date and issuance of vexatious litigant order for requesting accommodations several times in two days); as well as refusing to continue hearing dates to give time to research and provide proper and adequate opposition pleadings and granting Defendants in another action more than 3 days of time to depose Mrs. Merritt after they exerted violence at first date and committed other abuses upon her person during more than 24 hours collectively of her time which led to a collapse.

6. Defendants' refusal to provide accommodations to Mrs. Merritt, and retaliation thereof, due to her disabilities violates Title II of the Americans With Disabilities Act, (ADA), 42 USC § 12131 et seq. ADA §§202 et seq.

## II.   JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 USC § 1331. Plaintiffs' claims are authorized by 28 USC §§ 2201, 2202 and by 42 USC §§12101 et seq. (including § 12181 et seq.) ADA §§ 2 et seq. Pursuant to pendant jurisdiction, an attendant and related causes of action, arising from the same nucleus of operative facts and arising out of the same transactions, is also brought under California's Unruh Civil Rights Act and Disabled Persons Act. Venue is appropriate because the events took place in Santa Clara County.

## III.   PARTIES

8. Plaintiff Salma Merritt is a resident of Sunnyvale California. She brings this action through her husband, David Merritt, who is also a resident of Sunnyvale California.

9. Plaintiff David Merritt is a resident of Sunnyvale, California. He brings this action on behalf of his wife, Salma Merritt, who is a qualified person with disabilities under ADA in need of Aide.

10. Plaintiff Beatrice Pacheco-Starks is a resident of Mt View, California. Mr. Merritt brings this action on behalf of Mrs. Pacheco-Starks, who is a qualified person with disabilities under ADA in need of Aide.

11. Defendant Kevin E. Mckenney is a Santa Clara County judge. He is fully responsible for his illegal conduct that violated U.S. Federal and State laws. He is sued in his individual and official capacities. He currently works at 191 North First Street, San Jose, CA. Department 20.

12. Defendant Thomas W. Cain is a Santa Clara County judge. He is fully responsible for his illegal conduct that violated U.S. Federal and State laws. He is sued in his individual and official capacities. He is located/works at 191 North First Street, San Jose, CA. Department 3.

13. Defendant Mark H. Pierce is a Santa Clara County judge. He is fully responsible for his illegal conduct that violated U.S. Federal and State laws. He is sued in his individual and official capacities. He currently works at 191 North First Street, San Jose, CA. Department 9.

14. Defendant Socrates P. Manoukian is a Santa Clara County judge. He is fully responsible for his illegal conduct that violated U.S. Federal and State laws. He is sued in his individual and official capacities. He currently works at 191 North First Street, San Jose, CA. Department 20.

15. Defendant Lynn Searle is a lawyer in San Francisco. She is fully responsible for her illegal conduct that violated U.S. Federal and State laws. She is sued in her individual and official capacities. Her business office is Law Offices of Lynn Searle, 220 Bush Street, Suite 1200, San Francisco, CA 94104.

16. Defendant Michael G. Desmarais is a lawyer in San Jose. He is fully responsible for his illegal conduct that violated U.S. Federal and State laws. He is sued in his individual and official capacities. His business office is Law Office of Michael G. Desmarais, 16450 Los Gatos Blvd, Los Gatos, CA 95032.

17. Defendant Santa Clara Superior Court is a California State Court. Under California laws it provides public forum for citizens with litigation disputes, adjudicating civil and criminal matters which are commenced by California state citizens.

18. Does 1-20 are Santa Clara Superior Court personnel whose identities are not fully known at this time, but who have been involved in the ADA violations alleged herein.

## IV.    FACTS

19. Mrs. Merritt has fibromyalgia and other diagnosed disabilities, and as a consequence, in part, is unable to attend, or participate in, certain matters which requires more than a few hours, many times less, periods of time focus, energy, concentration, inability to think, or remain in prolonged fixed positions. She suffers from cognitive impairment. She also requires certain therapies during the course of each day should not be subjected to abnormal stresses such as hostilities, verbal assaults and needs non-stressful environments, all of which leads to cognitive limitations.

20. Mrs. Merritt resides with her husband who is her primary caretaker. She requires assistance each day from him for certain daily living functions and self-care activities, including but not limited to, getting out of bed, dressing children, making meals and other things.

21. From until 2005, Mrs. Merritt worked as a practicing Physician and was diagnosed with her permanent disabilities starting in 2005 and in 2006 onward was declared as being unable to work her own or similar profession.

22. From 2006 onward, Mr. Merritt had to relocate his office from San Francisco to, initially, his home, in 2006 onward, close to his home in order to provide direct care for his wife.

23. In 2006, the Merritts were defrauded by predatory lending schemes of Countrywide Home Loans et al and not until 2009 did they learn of the fraud.

24. From 2009 until now, the Merritts have been seeking redress in both the Federal and State courts for this fraud by commencing civil actions against the perpetrators.

25. From 2010 onward, the Merritts Home Owner Association, to which Mr. Merritt was previously the President and Secretary of, issued policies on behalf of the City of Sunnyvale requiring him to forego the accommodations that he set up for his wife in the simple way of ensuring that she could park in their home's garage with enough room to enter and exit vehicles.

26. In 2011, on behalf of his wife and himself, the Merritts commenced state lawsuit which Defendant Santa Clara Superior Court became venue for.

27. In both actions the Merritts are moving *pro se* litigants with Mrs. Merritt being a person with disabilities and no legal training.

28. Mr. Merritt is not a lawyer, and although he has prior experience in *pro se* actions; he never had any formal training.

29. Mr. Merritt has only Mrs. Merritt to rely upon to "brainstorm," strategize, plan and otherwise assist in preparing litigation.

30. Mrs. Merritt is physically and mentally unable to give any more time than 2 to 5 hours per week (infrequently more) in assessing and working with their litigation specifically due to her serious disabilities.

31. This has resulted in many deficiencies that would otherwise not be found in non-disabled litigants, even *pro se.*

32. At some time before 2013, the Federal Government and State of California mandated for state courts to provide accommodations for persons with disabilities.

33. At some time before 2013, Defendant Santa Clara Superior Court codified rules and procedures for its judges to follow when a party, witness and other persons with disabilities applied to them for accommodations regarding court proceedings.

34. Such rules and procedures permitted the Plaintiffs to proceed, to a certain degree, with their prosecution of their civil actions against other defendants' unlawful practices and violations of laws.

35. Specifically, another judge found doctors reports about Mrs. Merritts time-limitations to be sufficient enough to issue ADA order to where no more than 3 hours of deposition could be taken at any given time.

36. Nonetheless, Defendants do not have a practice or policy where once a limitation is found to exist, that all other judges must follow that order, and Plaintiffs have been forced to file ADA Request each and every time new proceedings or conditions arose where accommodations had to be afforded due to Mrs. Merritts disabilities.

37. Under the ADA there are certain qualifications that persons seeking accommodations must meet in order to be afforded such, and each and every time the Plaintiffs met that requirement.

38. Defendants do have, and are cognizant of, federal and state guidelines on what qualifies such a person, namely that the person is unable to perform one or more of life's major activities.

39. Defendants are aware that they must not permit personal or any intolerance to enter into the decision making process for affording disability accommodations.

40. In July 2012, Mrs. Merritt was subjected to some very serious and egregious verbal assaults and attacks by Countrywide Defendants in another case which resulted on the third day in her collapse into unconsciousness.

41. Defendants issued orders that would permit the attacks upon her and only by the grace of God did the Plaintiffs learn that the judge who was condoning such was in the employ of the Countrywide Defendants for a decade or so, which lead to Writ of Mandamus where California Court of Appeal's ordered the judge's disqualification.

42. This Court of Appeal ruling produced a backlash from Defendants where they now denied all requests' for disability accommodations.

43. Specifically, Mrs. Merritt was forced to spend a prolonged period of time overseas in her homeland, where medical treatment and care cost are fraction of what they are in U.S. Plaintiffs gave notice of such in both pending cases, and while they were some 8,000 plus miles outside the U.S., the defendants in one case filed their third motion seeking vexatious litigant status, after losing the first two, only this time scheduling hearing so that Plaintiffs would not have

1  time to work up opposition, knowing that it takes Mrs. Merritt weeks to review pleadings that

2  most can study in a day or two.

3      44. Defendant Pierce refused to continue the hearing pursuant to the ADA request that Mr.

4  Merritt Provided, which evidenced that Mrs. Merritt was in Pakistan undergoing daily therapies

5  and treatment, and that her doctors there advised her to continue such treatment since it was

6  unavailable to her in the States.

7      45. On March 13, 2013, after just being served with a motion for terminating sanctions

8  against both Plaintiffs, with only about a week to read through thousands of pages, perform 50

9  hours of legal research and other investigation, Mr. Merritt presented ADA request to Defendant

10  Pierce requesting that he accommodate Mrs. Merritt's disability due to the fact that she has her on-

11  going time limitation which restricts her cognitive abilities to function for hours at a time, but that

12  they could push to get it completed within 30-40 day period.

13      46. Defendants Pierce rejected the request out of hand and ordered Mr. Merritt to give

14  notice to Countrywide defendants so that they could be part of these confidential disability

15  proceedings, and Mr. Merritt complied.

16      47. The next day, Countrywide raised their objections, and Pierce decided to side with

17  them and not honor the ADA laws, doctors' reports or the need for accommodation

18      48. Defendant Pierce then had ADA coordinator Georgia Ku contact Mr. Merritt saying

19  that the information from doctors were older, and there was no way of knowing whether

20  conditions of disabilities still existed, so Pierce wanted him to update information from doctors.

21      49. Mr. Merritt contacted Stanford University treating physician and Pakistan treating

22  physician, both of who provided updated reports which demonstrated Mrs. Merritt being

23  permanently disabled and in need of time-limitation accommodations where the court permits her

24  more time than the average healthy adult in preparing and participating in litigation.

25      50. Plaintiff David presented ADA Request to defendants Manoukian, requesting that limit

26  deposition to 3 hours per session and that it take place either 7 to 10 AM or so PST or 6 to 9 PM

27  standard time since it was being conducted by way of videoconferencing upon Mrs. Merritt while

28  she was some 13 hours ahead of our Pacific time zone.

51. At first defendant Manoukian granted the accommodation until defendants were allowed to present objections and enter into the confidential disability accommodation process, resulting in them changing his mind to where he denied the accommodation.

52. Next, defendant Manoukian was assigned to hear the previous matters, which the now disqualified judge Stoelker, had previously ruled upon regarding Countrywide Defendants.[1]

53. Countrywide Defense lawyers had physically assaulted Deposition Attendees who had come to assist in the care and support of Mrs. Merritt during July 2012 deposition, which forced Mr. Merritt to physically restrain defense counsel from committing further assaults. Also, defense lawyer then orally assaulted and attacked Mrs. Merritt during deposition for not providing answers which would support their defense and for not permitting them to suborn perjury from her.

54. Plaintiffs moved to have the defendants protect Mrs. Merritt as a person with disabilities who should not be subjected to such nasty and unprofessional attacks; however, Stoelker refused to protect her which brought to light his biases that derived from being employed by Countrywide for some ten or so years prior to becoming state judge.

55. When Defendant Manoukian was assigned to rehear Plaintiffs and Countrywide defendants' motions, he appears to have not made his own independent evaluation and instead relied on the biased findings of disqualified judge Stoelker.

56. Defendant Manoukian further refused to enforce ADA laws to accommodate Mrs. Merritt disabilities so that she would not have to ever be subjected to further attacks by Countrywide defense, refused to implement California code which limits depositions to 7 hours, and ordered for her to be subjected to more than 12 hours of depositions, without taking into account her disabilities.

57. Then there is the March 4, 2013 trial date that the Merritts had asked Defendant Mckenney to schedule back in 2012, before they knew just how much disability medical therapy Mrs. Merritt would need.

---

[1] California Court of Appeal's granted Plaintiffs Writ of Mandate in December 2012 ordering for defendants to disqualify Stoelker from Plaintiffs case.

*MERRITT v. Mckenney et al* CV13-01391-PSG

58. The Merritts were scheduled to return back to the U.S. January 20, 2013; however, the therapies were having such a positive effect upon her that the doctors insisted and convinced Mr. Merritt to permit her to stay there longer so as to be treated more and he returned to the U.S. alone.

59. HOA Defendants in another case filed a motion for belated motion for summary judgment on the eve of trial; which pointed out some deficiencies that were made due to Mrs. Merritts disabilities and Mr. Merritt's inability to perceive such without her input.

60. Since they had never filed an amended complaint, and California laws liberally granted such to non-disabled persons, the Plaintiffs filed for leave to file first amended complaint of newly found claims and informed Mckenney that postponement of trial was not only needed in order to permit amended complaint, but in any event, Mrs. Merritt was undergoing disability therapy and postponement of trial date would be needed.

61. Defendant McKenney denied the motion to amend, even in light of Mrs. Merritt's disability status.

62. The Plaintiffs then filed a request for ADA accommodation on February 7, 2013, requesting for the trial date to be continued for a few months to give Mrs. Merritt time to complete therapy and return to U.S.

63. Defendant Mckenney wholly ignored the request and would not even see Mr. Merritt who was presenting ADA request as his wife's representative.

64. On February 8, 2013, Mr. Merritt return, was told my Mckenney's deputy that he should not have returned with the same requests and that Mckenney did not wish for him to even enter his court room with the request.

65. Mr. Merritt left, called McKenney's clerk informing her that they judge was supposed to process such requests, and in any event there were confidential medical records that had to be reviewed in camera.

66. Mr. Merritt was turned away and later that afternoon learned from assistant clerk the Mckenney was "infuriate at you for bringing that request to continue trial," and issued order that enjoins Plaintiffs from filing new pleadings, motions etc. by finding that they are vexatious litigants, when neither of them met that criteria.

67. Mckenney completely denied ADA accommodation request and punished the Plaintiffs for presenting such by issuing vexatious litigant order and dismissing their lawsuit altogether in place of continuing trial date until Mrs. Merritt's disability treatment overseas had concluded.

68. Prior to 2013, defendants Mckenney, Pierce, Manoukian and Santa Clara Superior Court consistently granted motions for continuance of hearings and trials to lawyers who requested such accommodations without them being disabled.

69. Lawyers typically have had to leave on vacations, had too much work load to contend with, and other priorities which interfered with their litigation which was pending before defendants.

70. Due to Mrs. Merritt being a disabled person petitioning the court as a pro se litigant, who relies upon her husband representative, the defendants have treated her at a standard which is higher than the standard defendants treat lawyers who practice law before them.

71. Likewise, defendants have a policy of not accepting or discrediting or not believing the evidence provided by Plaintiffs precisely because of being disabled pro se Plaintiffs, and accepting and believing lawyers evidence, no matter how clear misrepresentations are, because of Mrs. Merritts pro se disability status and the lawyers non-disability non-pro se status.

72. Each of these actions that defendants Pierce, Manoukian and Mckenney took in denying disability accommodation, when Mrs. Merritt meets all ADA criteria, was due to Mrs. Merritt having a disability, her needing accommodations and defendants retaliation against them for exercising their right to obtain accommodations after they caused one of their colleagues to be disqualified from their case.

73. As a direct result of defendants on-going violations of ADA rights Mrs. Merritt was forced to terminate her medical treatment and return to the U.S. to contend with failures to provide accommodations.

## MRS. BEATRICE PACHECO-STARKS

74. On or about March 2013, Mr. Marreon Starks contacted Mr. Merritt expressing an urgent need to learn how he can learn what was needed to advocate for himself in a conservatorship matter pending before defendant Cain and Santa Clara Superior court.

75. After explaining the impossibilities of learning such quickly and exhausting all avenues regarding whether he could hire a lawyer, Mr. Merritt authorized Mr. Starks to come to his office and when Mr. Starks could observe the things that he was doing as well as attend the law library with him to study.

76. During March-April 2013, at various times during Mr. Starks visits, Mr. Merritt began to overhear the phone calls that Mr. Starks received from his wife Beatrice and distinctly heard her desperation to dissolve the conservatorship that was imposed upon her.

77. On or about April 14, 2013, Mr. Merritt interrupted one of Mr. Starks phone discussions with his wife and began to interrogate her in order to determine whether she had any problem in comprehending things; tested her memory recall abilities of things in the past and present then began to ask her in varying ways what her wishes were.

78. She explained to Mr. Merritt that she had severe vision impairment and was weak from her aging; that she was an 83 year old white woman who fell in love with a younger 58 year old African American which her sons and others were against and have falsified court records to wrongly designate her as incompetent and incapable of making sound decisions.

79. That she knows that there are some things that she forgets or has forgotten, but that she still has her own mind, loves her husband and complains how her son repeatedly verbally abuses her as being too old to have remarried or to be with her husband and needed to get back together with him.

80. Mr. Merritt suggest to Mr. Starks that it may be helpful if he could build an audio data base of recordings of his wife so that he could either present it to the court or otherwise have evidence of the soundness of her mind and wishes.

81. On or about April 10, 2013, Mr. Merritt overheard Beatrice complaining about how she has been trying to terminate Defendant Desmerais from being her lawyer or otherwise representing her before defendant Cain; how defendant Desmerais is refusing to help her or represent to the court what her desires and needs are in needed to have contacts with her husband Mr. Starks, that she wanted the TRO dissolved against her husband because he never abused her, that she does not want annulment; how her son Stephen Pacheco has "fabricated lies" to the court, hates Mr. Starks due to him being African American, told her that she could not get permission to

1  go anywhere or speak with anyone other than those who Stephen decided because he was the

2  parent now and she the child; how she has spoken to conservatorship investigators about how she

3  needs to be back together with Mr. Starks and needed to speak with the court directly to "get rid

4  of" conservatorship and other statements.

5      82. On April 10, 2013, Mr. Merritt visited with Beatrice and had her dictate to him, face-

6  to-face, what her wishes were related to defendant Desmerais and he returned with enlarge typed

7  version, read it to her and left copy for her to read.

8      83. He then filed it in the family law case related to Stephen's petition in family law court

9  related to annulling Beatrice's and Mr. Starks marriage, not knowing at the time that the

10  annulment case involved another lawyer.

11     84. On or about April 17, 2013, while overhearing Beatrice's despair during another talk

12  with Mr. Starks, Mr. Merritt asked to speak with her and told her that she needed to get an

13  attorney of her own so that they could terminate defendant Desmerais and honestly represent her

   interests' before defendant Cain.

14     85. Beatrice informed Mr. Merritt that her son had terminated any access to her funds and

15  taken control of all her assets.

16     86. Mr. Merritt asked what types of things did she have which she could sale or give to

17  lawyer for hiring one, and she told him her car to which Mr. Merritt stated that if she could sale

18  the car, then it should be sufficient for hiring lawyer.

19     87. Mr. Merritt also reviewed the case files that Mr. Starks had gathered and read the court

20  transcript regarding his TRO hearing which was imposed upon him and after further investigation,

21  began to ascertain that defendant Superior Court records under In Re Conservatorship of Beatrice

22  K. Pacheco, 1-12-PR-171580, was not reflecting the reality of the person whom Mr. Merritt had

23  been communicating with.

24     88. On April 22, 2013, while Mr. Starks was working on his case file by Mr. Merritt,

25  Beatrice called him in frantic despair saying how she was assaulted and battered by her son and

26  was in desperate fear.

27     89. After Mr. Merritt spoke to her, he reported to Mt. View police the incident and

28  physically went there to file report with Mr. Starks.

90. Instead of arresting Stephen Pacheco, Mr. Starks was arrested for accepting phone calls from his wife against conservatorship TRO.

91. Mr. Merritt visited Beatrice, photographed her injury, told her what her options were and asked what she wanted him to do for her.

92. Beatrice asked Mr. Merritt to do whatever he could to "get rid of Stephen and this conservatorship and this Michael Desmerais."

93. Beatrice impressed upon Mr. Merritt that she needed someone to interpret and present to defendant Santa Clara Superior Court her true wishes and needs and to get her back together with her husband, Mr. Starks.

94. Mr. Merritt learned from Beatrice that she was a person with disabilities in very poor vision; recently underwent heart surgery due to the stress; natural feebleness from her age; depressed and no understanding or knowledge of the law or court processes or her rights.

95. Mr. Merritt then researched and learned what rights she had under to law to get married, control her finances etc., called her and asked whether she was ever notified orally about these rights, and she stated neither Stephen, his lawyer, her lawyer or defendants Cain and Santa Clara Superior court notified her about what she had a right to.

96. Mr. Merritt typed up a petition remove and replace Conservator and terminate legal services of defendant Desmarais, as well as petition to disqualify defendant Cain from hearing or being involved in this new petition, then visited Beatrice, read it to her and left enlarge font copies confirmed that she wanted him to present it to the defendants on her behalf.

97. Once Beatrice confirmed that she wished for Mr. Merritt to present these filings to the court and signed them, told Mr. Merritt filed them with defendant Cain and Superior Court.

## CONSPIRACY TO RETALIATE AGAINST MR. MERRITT

98. On April 23, 2013, Mr. Merritt visited Beatrice in order to have more discussion with her, to bring larger font copies of what was being filed so that she could read them herself.

99. Beatrice informed him that defendant Desmerais had visited her and was refusing to honor her request to quit her case so that she could apply for honest lawyer.

100. Mr. Merritt explained ADA Accommodation requests, told her that she had a right to get her voice heard in court and that she could ask defendants Cain and Superior Court to permit me to present her wished.

101. He explained that he could ask the court to make the accommodation of allowing him to be a kind of temporary interpreter who would communicate her wishes and needs to the court until an honest and impartial lawyer could be found for her to represent and protect only her interests'.

102. She told him that she wanted that and to have her lawyer terminated, and so Mr. Merritt typed up two ADA requests' and returned.

103. He read two requests' to her in which he typed up to: 1) Authorize him to present her wishes to the court; 2) Stop Stephan from interfering with her contacts with Mr. Merritt.

104. While visiting with her, Stephen Pacheco guard "care-taker" called him and he instructed her to terminate the visit and inform Mr. Merritt that his mother could not visit with anyone outside of his approval.

105. When Beatrice told her to go away, that it was her home, the care-taker called police and Mr. Merritt stated that it was best to keep tensions down.

106. On April 24, 2013, Mr. Merritt was on his way to court, but decided to call Beatrice, however, her phone was disconnected by Defendants.

107. He typed up a third ADA request, and as she attempted to leave her front door to speak with him her care-taker stated that Stephen said that she could neither receive any visitors nor go outside her home.

108. Beatrice told her to leave and came out, Mr. Merritt explained that Stephen had apparently terminated her phone and the third ADA request asking defendants to prohibited Stephen from interfering with her communications with Mr. Merritt and she signed it.

109. As they were talking, they were accosted by a man telling her that she was not allowed outside her home and had to return inside; she asked who he was and told him to leave off her property; he then ordered Mr. Merritt to leave and Mr. Merritt pulled out his phone to record asking them both whether he had their permission to record them and the man again ordered her to get in her home and for Mr. Merritt to leave.

110. Mr. Merritt then rushed to court and filed Beatrice's petition for removal of conservatorship and asked clerk what the procedure was on processing ADA request in conservatorship court and was told to see defendant Cain's clerk.

111. Defendant Cain's clerk stated that she could take the request and put it on Cain's desk; however, Mr. Merritt informed her that they were confidential and needed to be presented *in camera* without notice to defendants Searle and Desmerais.

112. The Clerk then told him that she would ask Cain for instruction on what to do and call Mr. Merritt later that day.

113. Based on statements from defendants Cain, Desmerais and Searle, as well as court records, Plaintiffs allege on information and belief that Cain called co-defendants Searle and Desmerais, from his Superior Court office speaking to them each on their cell phones in this district; informed them about Mr. Merritt's actions to encourage Beatrice to assert her ADA rights and have him present and interpret her wishes to the court; to disqualify him (i.e. Cain) from hearing the Petition for Removal; to dissolve the conservatorship against her and that they needed to act in order to intimidate and interfere with Mr. Merritt and Beatrice's activities.

114. Defendants Cain, Searle and Desmerais talked about what their options were after getting details about Beatrice's court filings and wishes, stated to each other that they needed to cover up their past actions to, *inter alia,* strip her of our rights to be married, because she was a European-American wishing to be with an African-American; she was 83 and he 58 and she female and he male.

115. Additionally, defendants Cain, Searle and Desmerais talked about Mr. Merritt aiding her and that they needed to discourage or otherwise stop him from doing so.

116. Cain asked them whether they would agree to him conducting a special hearing where they summoned Mr. Merritt to his court and do whatever they could to intimidate him and if he refused to cease all aid to Beatrice to issue an injunction against him which prohibited any further communications so that they could cover up the fabrications in the record that they had created and approved.

117. Defendants Searle and Desmerais agreed with Cain's idea and he ordered his clerk to summon Mr. Merritt.

1      118. Mr. Merritt arrived at 2:30 PM on April 24, 2013, where Cain asked who he was, why

2  he was involved in case, his contacts with Beatrice and other things related to her.

3      119. Mr. Merritt repeatedly informed Cain that he was there to present ADA Requests', in

4  order to report that Beatrice was being abused by son; assaulted; illegally held prisoner in her

5  home; and otherwise in need of emergency court intervention and that she wished to speak directly

6  with the court and terminate the services of defendant Desmerais.

7      120. For more than 60 minutes defendant Cain browbeaten Mr. Merritt, falsely told him

8  that he could not present ADA request to the court for Beatrice; falsely stated that she did not

9  know what she was signing; stated that everything was proper and that his aiding her was not

10 needed.

11     121. When Mr. Merritt persisted, Cain heightened the attacks against him, telling him that

12 he was basically acting unlawfully, that he could get in trouble for criminal violations; attacked his

13 experience as pro se litigant, belittled his knowledge about the law, falsely told him that the law

14 does not permit anyone to aid Beatrice and ultimately yelled at Mr. Merritt that he was now

15 threatened with court order to cease all communications with Beatrice, to remain 100 yards from

   her and otherwise enjoined from giving her any aid whatsoever.

16     122. Cain told Mr. Merritt to do whatever he wanted with the ADA Requests', but that he

17 (i.e. Cain) was rejecting even considering them.

18     123. Based on information and belief, Plaintiffs allege that Cain sought the pre-planned

19 supported of Searle and Desmerais, then asked co-defendants to speak up and Searle stated that

20 she supported Cain's action of issuing oral TRO fully, followed by Desmerais who stated that he

21 fully supported Cain's actions.

22

23

24

25

26

27

28

## V.    CLAIMS

## COUNT-I

124. Plaintiffs incorporate and reassert paragraphs 1 to 122 as if they were fully set forth herein.

125. This Count is asserted pursuant to the ADA, 42 U.S.C. §§ 12101 et seq. [ADA §§ 2 et seq.], against all defendants.

126. Plaintiff Salma Merritt is a qualified individual with disabilities as that term is defined by Title II of the ADA, 42 U.S.C. § 12131(2) [ADA § 201(2)].

127. Plaintiff Beatrice Pacheco-Starks is a qualified individual with disabilities as that term is defined by Title II of the ADA, 42 U.S.C. § 12131(2) [ADA § 201(2)].

128. The Santa Clara Superior Court is a public entity as that term is defined by Title II of the ADA, 42 U.S.C. § 12131(1) [ADA § 201(1)].

129. Defendants Mckenney, Cain, Pierce, Manoukian and other judges therein, are employees of this public entity with the responsibility of being charged with duties which mandates for them to honor, enforce and uphold ADA and corresponding laws.

130. Defendants Desmerais and Searle are members of California Bar and officers of Santa Clara Superior court.

131. Under defendants practices and unofficial policy, defendants are excluding Plaintiffs from participating in litigation which they are both witness and parties to; denying them access to effectively prosecute their claims and file oppositions as required, even though they have severe physical disabilities and require certain accommodations.

132. Defendants have used retaliation against Plaintiffs for seeking and being in need of ADA accommodations as a person with disabilities and interfering with Aide Mr. Merritt.

133. Defendants are constantly discriminating against Mrs. Merritt and Pacheco-Starks, due to their disabilities, by not accommodating their need to have their Aid, Mr. Merritt, interpret and communicate in hearings and other proceedings which were or are pending before defendants and have sanctioned them precisely because of their disability limitations.

134. Defendants fail to provide reasonable accommodations for Mrs. Merritt and Pacheco-Starks who has certain time-limitations which preclude her from attending to litigation full or even

1   half-time as a non-disabled person would be capable of doing, which produces cognitive

2   limitations; old age infirmities, near blindness, heart problems and more. For example, defendants

3   are refusing to continue trial and hearing dates to permit time for Mrs. Merritt to give her input

4   into preparations et cetera. Defendants are refusing to consider Mrs. Pacheco-Starks ADA requests

5   wholly and precluding anyone from helping her who is not part of defendants plans and team.

6       135. Defendants have violated Title II of the ADA, 42 U.S.C. § 12132 [ADA §202], by

7   excluding Plaintiffs Salma and David Merritt from participation in the trial scheduled under

8   *Merritt v. Gandhi, et al* 1-11-CV-195455 and from participating in proceedings set in *Merritt v.*

9   *Mozilo et al* 1-09-CV-159993; and Mrs. Pacheco-Starks from In Re Conservatorship of Beatrice

10   Pacheco, 1-12-PR-171580 (Each Santa Clara Superior Court), and denying them ADA

11   accommodations due to their physical, and consequential cognitive, visual and age impairments,

12   and by failing to otherwise permit a reasonable accommodation, to wit, permitting them additional

13   time to undergo medical treatment, protected from unprofessional and hostile attacks, adequate

14   time to prepare opposition to motions, terminate services of defendant Desmerais, remain together

15   with husband Mr. Starks and permit their Aid David Merritt, to act as surrogate (as needed when

16   they need to have interpreter/communicator of their wishes and needs in order to enable them to

    take part in petitions before Superior Court cited *ibid.*

17                              **COUNT-II**

18       136. Plaintiffs incorporate and reassert paragraphs 1 to 34 as if they were fully set forth

19   herein.

20       137. This Count is asserted pursuant to the ADA, 42 U.S.C. § 12203, against all the

21   defendants.

22       138. The Plaintiffs have repeatedly been compelled to file multiple requests for ADA

23   accommodations throughout the history of their civil prosecutions that were and are pending

24   before defendants, and more recently in Conservatorship matter; however, defendants has a policy

25   or practice of not recognizing ADA accommodations from one defendant to the next so as to force

26   disabled persons to have additional barriers to gain accommodations.

27       139. Mr. Merritt has been compelled to aid and articulate Mrs. Merritt's disabilities needs

28   and witnessed Pierce and Manoukian statement expressing that they do not appreciate him

bringing such disability needs before them; do not particularly care for the ADA requirements that mandates that ADA requests' be made *in camera* and without defense counsel ability to state their opposition and that it is not a good law.

140. Defendants have compelled Mr. Merritt to air Mrs. Merritt's disability needs and disability itself in open public court, without confidentiality protections, and has criticized the Plaintiffs for needing accommodations which are based on Mrs. Merritt's disabilities.

141. Defendant Mckenney has expressed his disdain for the Plaintiffs disability requests by refusing to answer them and by dismissing their lawsuit and designating them as vexatious for pursuing disability accommodations.

142. Defendant Cain has been violently hostile against Aid Mr. Merritt, for aiding Mrs. Pacheco-Starks in presenting ADA requests' and seeking her rights under Federal ADA laws. He punished Mr. Merritt by ordering him to stay 100 yards away from Mrs. Pacheco-Starks or face criminal arrest and proceedings for aiding her; falsified the ADA and conservatorship laws to him with the intent that Mr. Merritt should rely upon them as the truth, so that Cain, Desmerais and Searle could cover-up the fraudulent conduct that they and others committed against Mrs. Pacheco-Starks.

143. Defendants Cain, Desmerais and Searle have acted to imprison Mrs. Pacheco-Starks against her will, in her home with guards charged with preventing her from leaving home on her own; turning off phone service so that she cannot make any external contacts, falsifying reports to police, threating and intimidating Aid Mr. Merritt from trying to encourage or help her in any way or manner, all to her mental and physical detriment.

144. All defendants have retaliated against the Plaintiffs for seeking to enforce and assist in the enforcement of ADA laws and rights, and have interfered with their exercising the rights granted by the ADA laws.

145. Defendants have violated Title II of the ADA, 42 U.S.C. § 12203, by retaliating and interfering against Plaintiffs exercising ADA rights and laws, by dismissing lawsuit instead of continuing trial date, issuing order that they are vexatious litigants for pursuing, *inter alia*, disability accommodations, not continuing hearing dates, not protecting Mrs. Merritt from clearly abusive defense counsel practices and behavior, not protecting Mrs. Pacheco-Starks from physical

1    and mental abuses from her Stephen and not protecting her from their own fraud that they and

2    others are perpetrating upon her estate; and otherwise failing to permit them the freedom to enjoy

3    accessibility to court proceedings and activities that non-disabled persons would enjoy.

4                           **COUNT-IV**

5       146. This Court is asserted pursuant to California Unruh Civil Rights Act (on behalf of

6    Mrs. Merritt and against all defendants) (Cal.Civ. § 51 et seq.)

7       147. Plaintiffs incorporate and reassert paragraphs 1 to 144 as if they were fully set forth

8    herein.

9       148. Under the Unruh Civil Rights Act, a violation of the ADA is a violation of the Unruh

10    Act.

11       149. The failure to comply with the ADA and the Unruh Civil Rights Act as alleged above

12    created difficulties, interferences and retaliations against Plaintiffs which resulted in significant

      frustrations for them and attacks upon their rights.

13                           **COUNT-V**

14       150. This Court is asserted pursuant to California Disabled Persons Act (on behalf of Mrs.

15    Merritt and Mrs. Pacheco-Starks and against all defendants) (Cal.Civ. § 54 et seq.)

16       151. Plaintiffs incorporate and reassert paragraphs 1 to 149 as if they were fully set forth

17    herein.

18       152. Under the Disabled Persons Act, a violation of the ADA is a violation of the Disabled

19    Persons Act.

20       153. The failure to comply with the ADA and the Disabled Persons Act as alleged above

21    created difficulties, interferences and retaliations against Plaintiffs which resulted in significant

22    frustrations for them and attacks upon their rights and attempts to exercise thereof.

23

24       **COUNT-VI—Conspiracy to Retaliate Against Person Aiding Disabled Person**

25       154. Plaintiffs incorporate and reassert paragraphs 1 to 153 as if they were fully set forth

26    herein.

27       155. This Count is asserted pursuant to the ADA, 42 U.S.C. § 12203, against defendants

28    Cain, Searle and Desmerais and Santa Clara Superior Court.

*MERRITT v. Mckenney et al* CV13-01391-PSG

156. Mr. Merritt was enlisted and asked by Mrs. Pacheco-Starks to present her wishes and needs to the defendants.

157. Defendants Cain, Desmerais and Searle refused and failed to accept Mr. Merritt aiding Mrs. Pacheco-Starks, and joined in to a conspiracy to intimidate and threaten him so as to interfere with his attempts to aid her.

158. Defendants Cain, Desmerais and Searle then planned on how they would accomplish their intimidation, threats and interference, and agreed among themselves to do so.

159. In addition to the intimidating and threatening tactics employed by defendant Cain against Mr. Merritt in open court, Cain signaled to his deputy to summon six or so more deputies to court room to give the appearance that he could have Mr. Merritt taken into custody if he persisted on aiding Mrs. Pacheco-Starks.

160. Mr. Merritt finally ceased further effort to present ADA requests to defendants, and upon leaving court simply filed them with the clerk.

161. Mrs. Pacheco-Starks is a person who is qualified as a disabled person under the ADA and her disability compels her to seek and obtain the aid of others who would interpret and otherwise present her desires in needs to any court of law.

162. Defendants Cain, Desmerais and Searle, pursuant to defendant Superior Court policy or practice, refused and failed to accept Mr. Merritt aiding Mrs. Pacheco-Starks and acted to intimidate, threaten and punish him for doing so, as alleged herein.

163. All defendants have retaliated against the Plaintiffs for seeking to enforce and assist in the enforcement of ADA laws and rights, and have interfered with their exercising the rights granted by the Federal and State ADA laws.

164. Defendants have violated Title II of the ADA, 42 U.S.C. § 12203, by retaliating and interfering against Mr. Merritt's exercising ADA rights and laws to aid disabled persons, by dismissing lawsuit instead of continuing trial date, issuing order that they are vexatious litigants for pursuing, *inter alia*, disability accommodations, not continuing hearing dates, not protecting Mrs. Merritt from clearly abusive defense counsel practices and behavior, and otherwise failing to permit them the freedom to enjoy accessibility to court proceedings and activities that non-disabled persons would and do enjoy.

# VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs' prays that this Court:

1.   Assume jurisdiction over this case.

2.   Send case to Jury trial.

3.   Declare that defendants' exclusion of persons with physical disabilities such as Mrs. Merritt and Mrs. Pacheco-Starks, with corresponding cognitive and chronic pain disabilities, physical limitations, near blindness, old age infirmities, from participation in court proceedings, hearings, preparations, and other litigation matters, violates the ADA.

4.   Declare that defendants' retaliation against persons with disabilities such as Mrs. Merritt and Mrs. Pacheco-Starks with corresponding cognitive and chronic pain disabilities, physical limitations, near blindness, old age infirmities, and need to have their Aid, Mr. Merritt interpret their rights diligently, then punished for such attempts to enforce rights, or interfering with attempts to enforce such rights, violates the ADA.

5.   Declare that Cain, Desmerais, Searle et al did conspire to retaliate, intimidate and interfere against Mr. Merritt and Mrs. Pacheco-Starks for Mr. Merritt aiding and encouraging her how to exercise her ADA rights, and that such violates the ADA.

6.   Order injunctive relief requiring defendants to undo any and all orders which are found to have derived from retaliation, interference with or failures to provide disability accommodations.

7.   Order injunctive relief requiring defendants to cease and desist from further interference or retaliation against Plaintiffs.

8.   Order injunctive relief requiring defendants to implement a policy whereby Plaintiffs, and other persons with disabilities only need make one request for accommodations, one time, and that all state judges will need to abide to the accommodation that is needed and for there not be a requirement for persons with disabilities who are litigants, need to make repeated requests'.

9.   Order injunctive relief requiring defendants to not hold persons with disabilities and their representative to some higher standard than defendants hold lawyers to, and to in fact hold such litigants to less stringent standard than lawyers, per ADA and other Federal laws and practice.

10. Order any other injunctive relief that the Court deems proper which compels defendants to comply with the ADA and Unruh Civil Rights and Disabilities Acts. **NOTE:** Plaintiffs are not

1   invoking section 55 of the California Civil Code and not seeking injunctive relief under the

2   Disabled Persons Act.

3       11. Award monetary damages under the Unruh Civil Rights Act and/or the California Disabled

4   Persons Act which damages provide for actual damages and a statutory minimum of $4,000 from

5   each defendant separately. **NOTE:** Plaintiffs are not attempting to recover damages under both

6   acts, simultaneously, and an election will be made prior to or at trial.

7       12. Award any litigation expenses and costs of suit which may occur, pursuant to 42 U.S.C. §

8   12205; Cal.Civ. Code. §§ 52 and 54.3 and Cal. Civ. Proc. § 102.5.

9

                                        Respectfully submitted

10  Dated: April 25, 2013

11                                      David Merritt

12
    Dated: April 25, 2013
13                                      Salma Merritt

14                              Verification

15      We, David and Salma Merritt hereby declare, to the best of our knowledge and abilities,

16  under the penalties of perjury for the State of California that the foregoing is true and correct
    except to those things based on information and belief and to those things we alleged based on
17  actions and documents of defendants and other persons to be true.

18

19  Executed in Santa Clara County, CA on April 25 2013.

20                                      David Merritt

21

22  Executed in Santa Clara County, CA on April 25 2013.

23

24                                      Salma Merritt

25  Executed in Santa Clara County, CA on April 25, 2013.

26                                      By:_____
                                        David Merritt on behalf of
27                                      Beatrice Pacheco-Starks

28

*MERRITT v. Mckenney et al CV13-01391-PSG*

**CERTIFICATE OF SERVICE**

I, Marreon G. Starks, am over 18 years of age, not a professional process server and I hereby certify that I sent

First Amended Complaint By Persons with Disabilities to Santa Clara Superior Court (Brian Walsh), Kevin Mckenney, Mark Pierce and Socrates Manoukian

On April 25, 2013, by addressing envelope to them and hand delivering the copy to their superior Brian C. Walsh clerk and clerks of their respective departments 20, 9 and 19 located at 191 first street, San Jose, CA.

*M G. Starks*

Marreon Gene Starks
600 Wedell
Sunnyvale, CA 90489

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, STATE OF FLORIDA
FAMILY LAW DIVISION

LORI A. FOULTZ,
    Former Wife,

CASE NO.:  2002-4655-DR-FJ

v.

WILLIAM TODD OVERCASH,
    Former Husband.

_____/

## FORMER HUSBAND'S MOTION TO DISMISS

**COMES NOW** the Former Husband, William Todd Overcash (Overcash), by and through his undersigned counsel pursuant to Fla. R. Crim. P. 3.190(b) and files this Motion to Dismiss the Court's Show Cause Order and scheduled trial on December 12, 2013 at 1:30 p.m. In support, Overcash would show the following:

1.     On or about June 21, 2013,  Foultz  by and through her counsel filed a Motion for Direct Criminal Contempt in this cause (attached as Exh. A).

2.     This motion was filed some four months after Overcash gave testimony at a hearing on February 27, 2013 regarding his property taxes.

3.     Overcash filed a Response in Opposition to Former Wife's Motion for Direct Criminal Contempt on June 25, 2013 (attached as Exh. B).

4.     This Court issued a Show Cause Order on September 18, 2013 reciting almost verbatim the language used in opposing counsel's motion (attached as Exh.C).

5.     Florida Rule of Criminal Procedure 3.190 (b) provides that a Motion to Dismiss may be heard anytime prior to trial of a matter.

6.     The Court's Show Cause Order is one alleging "Direct Criminal Contempt" pursuant to Fla. Crim. P. 3.830.

1

7.    Pursuant to Fla. R. Crim. P. 3.830 – Direct Criminal Contempt, "A Criminal Contempt may be punished summarily if the Court saw or heard the conduct constituting the contempt committed in the actual presence of the Court. In other words. on the spot.

8.    Paragraph 1 of the Court's Order to Show Cause dated September 18, 2013, states that Overcash "should appear on October 22, 2013…to show cause why he is not in willful direct criminal contempt for his misrepresentations and statement to the Court."

9.    The Court's Show Cause Order was based on a Motion for Direct Criminal Contempt filed by the Former Wife's counsel, Mark Shelnutt dated June 21, 2013, some four months after the alleged misconduct.

10.    Moreover,  the Court, however. is treating these proceedings as Indirect Criminal Contempt pursuant to Fla. R. Crim. P. 3.840, which states that the Rule shall be prosecuted in the following manner:

    a.  Order to Show Cause.

    b.  Motions; Answer.

    c.  Order of Arrest; Bail.

    d.  Arraignment; Hearing.

    e.  Verdict; Judgment.

    f.  Sentence; Indirect Contempt.

11.    Thus far, the Court has abided by (a) (b) and (d) of Fla.R.Crim. P. 3.840, not the procedures of Fla.R.Crim.P. 3.830 (attached as Exh.D).

12.    Fla. R. Crim. P. 3.830 states that the Court should summarily punish the contemnor. Four months later does not meet the standard of the rule.

2

13.     As previously stated, the Court's Show Cause Order was predicated upon a motion by opposing counsel and not on the Court's own knowledge on February 27, 2013 of the alleged misconduct. In fact, it was not until opposing counsel brought the alleged misconduct to the Court's attention by a Motion filed on June 21, 2013 that the Court issued the Show Cause Order.

14.     In indirect criminal contempt, Rule 3.840 mandates that the Motion should be predicated on affidavit of some party having actual knowledge of the facts. Croft v. Culbreath, 150 Fla. 60, 6 So. 2d 638 (Fla. 1942); De Castro  v. De Castro, 957 So. 2d 1258 (Fla. 3rd DCA 2007); and Vernell v. State, 212 So. 2d 11 (Fla. 3rd DCA 1968).

15.   The Former Wife's Motion for Direct Criminal Contempt does not contain the requisite affidavit, as required by Florida law.

16.   Further, by the applicable Florida Rules of Criminal Procedure, Overcash must be informed of the specific charge being brought against him.  As it stands, the Show Cause Order is tantamount to a Charging Document and it is unclear if he is being charged with "Indirect Criminal Contempt" or "Direct Criminal Contempt".

17.     In State ex rel. Luban Coleman, 189 So. 713 (Fla. 1939) the Supreme Court of Florida citing 12 American Jurisprudence, page 400 stated:

> In order that perjury may constitute contempt of court, however, it must appear that (1) the alleged false answers had an obstructive effect, (2) there existed judicial knowledge of the falsity of the testimony, and (3) the question was pertinent to the issue.

Also Emanuel v. State, 601 So. 2d 1273 (Fla. 4th DCA 1992), stating that "a three prong test must be met to punish perjury by direct criminal contempt one of which is...(2) there existed judicial knowledge of the falsity of the testimony..."

18.    It is clear that not even Attorney Shelnutt had knowledge of the alleged misconduct on February 27, 2013, until months later when he brought it to the Court's attention.

19.    Thus, the Court does not meet the second prong outlined in the cases cited previously and the matter must be dismissed.

20.  Finally, pursuant to <u>Coleman</u> cited previously,

> [t]he Court should not weigh the conflicting evidence" to determine if a witness is being truthful.  In other words, the mere fact that the Court believes one witness over another is insufficient to establish judicial knowledge that a witness' testimony is false for the purpose of summarily adjudicating the witness in direct criminal contempt.

**WHEREFORE**, based on the foregoing, the Former Husband prays this Court will enter an Order dismissing the Show Cause Order dated September 18, 2013 currently set for trial.

Respectfully submitted,

Robert E. Taylor, Jr.
FBN:  0943071
Robert@rtaylorlaw.com
**The R. Taylor Law Firm, P.A.**
10014 North Dale Mabry Hwy., Suite 101
Tampa, Florida  33618
813-304-2264 (telephone)
Attorney for Former Husband

William Todd Overcash

4

## VERIFICATION

**STATE OF FLORIDA**
**COUNTY OF MARION**

Sworn to or affirmed and signed before me on this _10th_ day of _December_ , 2013
2013 by **WILLIAM TODD OVERCASH.**

_[signature]_
NOTARY PUBLIC

_Ann Gillan_
Print, type or stamp commissioned name

_[checkmark]_ Personally known
_____ Produced identification
Type of identification_____

Notary Public State of Florida
Ann Gillan
My Commission EE 195212
Expires 05/02/2016

(SEAL)
My Commission expires on:

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished
to Mark D. Shelnutt, Esquire, 1404 East Silver Springs Boulevard, Ocala, Florida 34470
mshelnutt@shelnuttpa.com: Skoerner@shelnuttpa.com: via [xx] electronic mail on this 10th day
of December, 2013.

_[signature]_
Robert E. Taylor, Jr.

cc: Judicial Assistant

5

IN THE CIRCUIT COURT, FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

IN RE: The Former Marriage of:                    CASE NO.: 2002-4655-DR-FJ

WILLIAM T. OVERCASH,

       Former Husband,

and

LORI A. FOULTZ,

       Former Wife.

_____/

## MOTION FOR DIRECT CRIMINAL CONTEMPT

**COMES NOW**, the Former Wife, LORI A. FOULTZ, by and through her undersigned attorney of record, and files with the Court her Motion for Direct Criminal Contempt in the above style cause, and as ground therefore would state:

1.      A hearing was held before this Court on February 27, 2013 in which both parties were present and represented by their respective counsels. Scheduled for hearing that day was a litany of case management issues and motions for contempt for non-payment of support obligations by the Former Husband. Attached as Exhibit "A" is the Notice for Hearing.

2.      The Former Husband was testifying before and in the direct presence of the Court as to his ability to pay the Court-order attorney's fees to counsel for the Former Wife. On direct examination, the following statements were made between Attorney Gordon and the Former Husband:

      Q:    Okay. What is your position today, as we sit here today, in terms of what you have available in your bank account to pay these fees?

1



A:      I have the amount to pay Lori that $2,500 for the month of
        February which I thought I had paid.
Q:      Twenty-four.
A:      Twenty-four. And other than that, I am financially broke
        because I issued checks for property taxes.
Q:      How much were those?
A:      $8,000.00.
Q:      Is that for the home that we're talking about. the equitable
        distribution on Ms. Foultz?
A:      The home and the farm. I think it's around $8,000.00. I
        know—I can't tell you the exact numbers, but the farm and the
        home had to be paid.
Q:      Okay. Two separate bills?
A:      Right.
Q:      You've already done that?
A:      Yes.

The complete transcript from the February 27, 2013 hearing is attached as Exhibit

"B." For the Court's convenience, the above conversation begins on page 82, line 11.

3.      As of the date of filing this motion, the Former Husband has not paid the property

taxes for either property that he attested to paying. Records from the Marion County Property

Appraisers are attached as Exhibit "C."

4.      This Court should find that the Former Husband's willful misrepresentations to the

Court were an act of perjury and punishable by criminal contempt, pursuant to Florida Rules of

Criminal Procedure 3.840. The Former Wife would ask that this Court enter its Order to Show

Cause, pursuant to this Rule, to order the Former Husband to appear at a time and place as specified

by this Court, to enter a plea to a charge of direct criminal contempt of either guilty or not guilty,

to hold a hearing on same, and to find that the Former Husband is in willful criminal contempt for

his calculated attempts to hinder and obstruct the administration of justice.

5.      The Wife has retained the Office of Mark D. Shelnutt, P.A. to represent her in this

matter and has agreed to pay a reasonable fee for the services. Due to the Former Husband's

2

actions, the Wife has been required to retain the undersigned counsel to file this Motion and has incurred attorney's fees and costs.

WHEREFORE, the Former Wife would respectfully requests that this Honorable Court enter its Order finding the Former Husband in direct criminal contempt for his statements made before this Court, that a hearing be held on this Court's Order to Show Cause, and that the Former Husband come before the Court and, upon his failing to produce evidence that he is not in direct criminal contempt pursuant to the above statute, that he be incarcerated for a reasonable time for those his actions, awarding reasonable attorney's fees and costs to the Former Wife, and such other and further relief as may be deemed reasonable and necessary under the circumstances.

DATED this 21st day of June, 2013.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by Email to Beth M. Gordon, Esquire, thegordonlawfirm@aol.com, Robert E. Taylor, Jr., Esquire, Robert@rtaylorlaw.com, sonia@rtaylorlaw.com, and Janet Behnke, Esquire, Guardian Ad Litem, janet@behnkelaw.net and pam@behnkelaw.net, this 21st day of June, 2013.

MARK D. SHELNUTT, P.A.

By_____
Mark D. Shelnutt, Esquire
Florida Bar No.: 304042
Rebecca A. Guthrie, Esquire
Florida Bar No.: 0030028
1404 East Silver Springs Blvd.
Ocala, Florida 34470
Telephone: (352) 629-6203
Facsimile: (352) 401-9485
mshelnutt@shelnuttpa.com
skoener@shenuttpa.com
Attorneys for the Former Wife

3

IN THE CIRCUIT COUT, FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

IN RE: The Former Marriage of:                    Case No: 2002-4655-DR-FJ

WILLIAM T. OVERCASH,

      Former Husband,

And

LORI A. FOULTZ,

      Former Wife,

_____/

## FORMER HUSBAND'S RESPONSE IN OPPOSITION TO FORMER WIFE'S MOTION FOR DIRECT CRIMINAL CONTEMPT

    **COMES NOW**, the Former Husband, William T. Overcash, by and through his undersigned counsel, and files with the Court his Answer to the Motion for Direct Criminal Contempt in the above style cause and as grounds would therefore state the following:

1. No perjury occurred- Fla. Stat. Ch. 837.02 defines perjury in pertinent part, as "Perjury in official proceedings (Florida Statutes (2012 Edition)) 1) Except as provided in subsection (2), whoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding in regard to any material matter, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083..."

2. Former Wife has asked that this Court hold the Former Husband in contempt for perjury. Since nothing resembling perjury occurred, there can be no finding of contempt. A hearing was held before this Court on February 27, 2013 in which both parties were present and represented by their respective counsel. Scheduled for hearing that day were case management issues and other motions.

EXHIBIT
B
ALL-STATE LEGAL®

3. The Former Husband was testifying before and in the direct presence of the Court regarding his ability to pay Court-ordered attorney's fees to counsel for the Former Wife. The Former Wife claims the Former Husband lied to the courts in stating that the property taxes *were paid*. In fact, the transcripts outlined below it reveal that the Former Husband did not state they were paid, but that he had issued (written) checks to pay the taxes. The Former Wife implied that he had paid in his question but Dr. Overcash was never asked the specific question of whether the taxes had been paid.

4. The Former Husband never had any intent to falsify or mislead the Court or any participant to this case. This was not a calculated attempt to hinder or obstruct the administration of justice. Had he been asked the specific question, i.e. whether the checks to the county had been paid and cashed, he would have given a truthful, specific answer. The money had been set aside for the taxes, which were owing to the county, and after the Court disapproved of the paying of the taxes, the money was used to pay, in part, the fees.

5. The Former Wife has neglected to complete the transcript on her Motion to give the Court only a partial rendition of facts. Below is the portion left out of the Former wife's motion:

*(This is a continuation of the examination between attorney Gordon and Dr. Overcash)*
*(pg. 83, lines 1-6)*

Q. Okay. Two separate bills?

A. Right.

Q. You've already done that?

A. Yes.

Q. That's something that's written and out?

A. It has to be paid on it—they put a tax lien on the property."

*This is examination between Mr. Shelnutt and Dr. Overcash: pg 96-97 lines 24-25,1-18:*

"Q.  So whatever else has happened on planet earth, we know that since mid-November of this year, you've paid 5,500 to Dr. Pinder and 8,000 to property tax and 2,000 to Mr. Taylor, which is 15,200, rather than do what you were supposed to do and running up all these obligations in attorney's fees; isn't that correct?

A. I don't have a right to defend myself?

 Q. Sir, yes or no?

A. I don't understand the question.

Q You paid $15,500 in the last three months for obligations that were not a court order.

A. When I sign…

Q. Sir, it's yes or no.

Ms. Gordon: Let me object.

By Mr. Shelnutt: Q. You think you can answer the question?

A. I think it's court ordered, yes I have a legal responsibility to defend myself.

Mr. Shelnutt: Judge, I don't have any other questions."

*Page 105 lines 4-12: Conversation between the Judge and Mr. Shelnutt regarding if payment was mailed or not.*

"The court: So you think it was—that it was just a coincidence that he paid his 8,000-dollar tax bill—what, what did he say, yesterday? I don't remember what day he said.

Mr. Shelnutt: He said over the weekend.  Three or four days prior to this hearing.

The Court: I don't know whether he put it in the mail over the weekend or what but I'm sure they're not open on the weekends."

*Page 105 lines 15-20: Conversation between the Judge and Mr. Shelnutt*

"The Court: But sure, so what. You don't get put in jail—you can't be put in jail for not paying your tax bill. Even if he didn't pay it by April 1st, it's going to take a while before any—and you can redeem tax, I believe.

Mr. Shelnutt: "You can."

Now, not only does attorney Shelnutt wish to testify, as is his habit, in Court, he wishes to hold others accountable *for perjury* when he so testifies. [1] This exchange is hardly the perjury that counsel would have the Court believe.

Following the Court's discussion and obvious, clear disapproval of the paying of the two tax bills, the checks were retrieved, and the tax bills not paid (the tax bill remains unpaid to date). The nearly $8,000 that had been earmarked for the taxes on two properties including the Petitioner's homestead was then used to pay the Former Wife's attorney's fees. The Court on the same day in question ordered the Former Husband to pay the sum of $24,378.02 for attorney's fees or face jail- the amount was paid, after sufficient funds were raised and borrowed, in full on 5th day of May, 2013.

WHEREFORE, the Former Husband would respectfully request that this Honorable Court enter an order dismissing the Motion for Direct Criminal Contempt, awarding

---

[1] Notably, the former Wife's counsel has also "testified," *untruthfully*, in this case that the Former Wife had brought the minor child to an orthodontist for a second opinion and that orthodontist agreed with the former wife- that the child didn't need braces. This was blatantly false, and a letter was presented to this court by way of a motion, to prove that in fact the orthodontist did agree with the first orthodontist. Sadly, the false statement of Former Wife's counsel carried the day, and no braces were ordered by the Court, nor were there any repercussions in this proceeding for the false information stated to the Court by Former Wife's counsel, despite a motion for rehearing and for sanctions for misrepresenting a material fact to the Court, comp-lete with evidence in the form of a dated letter from Dr. Reed, and the transcript in question. To date, Former wife's counsel has never attempted to retract his statements regarding the orthodontist, Dr. Reed, and the falsehoods told to the Court achieved the purpose of denying the minor child the braces that two local, well respected orthodontists agreed she needed immediately. Had the Court been told the truth, that the orthodontist that the mother took the child to herself was of the opinion that braces were needed right away, according to the language of the final judgment the minor child would have received that treatment.

reasonable attorney's fees and cost to the Former Husband pursuant to Chapter 61,

Florida Statutes, and such other and further relief as may be deemed reasonable and

necessary under the circumstances.

DATED this 25th day of June, 2013

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished by Email thiss 25th day of June, 2013, to Mark D. Shelnutt, Esquire at

mshelnutt@shelnuttpa.com; skoerner@shelnuttpa.com  Mark D. Shelnutt, PA, 1404 E Silver

Springs Blvd Ocala FL 34470-6820

The Gordon Law Firm
PO Box 734
Williston, FL 32696
(352) 528-0111

*B Gordon*
Beth Gordon, Esq.

IN THE CIRCUIT COURT, FIFTH JUDICIAL CIRCUIT,
IN AND FOR MARION COUNTY, FLORIDA

IN RE: The Former Marriage of:                    CASE NO.: 2002-4655-DR-FJ

WILLIAM T. OVERCASH,

        Former Husband,

and

LORI A. FOULTZ,

        Former Wife.

_____/

### ORDER TO SHOW CAUSE

THIS CAUSE coming on to be hearing on the Former Wife's Motion for Direct Criminal

Contempt, and the Court having reviewed the documents and being otherwise advised in the

premises, it is thereupon,

ORDERED AND ADJUDGED:

1.    That WILLIAM TODD OVERCASH is hereby ordered to appear before the

Honorable Barbara Gurrola, on October 22, 2013 at 10:00 a.m/p.m. at the Marion

County Judicial Center, 110 NW 1st Avenue, Ocala, Florida, to show cause why he is not in willful

direct criminal contempt for his misrepresentations and statements to the Court. More specifically

as follows:

    a.    A hearing was held before this Court on February 27, 2013 in which both

parties were present and represented by their respective counsels. Scheduled for hearing that day

was a litany of case management issues and motions for contempt for non-payment of support

obligations by the Former Husband.

1 .



b.     The Former Husband was testifying before and in the direct presence of the Court as to his ability to pay the Court-order attorney's fees to counsel for the Former Wife. On direct examination, the following statements were made between Attorney Gordon and the Former Husband:

Q:   Okay. What is your position today, as we sit here today, in terms of what you have available in your bank account to pay these fees?

A:   I have the amount to pay Lori that $2,500 for the month of February which I thought I had paid.

Q:   Twenty-four.

A:   Twenty-four. And other than that, I am financially broke because I issued checks for property taxes.

Q:   How much were those?

A:   $8,000.00.

Q:   Is that for the home that we're talking about, the equitable distribution on Ms. Foultz?

A:   The home and the farm. I think it's around $8,000.00. I know—I can't tell you the exact numbers, but the farm and the home had to be paid.

Q:   Okay. Two separate bills?

A:   Right.

Q:   You've already done that?

A:   Yes.

c.     As of June 21, 2013, and according to the Marion County Property Appraiser, the Former Husband had not paid the property taxes for either property that he attested to paying.

2.     That at this hearing, the Court will also determine what sanctions should be imposed against WILLIAM TODD OVERCASH, including possible incarceration, for failing to provide any evidence or to convince the Court that he is not in direct criminal contempt pursuant to Rule 3.840, *Fla.R.Crim.P.,* for his willful statements made in the direct presence of this Court, including attorney's fees and costs.

2

DONE AND ORDERED in Chambers, at Ocala, Marion County, Florida this _18_ day of September, 2013.

*Barbara Gurrola*

BARBARA GURROLA
Circuit Court Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S. Mail delivery to **Mark D. Shelnutt, Esquire,** mshelnutt@shelnuttpa.com, 1404 East Silver Springs Blvd., Ocala, Florida 34470; **Robert E. Taylor, Jr., Esquire,** robert@rtaylorlaw.com, 10014 North Dale Mabry Hwy., Suite 101, Tampa, Florida 33618 and **Janet Behnke, Esquire,** janet@behnkelaw.net, 500 NE 8th Avenue, Ocala, Florida 34470, this _18_ day of September, 2013

Judicial Assistant

3

**RULE 3.840.**     **INDIRECT CRIMINAL CONTEMPT**

A criminal contempt, except as provided in rule 3.830 concerning direct contempts, shall be prosecuted in the following manner:

(a) **Order to Show Cause.** The judge, on the judge's own motion or on affidavit of any person having knowledge of the facts, may issue and sign an order directed to the defendant, stating the essential facts constituting the criminal contempt charged and requiring the defendant to appear before the court to show cause why the defendant should not be held in contempt of court. The order shall specify the time and place of the hearing, with a reasonable time allowed for preparation of the defense after service of the order on the defendant.

(b) **Motions; Answer.** The defendant, personally or by counsel, may move to dismiss the order to show cause, move for a statement of particulars, or answer the order by way of explanation or defense. All motions and the answer shall be in writing unless specified otherwise by the judge. A defendant's omission to file motions or answer shall not be deemed as an admission of guilt of the contempt charged.

(c) **Order of Arrest; Bail.** The judge may issue an order of arrest of the defendant if the judge has reason to believe the defendant will not appear in response to the order to show cause. The defendant shall be admitted to bail in the manner provided by law in criminal cases.

(d) **Arraignment; Hearing.** The defendant may be arraigned at the time of the hearing, or prior thereto at the defendant's request. A hearing to determine the guilt or innocence of the defendant shall follow a plea of not guilty. The judge may conduct a hearing without assistance of counsel or may be assisted by the prosecuting attorney or by an attorney appointed for that purpose. The defendant is entitled to be represented by counsel, have compulsory process for the attendance of witnesses, and testify in his or her own defense. All issues of law and fact shall be heard and determined by the judge.

(e) **Disqualification of Judge.** If the contempt charged involves disrespect to or criticism of a judge, the judge shall disqualify himself or herself

**EXHIBIT**

**O**

ALL-STATE LEGAL

from presiding at the hearing. Another judge shall be designated by the chief justice of the supreme court.

(f)   **Verdict; Judgment.** At the conclusion of the hearing the judge shall sign and enter of record a judgment of guilty or not guilty. There should be included in a judgment of guilty a recital of the facts constituting the contempt of which the defendant has been found and adjudicated guilty.

(g)   **Sentence; Indirect Contempt.** Prior to the pronouncement of sentence, the judge shall inform the defendant of the accusation and judgment against the defendant and inquire as to whether the defendant has any cause to show why sentence should not be pronounced. The defendant shall be afforded the opportunity to present evidence of mitigating circumstances. The sentence shall be pronounced in open court and in the presence of the defendant.

### Committee Notes

#### 1968 Adoption.

(a)(1)   **Order to Show Cause.** The courts have used various and, at times, misleading terminology with reference to this phase of the procedure, viz. "citation," "rule nisi," "rule," "rule to show cause," "information," "indicted," and "order to show cause." Although all apparently have been used with the same connotation the terminology chosen probably is more readily understandable than the others. This term is used in Federal Rule of Criminal Procedure 42(b) dealing with indirect criminal contempts.

In proceedings for indirect contempt, due process of law requires that the accused be given notice of the charge and a reasonable opportunity to meet it by way of defense or explanation. *State ex rel. Giblin v. Sullivan*, 157 Fla. 496, 26 So.2d 509 (1946); *State ex rel. Geary v. Kelly*, 137 So.2d 262, 263 (Fla. 3d DCA 1962).

The petition (affidavit is used here) must be filed by someone having actual knowledge of the facts and must be under oath. *Phillips v. State*, 147 So.2d 163 (Fla. 3d DCA 1962); see also *Croft v. Culbreath*, 150 Fla. 60, 6 So.2d 638 (1942); *Ex parte Biggers*, 85 Fla. 322, 95 So. 763 (1923).

(2)   **Motions; Answer.** The appellate courts of Florida, while apparently refraining from making motions and answers indispensable parts of the procedure, seem to regard them with favor in appropriate situations. Regarding motions to quash and motion for bill of particulars, see *Geary v. State*, 139 So.2d 891 (Fla. 3d DCA 1962); regarding the answer, see State ex rel. *Huie v. Lewis*, 80 So.2d 685 (Fla. 1955).

Elsewhere in these rules is a recommended proposal that a motion to dismiss replace the present motion to quash; hence, the motion to dismiss is recommended here.

The proposal contains no requirement that the motions or answer be under oath. Until section 38.22, Florida Statutes, was amended in 1945 there prevailed in Florida the common law rule that denial under oath is conclusive and requires discharge of the defendant in indirect contempt cases; the discharge was considered as justified because the defendant could be convicted of perjury if the defendant had sworn falsely in the answer or in a motion denying the charge. The amendment of section 38.22, Florida Statutes, however, has been construed to no longer justify the discharge of the defendant merely because the defendant denies the charge under oath. See *Ex parte Earman*, 85 Fla. 297, 95 So. 755 (1923), re the common law; see *Dodd v. State*, 110 So.2d 22 (Fla.

3d DCA 1959) re the construction of section 38.22, Florida Statutes, as amended. There appears, therefore, no necessity of requiring that a pleading directed to the order to show cause be under oath, except as a matter of policy of holding potential perjury prosecutions over the heads of defendants. It is recommended, therefore, that no oath be required at this stage of the proceeding.

Due process of law in the prosecution for indirect contempt requires that the defendant have the right to assistance by counsel. *Baumgartner v. Joughin*, 105 Fla. 335, 141 So. 185 (1932), adhered to, 107 Fla. 858, 143 So. 436 (1932).

(3)     **Order of Arrest; Bail.** Arrest and bail, although apparently used only rarely, were permissible at common law and, accordingly, are unobjectionable under present Florida law. At times each should serve a useful purpose in contempt proceedings and should be included in the rule. As to the common law, see *Ex parte Biggers*, supra.

(4)     **Arraignment; Hearing.** Provision is made for a pre-hearing arraignment in case the defendant wishes to plead guilty to the charge prior to the date set for the hearing. The defendant has a constitutional right to a hearing under the due process clauses of the state and federal constitutions. *State ex rel. Pipia v. Buchanan*, 168 So.2d 783 (Fla. 3d DCA 1964). This right includes the right to assistance of counsel and the right to call witnesses. *Baumgartner v. Joughin*, supra. The defendant cannot be compelled to testify against himself. *Demetree v. State*, ex rel. Marsh, 89 So.2d 498 (Fla. 1956).

Section 38.22, Florida Statutes, as amended in 1945, provides that all issues of law or fact shall be heard and determined by the judge. Apparently under this statute the defendant is not only precluded from considering a jury trial as a right but also the judge has no discretion to allow the defendant a jury trial. See *State ex rel. Huie v. Lewis*, supra, and *Dodd v. State*, supra, in which the court seems to assume this, such assumption seemingly being warranted by the terminology of the statute.

There is no reason to believe that the statute is unconstitutional as being in violation of section 11 of the Declaration of Rights of the Florida Constitution which provides, in part, that the accused in all criminal prosecutions shall have the right to a public trial by an impartial jury. Criminal contempt is not a crime; consequently, no criminal prosecution is involved. *Neering v. State*, 155 So.2d 874 (Fla. 1963); *State ex rel. Saunders v. Boyer*, 166 So.2d 694 (Fla. 2d DCA 1964); *Ballengee v. State*, 144 So.2d 68 (Fla. 2d DCA 1962).

Section 3 of the Declaration of Rights, providing that the right of trial by jury shall be secured to all and remain inviolate forever, also apparently is not violated. This provision has been construed many times as guaranteeing a jury trial in proceedings at common law, as practiced at the time of the adoption of the constitution (see, e.g., *Hawkins v. Rellim Inv. Co.*, 92 Fla. 784, 110 So. 350 (1926)), i.e., it is applicable only to cases in which the right existed before the adoption of the constitution (see, e.g., *State ex rel. Sellers v. Parker*, 87 Fla. 181, 100 So. 260 (1924)). Section 3 was never intended to extend the right of a trial by jury beyond this point. *Boyd v. Dade County*, 123 So.2d 323 (Fla. 1960).

There is some authority that trial by jury in indirect criminal contempt existed in the early common law, but this practice was eliminated by the Star Chamber with the result that for centuries the common law courts have punished indirect contempts without a jury trial. See 36 Mississippi Law Journal 106. The practice in Florida to date apparently has been consistent with this position. No case has been found in this state in which a person was tried by a jury for criminal contempt. See Justice Terrell's comment adverse to such jury trials in *State ex rel. Huie v. Lewis*, supra.

The United States Supreme Court has assumed the same position with reference to the dictates of the common law. Quoting from *Eilenbecker v. District Court*, 134 U.S. 31, 36, 10 S.Ct. 424, 33 L.Ed. 801 (1890), the Court stated, "If it has ever been understood that proceedings according to the common law for contempt of court have been subject to the right of trial by jury, we have been unable to find any instance of it." *United States v. Barnett*, 376 U.S. 681, 696, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964). In answer to the contention that contempt proceedings without a jury were limited to trivial offenses, the Court stated, "[W]e find no basis for a determination that, at the time the Constitution was adopted, contempt was generally regarded as not extending

to cases of serious misconduct." 376 U.S. at 701. There is little doubt, therefore, that a defendant in a criminal contempt case in Florida has no constitutional right to a trial by jury.

Proponents for such trials seemingly must depend on authorization by the legislature or Supreme Court of Florida to attain their objective. By enacting section 38.22, Florida Statutes, which impliedly prohibits trial by jury the legislature exhibited a legislative intent to remain consistent with the common law rule. A possible alternative is for the Supreme Court of Florida to promulgate a rule providing for such trials and assume the position that under its constitutional right to govern practice and procedure in the courts of Florida such rule would supersede section 38.22, Florida Statutes. It is believed that the supreme court has such authority. Accordingly, alternate proposals are offered for the court's consideration; the first provides for a jury trial unless waived by the defendant and the alternate is consistent with present practice.

(5) **Disqualification of Judge.** Provision for the disqualification of the judge is made in federal rule 42(b). The proposal is patterned after this rule.

Favorable comments concerning disqualification of judges in appropriate cases may be found in opinions of the Supreme Court of Florida. See *Pennekamp v. State*, 156 Fla. 227, 22 So.2d 875 (1945), and concurring opinion in *State ex rel Huie v. Lewis*, supra.

(6) **Verdict; Judgment.** "Judgment" is deemed preferable to the term "order," since the proper procedure involves an adjudication of guilty. The use of "judgment" is consistent with present Florida practice. E.g., Dinnen v. State, 168 So.2d 703 (Fla. 2d DCA 1964); State ex rel. Byrd v. Anderson, 168 So.2d 554 (Fla. 1st DCA 1964).

The recital in the judgment of facts constituting the contempt serves to preserve for postconviction purposes a composite record of the offense by the person best qualified to make such recital: the judge. See *Ryals v. United States*, 69 F.2d 946 (5th Cir. 1934), in which such procedure is referred to as "good practice."

(7) **Sentence; Indirect Contempt.** The substance of this subdivision is found in present sections 921.05(2), 921.07 and 921.13, Florida Statutes. While these sections are concerned with sentences in criminal cases, the First District Court of Appeal in 1964 held that unless a defendant convicted of criminal contempt is paid the same deference the defendant is not being accorded due process of law as provided in section 12 of the Declaration of Rights of the Florida Constitution and the Fourteenth Amendment of the Constitution of the United States. *Neering v. State*, 164 So.2d 29 (Fla. 1st DCA 1964).

Statement concerning the effect the adoption of this proposed rule will have on contempt statutes:

This rule is not concerned with the source of the power of courts to punish for contempt. It is concerned with desirable procedure to be employed in the implementation of such power. Consequently, its adoption will in no way affect the Florida statutes purporting to be legislative grants of authority to the courts to punish for contempt, viz., sections 38.22 (dealing with "all" courts), 932.03 (dealing with courts having original jurisdiction in criminal cases), and 39.13 (dealing with juvenile courts). This is true regardless of whether the source of power is considered to lie exclusively with the courts as an inherent power or is subject, at least in part, to legislative grant.

The adoption of the rule also will leave unaffected the numerous Florida statutes concerned with various situations considered by the legislature to be punishable as contempt (e.g., section 38.23, Florida Statutes), since these statutes deal with substantive rather than procedural law.

Section 38.22, Florida Statutes, as discussed in the preceding notes, is concerned with procedure in that it requires the court to hear and determine all questions of law or fact. Insofar, therefore, as criminal contempts are concerned the adoption of the alternate proposal providing for a jury trial will mean that the rule supersedes this aspect of the statute and the statute should be amended accordingly.

**1972 Amendment.** Same as prior rule.

**(b)    Custody Pending Appeal of Order Granting.** Pending review of a decision discharging a prisoner on habeas corpus, the prisoner shall be discharged on bail, with sureties to be approved as other bail bonds are approved for the prisoner's appearance to answer and abide by the judgment of the appellate court.

### Committee Notes

**1968 Adoption.** Same as section 922.03, Florida Statutes.

**1972 Amendment.** Same as prior rule, but some terminology has been changed.

## XVI. CRIMINAL CONTEMPT

### RULE 3.830.               DIRECT CRIMINAL CONTEMPT

A criminal contempt may be punished summarily if the court saw or heard the conduct constituting the contempt committed in the actual presence of the court. The judgment of guilt of contempt shall include a recital of those facts on which the adjudication of guilt is based. Prior to the adjudication of guilt the judge shall inform the defendant of the accusation against the defendant and inquire as to whether the defendant has any cause to show why he or she should not be adjudged guilty of contempt by the court and sentenced therefor. The defendant shall be given the opportunity to present evidence of excusing or mitigating circumstances. The judgment shall be signed by the judge and entered of record. Sentence shall be pronounced in open court.

### Committee Notes

**1968 Adoption.** This proposal is consistent with present Florida practice in authorizing summary proceedings in direct criminal contempt cases. See *Ballengee v. State*, 144 So.2d 68 (Fla. 2d DCA 1962); *Baumgartner v. Joughin*, 105 Fla. 334, 141 So. 185 (1932); also see *State v. Lehman*, 100 Fla. 481, 129 So. 818 (1930), holding that the defendant is not entitled to notice of the accusation or a motion for attachment. Fairness dictates that the defendant be allowed to present excusing or mitigating evidence even in direct criminal contempt cases.

Much of the terminology of the proposal is patterned after Federal Rule of Criminal Procedure 42(a) with variations for purposes of clarity. What may be considered a significant change from the terminology of the federal rule is that the proposal provides for a "judgment" of contempt, whereas the term "order" of contempt is used in the federal rule. Both terms have been used in Florida appellate cases. The term "judgment" is preferred here since it is consistent with the procedure of adjudicating guilt and is more easily reconciled with a "conviction" of contempt, common terminology on the trial and appellate levels in Florida. It also is consistent with appeals in contempt cases. See, e.g., *State ex rel. Shotkin v. Buchanan*, 149 So.2d 574, 98 A.L.R.2d 683 (Fla. 3d DCA 1963), for the use of the term "judgment".

**1972 Amendment.** Same as prior rule.